1   Jeffrey L. Bornstein (State Bar No. 99358)
    Luke G. Anderson (State Bar No. 210699)
2   KIRKPATRICK & LOCKHART
    PRESTON GATES ELLIS LLP
3   55 Second Street, 17th Floor
    San Francisco, CA 94105
4   Telephone: (415) 882-8200
    Facsimile: (415) 882-8220
5
    Barry M. Hartman, *Admitted Pro Hac Vice* (DC Bar No. 291617)
6   Christopher R. Tate, *Pro Hac Vice pending* (PA Bar No. 205510)
    KIRKPATRICK & LOCKHART
7   PRESTON GATES ELLIS LLP
    1601 K Street, N.W.
8   Washington, D.C. 20006
    Telephone: (202) 778-9000
9   Facsimile: (202) 778-9100

10  Attorneys for Defendant
    JOHN J. COTA

11                  UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14

15  UNITED STATES OF AMERICA,        Case No.  CR 08-0160 SI

16                    Plaintiff,     **DEFENDANT JOHN J. COTA'S**
                                     **MEMORANDUM OF POINTS AND**
17        v.                         **AUTHORITIES IN SUPPORT OF**
                                     **MOTION TO DISMISS FALSE**
18                                   **STATEMENT CHARGES**
    JOHN J. COTA,
19                                   
                      Defendant.     Date:     July 18, 2008
20                                   Time:     11:00 a.m.
                                     Judge:    Honorable Susan Illston
21
                                     Speedy Trial Act; Excludable Time Through
22                                   Disposition, 18 U.S.C. § 3161 (h)(1)(F)

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS. ....................................................................................3

   A.   Procedural History. ..........................................................................................3

   B.   The Regulation of Pilot Licensing. ..................................................................4

      1.   California Has Enacted Comprehensive Regulations Regarding Pilot Licensing and
           Physical Examinations. ................................................................................4

      2.   Licensing Regulations Under Federal Law. .................................................5

      3.   The Coast Guard Has Long Recognized California's Regulatory Control Over San
           Francisco Bar Pilots. ...................................................................................6

      4.   The Coast Guard Changed Its Regulations Regarding Physical Examinations For Pilots
           Effective April 11, 2007. .............................................................................6

   C.   Captain Cota Complied With The State-Required Physical Examination Program. ...............8

      1.   The January 2006 Examination. ....................................................................8

      2.   The January 2007 Examination. ....................................................................9

      3.   In Response To The Change In The Coast Guard Regulations Captain Cota Submitted A
           Copy Of His 2007 Form. ............................................................................10

III.    ARGUMENT...........................................................................................................11

   A.   Rule 12(b) Is the Appropriate Mechanism for Dismissing Inadequately Pled   Claims. .......11

   B.   The Government's False Statement Claims Are Legally Deficient. ..........................12

      1.   The Alleged False "Statements" Were Not Made Within the Jurisdiction of a Federal
           Agency...........................................................................................................12

      2.   The Ex Post Facto Clause Bars This Prosecution...........................................15

      3.   The Alleged False "Statements" Were Not Material.......................................16

      4.   The Due Process Clause Requires Dismissal of the False Statement Counts Because
           They  Are Based on Inquiries that the United States Itself  has Concluded Are
           Hopelessly Ambiguous and Flawed. .............................................................17

IV.     CONCLUSION. ......................................................................................................20

i

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*Calder v. Bull*, 3 U.S. 386, 390 (1798).................................................................15

*Collins v. Youngblood*, 497 U.S. 37, 42 (1990)......................................................15

*United States v. Atalig*, 502 F.3d 1063, 1067 (9th Cir. 2007).................................12

*United States v. Cogswell*, 637 F.Supp.295, 296 (N.D.Cal. 1985)...........................12

*United States v. DeLaurentis*, 230 F.3d 659, 660-61 (3rd Cir. 2001) ......................11

*United States v. Facchini*, 874 F.2d 638, 641 (9th Cir. 1989)...................12, 14, 16

*United States v. Fitzgerald*, 882 F.2d 397, 399 (9th Cir. 1989) ...............................11

*United States v. Manapat*, 928 F.2d 1097, 1101 (11th Cir. 1991) .................17, 19, 22

*United States v. Martin*, 783 F.2d 1449 (9th Cir. 1986).......................................11

*United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005)...................................11

*United States v. Sampson*, 371 U.S. 75 (1962)......................................................11

## Federal Statutes

Title 18, United States Code, Section 1001............................................................1, passim

## Federal Rules

Federal Rule of Criminal Procedure 12(b) ..............................................................11

## Federal Regulations

46 C.F.R. § 10.205(d)..............................................................................................5, 13

46 C.F.R. § 10.709...................................................................................................5

## California Regulations

California Code of Regulations, Title 7, Division 2, Section 202................................4

California Code of Regulations, Title 7, Division 2, Section 217(a)(1)(2) ....................5

California Code of Regulations, Title 7, Division 2, Section 217(b)(3) .........................4

California Code of Regulations, Title 7, Division 2, Section 217(d)(e)02......................5

California Code of Regulations, Title 7, Division 2, Section 217(e) .............................5

DEFT COTA'S MEMO OF P&As IN SUPP OF MOTION TO DISMISS FALSE STATEMENT CHARGES
CR 08-0160 SI

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION.

Captain John Cota moves to dismiss Counts One and Two of the Superseding Indictment charging him with knowingly and willfully making materially false statements in a matter within the jurisdiction of a federal department or agency in violation of Title 18 United States Code Section 1001. Although not clearly stated, each count is premised on the fact that Captain Cota was required to obtain an annual physical under rules and regulations established by the State Board of Pilot Commissioners (the "State Board") and in so doing, was required to see a doctor certified by the State Board for this purpose. For convenience, the State Board used a Coast Guard approved Form, "Coast Guard Form CG 719K – Merchant Mariner Physical Examination Report" ("Form 719K"). That form, which was filled out by the State's examining doctor has a place for the doctor to report all "current medications, the dosage, side effects and medical conditions."

The basic thrust of the government's case is that Captain Cota failed to provide adequate information to the State Board's doctor during physical examinations in 2006 and 2007 and in so doing, acted knowingly and willfully with the intent to conceal material information from the doctor. Thus, even though Captain Cota is not a doctor, and he did not fill out the forms himself, but because he "certified that all of the information he provided was complete and true to the best of his knowledge …," he is being charged with felonies for allegedly making false statements based on what the examining physician deemed to be important enough to record on the forms.[1] At most, the Superseding Indictment can be read to say that on January 18, 2006 (22 months before the accident)

---

[1] This is particularly important because the same examining physician conducted most of Captain Cota's annual physical examinations over the past several years. The examinations focused primarily on vision, hearing and routine blood and urine tests. The State Board's doctor kept no chart. In addition, despite being told that Captain Cota was taking additional medications and had additional medical conditions in 2007 than he had in 2006, the doctor made no effort to conduct any research, review any medical records or contact Captain Cota's treating physicians. Further, based on what the examining physician said during a post-incident interview – assuming his recollection is accurate and that what he said was accurately reported – there were material matters discussed between him and Captain Cota not reflected on the forms he completed. This includes his claim, not recorded on any document except the government's after-the-fact interview report, that he warned Captain Cota not to use certain medications while working. There is no evidence that Captain Cota actually used any of these medications while working on November 7, 2007 except for Provigil, Alphagan and Synthroid, the latter medication having been prescribed after his January 2007 physical.

1

1   and on January 19, 2007 (ten months before the accident) Captain Cota said something (or did not

2   say something), presumably to Dr. Calza, about "current medications, the dosage, side effects and

3   medical conditions" that Captain Cota allegedly knew was not complete and true to the best of his

4   knowledge, and that whatever it is Captain Cota said or did not say was a matter within the

5   jurisdiction of the United States.

6          For the reasons set forth in detail below, these counts are deficient and should be dismissed

7   without leave to amend.  First, this was not a matter within the jurisdiction of the United States, but

8   was rather a matter within the jurisdiction of the State Board of Pilot Commissioners.  Captain

9   Cota's entire interaction with Dr. Calza occurred in the context of the State's licensing proceeding --

10  not the federal one.  Second, even assuming, arguendo, that the change in federal regulations

11  effective April 2007 requiring submission of an annual physical examination to the Coast Guard can

12  be used to establish jurisdiction prospectively, it cannot be used to reach back to either examination

13  in this case since the alleged false statements, if any, predate the effective date of the new

14  requirements and using them in this manner would violate the *Ex Post Facto* Clause.  Third, there

15  were no material false statements made during the examinations under the circumstances then

16  appreciated by Captain Cota, by the pilot community and by the examining doctor about the scope of

17  the examination to be conducted and the required record to be made.  Fourth, the manner in which

18  the form was completed by the examining doctor and the examination process itself are sufficiently

19  ambiguous such that using these examinations as the basis for a false statement case violates due

20  process, a problem exacerbated by the fact there is no notice on the form nor otherwise provided

21  during the medical examination process that one could be prosecuted under Section 1001 for what

22  was disclosed or not disclosed during the exam.  In this regard, the Coast Guard is still not even clear

23  today on the scope of what needs to be disclosed during the examination.

24          Accordingly, the Court should dismiss Counts One and Two of the Superseding Indictment

25  without leave to amend.

26

27

28

**DEFT COTA'S MEMO OF P&As IN SUPP OF MOTION TO DISMISS FALSE STATEMENT CHARGES**
**CR 08-0160 SI**

1    ## II.    STATEMENT OF FACTS.

2    ### A.    Procedural History.

3    On the morning of November 7, 2007, the container vessel M/V COSCO BUSAN ("COSCO

4    BUSAN") scraped the San Francisco Bay Bridge fendering system, damaging the ship's hull and

5    bunker fuel tank, thereby resulting in the fuel tank in the vessel to spill oil into the San Francisco

6    Bay. During the incident, Captain John Cota was onboard the COSCO BUSAN as an advisory pilot.

7    Exhibit A (March 28, 2008 Report of Investigation).[2]

8    On March 17, 2008, the United States Attorney's office formally charged Captain Cota with

9    one count of negligence under the Clean Water Act and one count of violating the Migratory Bird

10    Treaty Act. On April 22, 2008, the Grand Jury returned a Superseding Indictment re-alleging the

11    two misdemeanor counts and adding two felony counts for making false statements to a federal

12    agency under P. The felony false statement charges allegedly arise out of the medical examinations

13    of Captain Cota conducted by Dr. Charles Calza on behalf of the State Board of Pilot Examiners in

14    January 2006 and January 2007.[3] Importantly, there is no allegation that any false statement or

15    omission had anything to do with the accident on November 7, 2007.[4]

16

17

18

19

20    ----

[2] Exhibit A, as well as Exhibits H, J, K, M, and O are filed under seal because they contain Captain

21    Cota's personal, private medical and identification information. Declaration of Jeffrey L. Bornstein
in Support of Application to File Documents Under Seal ("Bornstein Decl.") ¶ 2-4.

22

[3] Captain Cota has been a licensed pilot and a member of the San Francisco Bar Pilot's Association

23    for over 26 years. As a member of the San Francisco Bar Pilot's Association, Captain Cota is
required to pass an annual physical administered by a doctor selected by the State Board. In

24    addition, every five years, Captain Cota is required to renew his federal pilot license by filling out a
license renewal form, signed under penalty of perjury, and submitting that form to the United States

25    Coast Guard. Captain Cota last renewed his federal license in January 2005. The examinations in

26    question therefore were not connected to the federal license renewal process.

27    [4] Captain Cota has successfully piloted approximately 4,000 vessels in the waters of the San
Francisco Bay during his tenure as a Bar Pilot.

28

3

**DEFT COTA'S MEMO OF P&As IN SUPP OF MOTION TO DISMISS FALSE STATEMENT CHARGES**
**CR 08-0160 SI**

1

**B.    The Regulation of Pilot Licensing**.

2

       **1.    California Has Enacted Comprehensive Regulations Regarding Pilot Licensing and Physical Examinations.**

3

4    The State of California has enacted a comprehensive and detailed set of regulations

5    governing the ports and harbors of San Francisco Bay.  These regulations are set forth in the

6    California Code of Regulations, Title 7 ("Harbors and Navigation"), Division 2 ("State Board of

7    Pilot Commissioners for the Bays of San Francisco, San Pablo and Suisun") – hereafter referred to

8    as the "State Regulations."  Exhibit B (Relevant Portions of C.C.R., Title 7, Div. 2).  The territory

9    covered by these regulations is defined as the waters of "the Bays of San Francisco, San Pablo and

10    Suisun" and "of the tributaries, ports and harbors of those bays, and includes the water areas from

11    the south end of San Francisco Bay and from the Ports of Sacramento and Stockton to the Golden

12    Gate Bridge."  State Regulations, § 202.

13    The State Regulations established the State Board, which governs the San Francisco Bar

14    Pilot's Association -- a group of approximately 60 pilots authorized to pilot large vessels into and

15    out of San Francisco Bay.  The State Regulations provide comprehensive requirements for pilot

16    licensing for all San Francisco Bar Pilots.  For example, Section 217(b)(3) of the State Regulations

17    requires that pilots of a certain age (including Captain Cota) submit to an annual medical

18    examination.  Furthermore, under the State Regulations, the State Board (i) designates which State-

19    licensed physicians may perform the examinations (the State Board shall "maintain a list of

20    physicians, licensed by the State of California, who have agreed to perform the examinations

21    required by these regulations") and (ii) pays for the examinations ("the cost of any medical

22    examination required by these regulations shall be borne exclusively by the Board").  Section

23    217(a)(1)(2) (emphasis added).  Up until approximately May 2008, the State Board had designated

24    Dr. Charles Calza as one of the qualified examining physicians who could complete the annual

25    physical required by the State Board.  The Board, as a matter of convenience, used Form 719K for

26    this purpose.

27

28

1    The State Regulations further provide the State Board with the authority, based on the results

2    of a pilot's medical examination, to suspend or revoke a pilot's license and/or place a pilot on

3    medical leave if the pilot is found not fit for duty. State Regulations, § 217(d)(e). Pilots, in turn,

4    have the right to appeal any such disciplinary action by the State Board. The State Regulations

5    provide a detailed appeals process in which the pilot's case is reviewed by a panel of physicians

6    selected by both the pilot and the State Board. State Regulations, § 217(e). The State Board is given

7    ultimate authority to rule on whether the pilot is or is not fit for duty. State Regulations, §

8    217(e)(9).[5]

9            **2.    Licensing Regulations Under Federal Law.**

10    California's detailed, comprehensive licensing regulations for San Francisco Bar Pilots stand

11    in stark contrast to the limited federal regulation addressing pilot licensing. 46 C.F.R. § 10.709

12    provides that every person "holding a license or endorsement as a first class pilot shall have a

13    thorough physical examination each year." The regulation, however, does not require that pilots

14    provide any examination results to the Coast Guard unless specifically requested to do so: "the

15    record of examination <u>need not be submitted to the Coast Guard</u>" (emphasis added). The federal

16    regulation also does not provide any guidance or requirements regarding which physicians may

17    perform the examinations, stating simply that pilots "must be examined by a licensed physician or

18    physician's assistant." 46 C.F.R. § 10.205(d). Finally, the federal regulation does not require the

19    use of any particular form during the examination, stating only that the physician or physician's

20    assistant must complete a "Coast Guard physical examination form, <u>or its equivalent</u>" (emphasis

21    added). <u>Id.</u> Thus, while the federal regulation would seem to allow a pilot to be examined by his

22    treating physician, the superseding state regulations do not, unless that physician is on the state's list.

---

27    [5]  In this regard, as a result of the COSCO BUSAN incident, Captain Cota has been suspended by
     the State Board and is subject to further disciplinary actions to include the revocation of his state
28    pilot license. <u>Exhibit C</u> (State Board Release).

**DEFT COTA'S MEMO OF P&As IN SUPP OF MOTION TO DISMISS FALSE STATEMENT CHARGES
CR 08-0160 SI**

**3.    The Coast Guard Has Long Recognized California's Regulatory Control Over San Francisco Bar Pilots.**

The Coast Guard has formally acknowledged California's regulatory control of San Francisco Bar Pilots. In its October 1, 2005 "Memorandum of Agreement on Oil Pollution Prevention and Responses between The Commander, Eleventh Coast Guard District and The State of California" (the "MOA"), the Coast Guard recognized that foreign vessels – such as the COSCO BUSAN – are controlled virtually exclusively by State pilotage requirements. Exhibit D (Memorandum of Agreement, page 147). The Coast Guard explained that "[i]n the absence of State pilotage requirements, the Federal government may impose pilotage requirements on those vessels" (emphasis added). The inverse, of course, is that in the presence of State pilotage requirements, the Coast Guard believed that the Federal government may not impose its own pilotage requirements.

Of critical importance to this Motion, the Coast Guard and the State of California then agreed in the MOA to "enter into a memorandum of agreement with California's port and harbor authorities for the purpose of creating a state pilotage system; except for the port and harbor authorities falling under pilotage jurisdiction of the Board of Pilot Commissioners for San Francisco, San Pablo and Suisun Bays, where the Coast Guard recognizes the State regulation of pilotage" (emphasis added). Exhibit D (Memorandum of Agreement, page 147). Accordingly, the Coast Guard recognized that, unlike other California ports and harbors, the San Francisco Bay is already subject to comprehensive State regulations which provide the State with primary and, for all intents and purposes, exclusive pilotage jurisdiction.

**4.    The Coast Guard Changed Its Regulations Regarding Physical Examinations For Pilots Effective April 11, 2007.**

Following a passenger ferry accident at Staten Island, New York in 2003, the Coast Guard's physical examination program came under scrutiny. On March 18, 2005, the National Transportation Safety Board (NTSB) issued a Safety Recommendation to the Coast Guard outlining significant weaknesses and defects in the Coast Guard's program, including that:

6

1    (i) although Coast Guard regulations require pilots to undergo an annual physical, "the Coast

2    Guard does not provide guidance on the acceptable methods of meeting the requirements," nor does

3    it "require pilots to report the results of their annual medical appraisal to either the Coast Guard or

4    their employer"; and

5    (ii) the Coast Guard does not "require mariners to report changes in medical condition

6    between examinations" and therefore "has no formal mechanism for being informed about a mariner

7    who has a disqualifying physical condition." Exhibit E (NTSB March 18, 2005 Safety

8    Recommendation).

9    In addition, in its Marine Accident Report regarding the Staten Island accident, the NTSB

10    acknowledged that the Coast Guard physical examination form -- Coast Guard Form 719K -- "does

11    not apply to the annual pilot medical evaluations, and the regulations and other published material do

12    not provide additional information on the medical evaluation or the documentation necessary after

13    the evaluation is completed." Rather, pilots and their examiners may use forms other than Form

14    719K and are under no obligation to provide such forms to the Coast Guard. Exhibit F (NTSB

15    October 15, 2003 Marine Accident Report) (emphasis added).[6]

16    In response to the NTSB's criticisms, the Coast Guard issued a Notice in the September 28,

17    2006 Federal Register stating for the first time that: "… the Coast Guard is exercising its authority

18    currently set forth in the Coast Guard regulations to require all first class pilots…to provide a copy

19    of their annual physical to the Coast Guard." The Notice further explained that the "Coast Guard

20    agrees with the NTSB that it is not effective to require pilots to undergo annual physical

21    examinations without an affirmative obligation for pilots to actually submit them to the Coast Guard

22    for review." On December 12, 2006, the Coast Guard issued another Notice in the Federal Register

23    "extending the deadline for pilots to submit a copy of their most recent physical examinations until

24    April 11, 2007," which was also confirmed in a December 18, 2006 letter from the Coast Guard to

25    the American Pilots' Association. Exhibit G (Federal Register, September 28, 2006 and December

26    12, 2006 and December 18, 2006 Coast Guard letter). Thus, until four months after the last alleged

27

28    [6] Due to the length of this document, only relevant portions are included here. The entire report may be accessed at www.ntsb.gov/publictn/2005/MAR0501.htm.

7

1   false statement was made, the Coast Guard did not require, ask for, or expect any Form 719K to be

2   submitted to it. Furthermore, in neither Federal Register notice did the Coast Guard address or in

3   any way alter its MOA with the State of California in which it recognized State pilotage jurisdiction

4   over the San Francisco Bay.

       **C.**    **Captain Cota Complied With The State-Required Physical Examination Program.**

       **1.**     **The January 2006 Examination.**

8       In compliance with the State Regulations' requirement that San Francisco Bay pilots obtain

9   annual physical examinations, Captain Cota visited Dr. Charles Calza, who was on the State Board's

10   approved doctor list, in January 2006. <u>Exhibit A</u> (March 28, 2008 Report of Investigation). Captain

11   Cota had previously visited Dr. Calza for his annual state license physical evaluations in 2003 and

12   2004. <u>Id.</u> Dr. Calza was not Captain Cota's regular physician.

13       Apparently, the only records of Dr. Calza's interaction with Captain Cota are part of the

14   Form 719K that Dr. Calza uses during examinations. For the exam on January 16, 2006, the entire

15   form is in Dr. Calza's handwriting with the sole exception of Captain Cota's signature at the bottom

16   of the two-page document. <u>Exhibit H</u> (Form 719K Dated January 18, 2006).[7] Above the signature

17   line for Captain Cota is the following sentence:

18        "I certify that all information provided by me is complete and true to the best of my knowledge."

20       Nothing on the form specifically indicates that Captain Cota is responsible for the accuracy

21   of any of the information Dr. Calza placed on the form. There is a Privacy Act warning admonition

22   on the form but no warning that Captain Cota's responses to Dr. Calza's inquiries were subject to the

23   sanctions of 18 U.S.C. 1001 or were otherwise given under penalty of perjury. The same can be said

24   about the lack of warnings to the physician filling out the form. Nowhere does the form require that

25   Dr. Calza certify that the information he placed on the form is accurate and complete or that criminal

26   prosecution could be initiated for a material false statement.

28   [7]   <u>Exhibit H</u> is filed under seal. See Bornstein Decl. ¶ 2-4.

**DEFT COTA'S MEMO OF P&As IN SUPP OF MOTION TO DISMISS FALSE STATEMENT CHARGES CR 08-0160 SI**

1      There is, however, evidence that Dr. Calza's notes on Form 719K did not fully or accurately

2  reflect information that he and Captain Cota discussed. For example, Dr. Calza indicated that

3  Captain Cota had glaucoma. Exhibit H, page 4. Form 719K required that test results be provided,

4  yet as far as we know, none were. Similarly, Dr. Calza reported that Captain Cota was taking at

5  least two medications, one of which he listed as being for depression. Although Dr. Calza claims to

6  have discussed the side effects of these medications with Captain Cota, cautioning "Captain Cota

7  about not taking pain medication or mood altering medications while on duty as a pilot," Dr. Calza

8  omitted listing the side effects of these medications or any of the "warnings" he allegedly provided

9  to Captain Cota. Exhibit A (March 28, 2008 Report of Investigation) and Exhibit H (Form 719K

10  Dated January 18, 2006).

11      Dr. Calza signed Form 719K, certifying that in his opinion Captain Cota was fit for duty. He

12  also filled out a separate form, titled "Report of Medical Evaluation to the State Board of Pilot

13  Commissioners," again finding that Captain Cota was "fit for duty" and apparently mailed it to the

14  Board of Pilot Commissioners. Exhibit I (1/18/06 Report of Medical Evaluation). In so doing, Dr.

15  Calza indicated that he had reviewed Captain Cota's medical "history, physical examinations,

16  laboratory results and special studies" and concluded that Captain Cota was fit for duty.

17  Importantly, Dr. Calza had the opportunity, and one would argue duty, to ask for any additional

18  information he needed to complete his examination, including confirming and/or gathering

19  additional information from Captain Cota's treating physicians, but he decided not to do so.

20          **2.    The January 2007 Examination.**

21      In January 2007, Captain Cota visited Dr. Calza for his annual physical examination. Once

22  again it was Dr. Calza – and not Captain Cota – who filled out an identical Form 719K, as reflected

23  by the handwriting on the form. Exhibit J (Form 719K Dated January 19, 2007).[8]  On page three of

24  the form Dr. Calza listed eight medications that Captain Cota was taking, including Provigil, pain

25  medications and a drug classified as an anti-depressant/anti-anxiety medication.[9]  Dr. Calza did not

26

---

27  [8]  Exhibit J is filed under seal. See Bornstein Decl. ¶ 2-4.

28  [9]  The evidence will show that within the six weeks prior to the examination Captain Cota also filled
    prescriptions for a codeine-based pain medication and two medications (at least one of which was

9

**DEFT COTA'S MEMO OF P&As IN SUPP OF MOTION TO DISMISS FALSE STATEMENT CHARGES
CR 08-0160 SI**

1  list side effects for any of these medications.  On page four, Dr. Calza listed a number of medical

2  conditions that he had learned from talking with Captain Cota, including that he was being treated

3  for sleep apnea.  As in 2006, Dr. Calza failed to review any of Captain Cota's medical records or to

4  obtain any additional information from Captain Cota's physicians.  Aside from what he scribbled on

5  the Form 719K, Dr. Calza maintained no physician notes or records of his interaction with Captain

6  Cota.

7       Captain Cota signed the last page of this multi-page document, indicating that the

8  information he provided to Dr. Calza was complete and true to the best of his knowledge.  Dr. Calza

9  signed the form indicating just below the extensive list of conditions on page 4, that Captain Cota

10  was competent as a pilot.  Several days later, Dr. Calza again filled out a separate form, titled

11  "Report of Medical Evaluation to the State Board of Pilot Commissioners," finding that Captain

12  Cota was "fit for duty."  Exhibit L (1/19/07 Report of Medical Evaluation).

13       In his interview with the government, Dr. Calza again insisted that during the 2007 exam he

14  warned Captain Cota not to take the "PROVIGIL, sleeping pills or pain medications while on duty

15  as a pilot".  There is no other record of this alleged warning aside from the government's after the

16  fact interview report.[10]

### 3.  In Response To The Change In The Coast Guard Regulations, Captain Cota Submitted A Copy Of His 2007 Form.

19       In light of the Coast Guard's new policy as announced in the Federal Register (see page 9,

20  *supra*), Captain Cota forwarded a copy of the Form 719K filled out by Dr. Calza to the Coast

21  Guard.[11]  The Coast Guard did not review the form until sometime in late November or early

---

23  an off-label prescription for a mild anti-depressant).  Exhibit K (Prescription Chart), filed under seal.  Bornstein Decl., ¶ 2-4.  Importantly, these medications are in the same family and/or class as those that were listed on Form 719K.

25  [10] It strains credulity for Dr. Calza to claim that he warned Captain Cota not to take Provigil.  Had Dr. Calza said what he now claims to have said, it would have surely led to some discussion because the Provigil had been prescribed by a physician specialist to be used on a daily basis.  Exhibit M (Provigil Prescription), filed under seal.

27  [11] Because he believes it was in the same envelope, Captain Cota may have also inadvertently submitted a copy of the 2006 form.

DEFT COTA'S MEMO OF P&As IN SUPP OF MOTION TO DISMISS FALSE STATEMENT CHARGES
CR 08-0160 SI

1  December 2007.  Based on the medical conditions and prescription medications that were disclosed,

2  the Coast Guard determined that Captain Cota was medically unfit to hold a federal license.  Exhibit

3  N (12/7/07 Letter from Captain J.E. Long).[12]  Captain Cota's treating doctor is prepared to certify

4  that Provigil is the appropriate treatment for Captain Cota's sleep condition, and that he has been

5  taking the drug since January 2006 and has suffered no side effects.  Exhibit O (6/2/08 Letter from

6  his physician), filed under seal.

7  **III.    ARGUMENT.**

8  **A.    Rule 12(b) Is the Appropriate Mechanism for Dismissing Inadequately Pled**
   **Claims.**

9

10  Federal Rule of Criminal Procedure 12(b) provides: "Any defense, objection, or request

11  which is capable of determination without a trial of the general issue may be raised before trial by

12  motion." Fed. R. Crim. P. 12(b).  A Superseding Indictment must contain a "plain, concise and

13  definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P.

14  7(c)(1).  A Superseding Indictment also "must set forth the elements of the offense charged and

15  contain a statement of the facts and circumstances that will inform the accused of the elements of the

16  specific offense." *United States v. Fitzgerald*, 882 F.2d 397, 399 (9th Cir. 1989)[citing *United States*

17  *v. Martin*, 783 F.2d 1449, 1452 (9th Cir. 1986)].  Under Rule 12(b)(2), a court is authorized to

18  dismiss "a Superseding Indictment if its allegations do not suffice to charge an offense," but not if it

19  merely fails to contain sufficient evidence "to prove the Superseding Indictment's charges." *United*

20  *States v. DeLaurentis*, 230 F.3d 659, 660-61 (3rd Cir. 2001) (reversing dismissal where Superseding

21  Indictment "substantially track[ed] the language of the statute") [citing *United States v. Sampson*,

22  371 U.S. 75, 78-79.83 S. Ct. 173,9 L. Ed. 2d 136 (1962)].  "[I]f properly challenged prior to trial, an

23  Superseding Indictment's complete failure to recite an essential element of the charged offense is not

24  a minor or technical flaw subject to harmless error analysis, but a fatal flaw requiring dismissal of

25  the Superseding Indictment." *United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005).

26

27  [12] The Coast Guard has been criticized for not reviewing the form sooner.  The agency obviously
disagrees with Dr. Calza's determination that Captain Cota was fit for duty.  While not in the

28  letter, the Coast Guard later advised that its decision was based on the disclosed sleep apnea and
use of Provigil.

11

**DEFT COTA'S MEMO OF P&As IN SUPP OF MOTION TO DISMISS FALSE STATEMENT CHARGES**
**CR 08-0160 SI**

1  Furthermore, the district court must dismiss a Superseding Indictment prior to trial if it fails to allege

2  facts that constitute a prosecutable offense. *United States v. Cogswell*, 637 F.Supp.295, 296

3  (N.D.Cal. 1985).

4  **B.    The Government's False Statement Claims Are Legally Deficient.**

5      18 U.S.C. § 1001 provides in pertinent part: "Whoever, in any matter within the jurisdiction

6  of the executive, legislative or judiciary branch of the government of the United States knowingly

7  and willfully...makes any materially false, fictitious or fraudulent statement or representation" shall

8  be subject to specified fines and/or imprisonment. Thus, "a conviction under Section 1001 requires

9  at a minimum that the government prove (1) a statement, (2) falsity, (3) materiality, (4) knowledge,

10 and (5) jurisdiction." *United States v. Atalig*, 502 F.3d 1063, 1067 (9th Cir. 2007). Importantly,

11 "[t]here can be no valid conviction under section 1001 unless both jurisdiction and materiality are

12 shown." *United States v. Facchini*, 874 F.2d 638, 641 (9th Cir. 1989). The initial determination of

13 whether there is jurisdiction is to be made by the Court. Ninth Circuit Manual of Model Jury

14 Instructions (2003), Criminal 8.66.

15        **1.    The Alleged False "Statements" Were Not Made Within the Jurisdiction
          of a Federal Agency.**
16

17     In order to satisfy Section 1001's jurisdiction requirement, the false statement must concern

18 the "authorized functions of an agency or department rather than matters peripheral to the business

19 of that body." *Facchini*, 874 F.2d 638, 642 (9th Cir. 1989). Importantly, "[m]ere access to

20 information is not enough to establish jurisdiction. Instead, the information received must be

21 directly related to an authorized function of the federal agency. Otherwise, the scope of Section

22 1001 jurisdiction would be virtually limitless." *Id.*

23     In the present case, Captain Cota is alleged to have made false statements in connection with

24 his January 18, 2006 and January 19, 2007 State Board ordered physical examinations with Dr.

25 Calza. As a matter of law, Captain Cota's communications with Dr. Calza during his 2006 and 2007

26 physical examinations were not and could not have been "directly related to an authorized function"

27 of the Coast Guard, since at that time, the Coast Guard took the position that it had no jurisdiction

28

**DEFT COTA'S MEMO OF P&As IN SUPP OF MOTION TO DISMISS FALSE STATEMENT CHARGES
CR 08-0160 SI**

1  over such matters.  In the above-described MOA, the Coast Guard expressly acknowledged that (i) it

2  only regulates pilot licensing in the absence of state regulations, and (ii) the State Board has pilotage

3  jurisdiction over the San Francisco Bay pilots.  Exhibit D (Memorandum of Agreement).  It is

4  impossible for the government in this case to establish that the communications at issue directly

5  related to an authorized function of the Coast Guard when the Coast Guard had explicitly recognized

6  "pilotage jurisdiction of the Board of Pilot Commissioners" over San Francisco Bay.  On this basis

7  alone, dismissal is proper.

8         Moreover, Captain Cota visited Dr. Calza only because Dr. Calza was on the State Board's

9  approved list of doctors who met the physical examination requirements of Section 217 of the State

10  Regulations.  Indeed, even in the Coast Guard's own Report of Investigation regarding the COSCO

11  BUSAN accident, Dr. Calza is described as a general physician who "conducts physicals for the San

12  Francisco Bay Bar Pilots."  Exhibit A (March 28, 2008 Report of Investigation).  Furthermore, at the

13  end of each physical, Dr. Calza completed a State Board-issued form, titled "Report of Medical

14  Evaluation to the State Board of Pilot Commissioners," which found Captain Cota "Fit for Duty" –

15  demonstrating that the point of the medical evaluation was to satisfy State piloting requirements, not

16  federal ones.  Under these circumstances, the communications between Captain Cota and Dr. Calza

17  during the evaluations cannot be said to be a "federal matter" for purpose of Section 1001.

18         In addition, 46 C.F.R. § 10.205(d) itself states that the use of Form 719K is not required to

19  satisfy the Coast Guard's physical examination regulations.  The only reason the form was used in

20  this instance was because the State Board apparently included it as a convenience in the packet of

21  materials sent to pilots seeking to renew a state license.  Indeed, as acknowledged by the United

22  States itself, after conducting a comprehensive review of the use and purpose of the Form 719K:

23  "Form 719K does not apply to the annual pilot medical evaluation."  Exhibit F (NTSB October 15,

24  2003 Marine Accident Report).

25         Thus, Captain Cota's certification on the Form 719K is not really germane to the issue before

26  this Court.  The real question is whether Captain Cota failed to disclose material information,

27  knowingly and willfully, when he was examined by the State Board's doctor, and if so, was that in

28

13

1    the course of an examination conducted on behalf of a federal agency?  The answer is that the

2    interaction between Dr. Calza and Captain Cota is so attenuated from the Coast Guard and its

3    authority that it cannot be used as the basis for a false statement prosecution.

4         In *Facchini*, 874 F.2d 638, 642 (9th Cir. 1989), defendants were charged with making false

5    statements under 18 U.S.C. § 1001 based on claim forms they submitted to a state unemployment

6    agency.  The defendants fell into two groups: (i) those seeking unemployment payments from the

7    state treasury only, and (ii) those seeking funds under a federal program providing states with

8    additional unemployment compensation for those who had exhausted state eligibility.  *Id.* at 640.  On

9    appeal, the Court reversed the state court's conviction of those defendants who received state funds

10   only, finding no jurisdiction under Section 1001 because the false statements did not directly

11   concern an authorized function of the federal government.[13]  The Court reached this decision despite

12   the fact that: (i) the state unemployment program was established under the federal unemployment

13   compensation system, (ii) the federal government approved the state program, (iii) the federal

14   government monitored the state program and (iv) the federal government provided funds for the

15   administration of the state program and had the power to terminate such funding.  *Id.*

16        The facts here present a much stronger case against federal jurisdiction than *Facchini*.

17   Unlike the unemployment system in *Facchini,* the State Regulations governing San Francisco Bay

18   pilots did not originate under federal law, nor were they approved by the federal government.  In

19   addition, the federal government does not fund or pay for state licensing or the state-mandated

20   medical evaluations; to the contrary, the cost of medical examinations under the State Regulations is

21   "borne exclusively by the [State] Board."  See State Regulations, § 217(a)(2), above.  Not only does

22   the federal government <u>not</u> monitor and/or administer the State piloting program, it has expressly

23   ceded pilotage jurisdiction to the State Board.  See discussion pages 5-8, *supra.*

24

---

25   [13]  In finding jurisdiction over the other defendants – those who received the federal supplement
     benefits – the Court emphasized that (1) the federal supplemental benefits regulations expressly
26   provided that applicants were subject to prosecution under Section 1001, and (2) there was a direct
     relationship between the false statements and the federal government because the benefits were paid
27   out of federal funds.  Here, <u>neither</u> is true: first, Form 719K nowhere states that it is subject to
     Section 1001; and second, the State Regulations expressly provide that the State Board pays for the
28   medical examinations.  (See page 6, *supra*).

14

1    Based on the foregoing, the government lacks a sufficient jurisdictional basis to maintain its

2  claims that Captain Cota violated 18 U.S.C. § 1001.

3          **2.    The Ex Post Facto Clause Bars This Prosecution.**

4          The government may nonetheless argue that the Coast Guard asserted jurisdiction over

5  medical evaluations for pilots when it issued instructions in the September 28, 2006 and December

6  12, 2006 Federal Register requiring pilots to submit annual medical results to the Coast Guard –

7  effective April 11, 2007. Applying this regulatory change retroactively in an attempt to establish

8  jurisdiction over the January 2006 and January 2007 examinations would violate the *Ex Post Facto*

9  clause of the U.S. Constitution. Article 1, Section 9 of the U.S. Constitution provides that "No bill

10  of attainder or *Ex Post Facto* Law shall be passed." The clause prohibits any law which (i) punishes

11  as a crime an act previously committed, which was innocent when done, (ii) makes more

12  burdensome the punishment for a crime, after its commission, (iii) deprives one charged with a

13  crime of any defense available according to law at the time the act was committed, and (iv)

14  aggravates a crime, or makes it greater than it was, when committed." *Collins v. Youngblood*, 497

15  U.S. 37, 42 (1990); *Calder v. Bull*, 3 U.S. 386, 390 (1798).

16          Here, any attempt by the government to support its felony false statement allegations by

17  applying the Coast Guard's new regulation retroactively would violate categories (i), (ii) and (iv)

18  above. First, there is no question that the January 2006 examination predates both the *enactment* of

19  the new regulation and its effective date. The Coast Guard's new instructions required the

20  submission of only the "most recent" physical exam results by April 11, 2007, which in this case

21  would have been Captain Cota's January 2007 exam results, not those from 2006. The government

22  is therefore wholly barred from using the new regulation to establish jurisdiction over the 2006

23  medical examination.[14]

24  _____

25  [14]  The April 11, 2007 date also postdates the January 2007 alleged false statements and similarly
violates the *Ex Post Facto* Clause. Even assuming arguendo, that the 2007 examination is not

26  similarly barred, the government must still establish jurisdiction as a matter of law. That it cannot
do. The above cited Memorandum of Agreement with the State Board is still in effect. The MOA

27  plainly states that the federal regulations only apply *in the absence* of state regulation. Here, the
Coast Guard has expressly acknowledged the State Regulations and ceded pilotage jurisdiction of

28  San Francisco Bay to the State Board. The Coast Guard's instructions in the Federal Register do
nothing to alter this fact.

**DEFT COTA'S MEMO OF P&As IN SUPP OF MOTION TO DISMISS FALSE STATEMENT CHARGES
CR 08-0160 SI**

3.    **The Alleged False "Statements" Were Not Material.**

In addition, the government has not alleged facts demonstrating that the alleged false statements were material, as required by law. To establish materiality, "the government has the burden of proving that the false statement had the intrinsic capability of influencing or affecting the agency's or department's decision." *Facchini*, 874 F.2d 638, 641 (9th Cir. 1989). "To assess intrinsic capability, a court must consider whether a statement could, under some set of foreseeable circumstances, significantly affect an action by a federal department or agency." *Id.*

Here, as a matter of law, the government cannot establish that it was foreseeable that the communications between Captain Cota and Dr. Calza during the 2006 and 2007 examinations were "intrinsically capable" of affecting federal action, for several reasons. First, the statements were only relevant to Dr. Calza's examination during the course of a State Board-mandated examination before a State Board-approved physician. Dr. Calza was not acting as an agent of the Coast Guard.

Second, even if the Coast Guard had pilotage jurisdiction over the San Francisco Bar pilots (which they do not), the federal regulatory system is simply too ill-defined to conclude that Captain Cota's statements to Dr. Calza were materially false. The NTSB has expressly found that (i) the Coast Guard "does not provide guidance on the acceptable methods of meeting the [federal] requirements," (ii) the Coast Guard does not have any "formal mechanism for being informed about a mariner who has a disqualifying physical condition," and (iii) Form 719K does not apply to annual pilot medical evaluations. Thus, the government cannot establish "materiality" based on a process and a form the United States has expressly stated is inherently ambiguous and immaterial.

Nor can the government establish that Captain Cota's *2007* examination (and the Form 719K filled out by Dr. Calza) became material when the Coast Guard changed its regulations in the September 28, 2006 and December 12, 2006 Federal Register. The fact is Dr. Calza's 2007 examination of Captain Cota was still performed for purposes of renewing his state license, not his federal license. The fact that the Coast Guard began to require submission of an annual physical by April 11, 2007 does not change the nature of the interaction between Captain Cota and Dr. Calza.

16

1    The government may argue that *if only* Captain Cota had made a more fulsome disclosure to

2   Dr. Calza that it is likely he would not have agreed to certify him as competent. To the contrary, as

3   discussed more fully below, in addition to being pure speculation, this argument does not alter the

4   fact that Dr. Calza knew that Captain Cota was being treated for sleep apnea with a CPAP machine

5   and Provigil and that he had been prescribed pain medications and an anti-depressant / anti-anxiety

6   medication (for sleep apnea). He also knew, because he had examined Captain Cota for at least

7   three of the previous four years, that Captain Cota's underlying conditions and medications that he

8   listed in 2007 were different from what had been listed previously. Yet he did nothing: he did not

9   consult with Captain Cota's prescribing physicians, he did not review Captain Cota's medical

10   records, he did not order a second opinion and he did not conduct any further evaluation or testing of

11   Captain Cota. What he claims to have done is to simply warn Captain Cota not to take the

12   medications when working. And, except for the Provigil, Captain Cota did not.[15] Given these facts,

13   the government cannot establish that any information Captain Cota allegedly concealed during his

14   2007 examination constituted a "material" false statement and certainly not one to a federal official

15   or agency.

16    **4.    The Due Process Clause Requires Dismissal of the False Statement Counts Because They Are Based on Inquiries that the United States Itself has Concluded are Hopelessly Ambiguous and Flawed.**

17

18    Federal courts have recognized that in order to establish a knowing and willful false

19   statement under Section 1001, the government must demonstrate that the inquiry or question

20   eliciting the allegedly false response is not ambiguous. For example, in *United States v. Manapat*,

21   928 F.2d 1097, 1101 (11th Cir. 1991), the defendant was charged with violating Section 1001 by

22   making false statements in an application to the Federal Aviation Administration for an "Airman

23   Medical Certificate." Specifically, the defendant checked "No" to questions asking for traffic and

24   other convictions, when in fact she had five prior convictions. The defendant moved to dismiss the

25   Superseding Indictment on the ground that the form was ambiguous since the conviction questions

26

27   [15] The Form 719K which Dr. Calza used for the examination does not refer to any such warnings –
     demonstrating that Dr. Calza, even if he is to be believed about what occurred, did not choose to
28   fully and accurately document all of the information exchanged between Captain Cota and him.

**DEFT COTA'S MEMO OF P&As IN SUPP OF MOTION TO DISMISS FALSE STATEMENT CHARGES
CR 08-0160 SI**

1    appeared in a section titled "Medical History." The district court granted the motion and the

2    appellate court affirmed. *Id.* at 1102.

3         In ruling that the form was too ambiguous to be presented to a jury, the Court explained that

4    "[m]embers of our society are often asked to fill out standardized forms containing large numbers of

5    general background questions." *Id.*at 1101. The Court recognized that "[s]uch forms, usually hastily

6    completed in waiting rooms, rarely require critical information that, if inaccurate, could result in

7    criminal prosecution" and that an applicant "could fail to understand the importance of such

8    questions...and simply not give proper thought before answering." *Id.* Finding the form fatally

9    ambiguous, the Court upheld the dismissal. *Id.* at 1102.[16]

10        Here the ambiguity and confusion is amplified. The Superseding Indictment does not even

11   allege that Captain Cota falsely completed Form 719K because he did not; it was completed by Dr.

12   Calza. Nor does the Superseding Indictment allege that he falsely certified that the contents of Form

13   719K were true and accurate to the best of his knowledge because he did not. Indeed, the form

14   required no such certification; neither Captain Cota nor Dr. Calza were required to certify that what

15   was recorded on the form accurately reflected the complete discussion and examination that

16   occurred.

17        Even if the Superseding Indictment could somehow be stretched to allege such a

18   certification, the Form 719K itself is fundamentally ambiguous. As in *Manapat*, the forms Dr. Calza

19   used in 2006 and 2007 were standardized forms which failed to provide any indication that certain

20   sections – i.e. Sections VI and VII – were of greater significance than the general background

21   questions. Nor do the forms anywhere state that the responses are subject to the criminal sanctions

22   of Section 1001 or given under penalty of perjury.

23        Further, the language of Sections VI and VII (i.e., "Medications/Certification of Physical

24   Impairment") itself is ambiguous. Assuming the government can prove at trial that Dr. Calza posed

25

26

---

27   [16] See article "Information Tech For Health Care," The Washington Times, noting the inherent
     difficulty of asking patients to detail medical information from memory during physician visits.
28   Exhibit P ("Information Tech For Health Care" article).

1   the inquiry to Captain Cota using the language of the form,[17] the form asks someone, presumably the

2   doctor, to: "List all current medications, including dosage and possible side effects" and to "[s]tate

3   the condition(s) for which the medication(s) are taken." This language is ambiguous on several

4   levels. First, the phrase "List all current medications" does not indicate whether the respondent is to

5   list medications he is currently taking (i.e. on the day of the examination) or that he may have taken

6   in the past (i.e. in the course of the past week, month or year). Second, it unreasonable to expect a

7   layperson to accurately recall and properly describe the potential side effects and underlying

8   conditions for all of the medications he may be taking. Such questions are better suited for a

9   physician. There is certainly a great risk in permitting the government to fashion criminal false

10  statement charges based on "incomplete" responses to technical, medical questions. See Exhibit P

11  ("Information Tech for Health Care" article).

12      The ambiguity of Form 719K is most evident, and indisputably established, by the

13  government's own doubts and conduct regarding the form. Indeed, the United States has taken the

14  extraordinary step of convening a federal committee, MERPAC, to review the use of Form 719K

15  and make recommendations that will actually render it useful in evaluating the medical conditions of

16  pilots. Exhibit Q (MERPAC Task Statement 46 and 61); Exhibit R (Form 719K - Draft E). With

17  the Coast Guard's endorsement, MERPAC has issued a revised draft of Form 719K which aims to

18  eliminate fundamental problems with the form. Exhibit R (Form 719K - Draft E). As set forth in

19  *Manapat*, the decision of the federal government to revise Form 719K is compelling evidence of the

20  form's ambiguity. [See *Manapat*, 928 F.2d 1097, 1101 (11th Cir. 1991), wherein the Court, in

21  reversing a Section 1001 conviction, took judicial notice of a United States Department of

22  Transportation internal memorandum stating that the form at issue should be changed].

23      The MERPAC draft contains substantial revisions to the "Medications" section of Form

24  719K both providing greater detail regarding the information requested and emphasizing the

25  importance of providing complete, exhaustive responses. Among other things, the form would now

26  state that "Applicants are required to report **all** current prescription and non-prescription (over-the-

27

28  [17] Such proof is an obvious opportunity for even greater ambiguity and fraught with doubt given
    that Dr. Calza did not keep a single note of his 'examination' of Captain Cota.

**DEFT COTA'S MEMO OF P&As IN SUPP OF MOTION TO DISMISS FALSE STATEMENT CHARGES**
**CR 08-0160 SI**

1   counter) medications, including dietary supplements and vitamins at the time of application"

2   (emphasis in original). In addition, the revised form recognizes the inherent defect in relying solely

3   on a layperson to fully and adequately respond to the request, now requiring that the "information

4   reported by the applicant must be verified by the verifying medical practitioner," including by

5   "<u>assisting the applicant</u> in reporting dosages and condition(s) for which he/she takes each substance"

6   (emphasis added). Finally, the new form states, both in the opening "Applicant Information" section

7   and in the signature block, that the responses are "subject to criminal prosecution under 18 U.S.C.

8   1001" and requires that the pilot attest that they "have not knowingly omitted to report any material

9   information to the form."

10          The fact that the government has recognized a need to substantially revise Form 719K to

11   finally make it clear on precisely the points at issue in this case is compelling evidence that the

12   current form is inherently ambiguous. As a matter of law, given the government's own position that

13   this form is unclear, ambiguous, misleading and defective, it would violate due process to permit it

14   to charge someone with false statements relating to the same form. *See Manapat, supra.*

15   **IV.    CONCLUSION.**

16          In light of the foregoing, Captain Cota respectfully requests that the Court grant his motion to

17   dismiss Counts One and Two of the Superseding Indictment without leave to amend.

18                                          Respectfully submitted,

19

20

21   Dated: June 13, 2008.                  KIRKPATRICK & LOCKHART
                                            PRESTON GATES ELLIS LLP

22

23                                          By __ /s/ Jeffrey L. Bornstein_____
                                            Jeffrey L. Bornstein, Esq.
24                                          Barry M. Hartman, Esq., *Admitted Pro Hac Vice*
                                            Luke G. Anderson, Esq.
25                                          Christopher R. Tate Esq., *Pro Hac Vice pending*

26                                          Attorneys for Defendant
                                            JOHN J. COTA

27

28

DEFT COTA'S MEMO OF P&As IN SUPP OF MOTION TO DISMISS FALSE STATEMENT CHARGES
CR 08-0160 SI

# EXHIBIT A

# (FILED UNDER SEAL)

# EXHIBIT B



California Office of    **Home   Most Recent Updates   Search   Help**
Administrative Law                                                                        ©

# Welcome to the online source for the California Code of Regulations

7 CA ADC § 202

 Term

7 CCR § 202

Cal. Admin. Code tit. 7, § 202

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
TITLE 7. HARBORS AND NAVIGATION
DIVISION 2. STATE BOARD OF PILOT COMMISSIONERS FOR THE BAYS OF SAN
FRANCISCO, SAN PABLO AND SUISUN
ARTICLE 1. DEFINITIONS
This database is current through 5/30/08, Register 2008, No. 22
§ 202. Other Definitions.

(a) "Administrative Assistant/Secretary" means the individual appointed by the Board pursuant to Section 212.

(b) "Bays of San Francisco, San Pablo and Suisun" means all the waters of those bays and of the tributaries, ports and harbors of those bays, and includes the water areas from the south end of San Francisco Bay and from the Ports of Sacramento and Stockton to the Golden Gate Bridge.

(c) "Certificate of completion" means the certificate given by the Board to a pilot trainee notifying the trainee that he or she has successfully completed the training program.

(d) "Chemical test" means a scientifically recognized test which analyzes an individual's breath, blood, urine, saliva, bodily fluids, or tissues for evidence of dangerous drug or alcohol use.

(e) "Conflict of interest code" means those provisions in Section 222 which define conflicts of interest for licensees of the Board.

(f) "Conflict of interest code of the Board" means those provisions in Section 212.5 which define conflicts of interest for designated employees of the Board.

(g) "Dangerous drug" means a narcotic drug, a controlled substance, marihuana, or a controlled-substance analogue (as defined in section 102 of the federal Comprehensive Drug Abuse and Control Act of 1970 (Title 21, United States Code, Section 802)).

(h) "Executive Director" means the individual appointed by the Board pursuant to Section 211.

(i) "Fails a chemical test for dangerous drugs" means that the result of a chemical test conducted in accordance with Title 49, Code of Federal Regulations, Part 40 is reported as "positive" for the presence of dangerous drugs or drug metabolites in an individual's system by a Medical Review Officer in accordance with that part.

(j) "Inland pilot" means an individual licensed as an inland pilot by the Board.

(k) "Investigator" means a person employed by or under contract with the Board and assigned to investigate

a navigational incident involving a vessel piloted by a pilot or inland pilot licensed by the Board, or any other matter for which a pilot's or inland pilot's license may be revoked or suspended pursuant to these regulations, including a possible conflict of interest as set forth in Section 222, or to investigate reports of suspected pilot ladder or pilot hoist safety violations.

(l) "Medical Review Officer" means an individual designated to carry out the duties specified in Title 46 Code of Federal Regulations Section 16.370 on behalf of the pilots, inland pilots or pilot trainees.

(m) "Monterey Bay" means all the waters of that bay and of the tributaries, ports and harbors of that bay.

(n) "Pilot" means an individual licensed as a pilot by the Board other than as an inland pilot.

(o) "Pilot Evaluation Committee" means the committee appointed by the Board pursuant to Section 209.

(p) "Pilot trainee" or "trainee" means a person who is training as a pilot in the pilot trainee training program established by the Board.

(q) "Pilotage grounds" means all waters extending eastward from the precautionary area surrounding buoy SF to, and including, the Bays of San Francisco, San Pablo and Suisun, and also includes the waters of Monterey Bay, eastward of a straight line drawn between Point Santa Cruz Light and Point Pinos Light.

(r) "Port Agent" means the individual identified in Section 218.

(s) "Serious Marine Incident" means an event or events that meet the definition of "Serious Marine Incident" under Title 46, Code of Federal Regulations, Section 4.03-2.

(t) "Training program" or "program" means the standards and procedures for training pilots, inland pilots and pilot trainees adopted by the Board as contained in Sections 214 and 215.

Note: Authority cited: Section 1154, Harbors and Navigation Code. Reference: Sections 1101(e), 1101(h), 1110, 1113, 1114, 1114.5, 1154, 1156, 1156.5, 1156.6, 1170.3, 1171.5, 1180, 1180.3 and 1181, Harbors and Navigation Code; Title 21, U.S. Code, Section 802; Title 46, Code of Federal Regulations, Sections 4.03-2, 97.90-1 and 108.719, subparts 163.002 and 163.003, and Part 16; and Title 49, Code of Federal Regulations, Part 40.

HISTORY

1. Repealer and new section filed 5-9-88; operative 6-8-88 (Register 88, No. 20). For prior history, see Register 83, No. 1.

2. Amendment filed 8-12-93; operative 9-13-93 (Register 93, No. 33).

3. New subsection (l), subsection redesignation, and amendment of Note filed 6-16-94; operative 7-18-94 (Register 94, No. 24).

4. New subsections (d), (f), (h) and (k), subsection relettering, and amendment of Note filed 4-20-98; operative 5-20-98 (Register 98, No. 17).

5. Amendment of subsection (j) and amendment of Note filed 8-10-99; operative 9-9-99 (Register 99, No. 33).

6. Amendment of section and Note filed 6-3-2003; operative 7-3-2003 (Register 2003, No. 23).

7 CCR § 202, **7 CA ADC** § 202
1CAC

**7 CA ADC** § 202

END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

◀ Term ▶

◀ Doc 2 of 38 ▶

Cite List    Docs In Sequence    Table of Contents

This site is provided by West.
© 2008 West | Privacy |
Accessibility





California Office of    **Home   Most Recent Updates   Search   Help**
Administrative Law                                                      ©

## Welcome to the online source for the California Code of Regulations

7 CA ADC § 217

Term

7 CCR § 217

Cal. Admin. Code tit. 7, § 217

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
TITLE 7. HARBORS AND NAVIGATION
DIVISION 2. STATE BOARD OF PILOT COMMISSIONERS FOR THE BAYS OF SAN
FRANCISCO, SAN PABLO AND SUISUN
ARTICLE 5. LICENSING
This database is current through 5/30/08, Register 2008, No. 22
§ 217. Medical Examination.

(a)(1) An applicant for a pilot trainee position or for a pilot license, and an applicant for the renewal of any license, shall be medically examined prior to entry into the training program, issuance of the original license or the renewal of his or her license, as applicable. The examination shall be performed by a physician designated by the Board for the purpose of determining his or her mental and physical health and fitness for duty as a pilot, inland pilot or pilot trainee. The examination prescribed herein shall be conducted in accordance with the Code, these regulations and the guidelines set forth in the REFERENCE GUIDE FOR PHYSICIANS PHYSICAL EXAMINATION FOR RETENTION OF SEAFARERS IN THE U.S. MERCHANT MARINE as adopted by the Seafarers Health Improvement Program (SHIP) Committee on April 26, 1985, and which is hereby incorporated by this reference, and a copy of which shall be on file in the Board office. An applicant for renewal of an existing pilot or inland pilot license shall be examined as set forth in subsection (b) of this section. The Board shall maintain a list of physicians, licensed by the State of California, who have agreed to perform the examinations required by these regulations.

(2) The cost of any medical examination required by these regulations shall be borne exclusively by the Board.

(3) A pilot or inland pilot on medical disability leave when his or her license expires may, within 30 days after the termination of the disability, apply for renewal of his or her license.

(b)(1) A license renewal medical examination shall not be required for a pilot or inland pilot who will be 35 years of age or less on the date his or her license expires, unless at least four years will have elapsed since his or her previous examination pursuant to the requirements of this section.

(2) A license renewal medical examination shall not be required for a pilot or inland pilot who will be 36 years of age but less than 50 years of age on the date his or her license expires, unless at least two years will have elapsed since his or her previous examination pursuant to the requirements of this section.

(3) A license renewal medical examination shall not be required for a pilot or inland pilot who will

be 50 years of age or over on the date his or her license expires, unless at least one year has elapsed since his or her previous examination pursuant to the requirements of this section.

(c)(1) A physician performing an examination required by these regulations shall retain the records and any detailed report of the examination and shall not provide either to the Board, except upon the written authorization of the person examined or when the physician has been notified that an appeal has been made as authorized by subsection (e)(4) of this section. The examining physician shall provide the results of his or her examination to the Administrative Assistant/Secretary by stating, in writing, only one of the following possible findings:

(A) Fit for Duty ("FFD"), which shall signify that the examining physician finds the person examined mentally and physically qualified for duty as a pilot, inland pilot or pilot trainee in all areas addressed in the Code, these regulations and the guidelines set forth in the REFERENCE GUIDE FOR PHYSICIANS cited in subsection (a)(1) of this section.

(B) Not Fit for Duty ("NFFD"), which shall signify that the examining physician finds the person examined mentally or physically unqualified for duty as a pilot, inland pilot or pilot trainee in one or more of the areas addressed in the Code, these regulations and the guidelines set forth in the REFERENCE GUIDE FOR PHYSICIANS cited in subsection (a)(1) of this section.

(C) Permanently Not Fit for Duty ("PNFFD"), which shall signify that the examining physician finds the person examined mentally or physically unqualified for duty as a pilot, inland pilot or pilot trainee in one or more of the areas addressed in the Code, these regulations and the guidelines set forth in the REFERENCE GUIDE FOR PHYSICIANS cited in subsection (a)(1) of this section, and the examining physician is of the opinion that the mental or physical condition of the person examined is such that he or she will never again be mentally or physically qualified for duty as a pilot, inland pilot or pilot trainee, as appropriate.

(d) If the Board obtains information from a source other than the report of a Board ordered medical examination made pursuant to subsection (c) of this section that at any time leads it to believe that a pilot or inland pilot has become unable to comply with the standards of health or physical condition required to perform the duties of a pilot or inland pilot, that person shall be required to be examined in accordance with the Code, these regulations and the guidelines set forth in the REFERENCE GUIDE FOR PHYSICIANS cited in subsection (a)(1) of this section. The Board may, without a hearing, temporarily suspend the license of the pilot or inland pilot involved in accordance with s 1180 of the Code pending a hearing and decision on whether or not he or she complies with the standards of health and physical condition necessary to perform the duties of a pilot or inland pilot. A pilot or inland pilot required to be examined pursuant to this subsection and whose license has been temporarily suspended shall submit to an examination within the period of the suspension. A pilot's or inland pilot's failure to submit to the examination required herein may be considered by the Board as evidence sufficient to warrant a finding that such pilot or inland pilot is either NFFD or PNFFD and the Board shall then act in accordance with subsection (e) of this section.

(e)(1) A pilot or inland pilot who is found to be either NFFD or PNFFD by a Board examining physician shall, upon the report being received by the Board, immediately be placed on medical disability leave with the right to appeal the medical finding as provided for in the Code and these regulations. An applicant for a license who is found to be either NFFD or PNFFD shall have his or her application suspended until such time as he or she is found FFD.

(2) A pilot trainee who is found to be either NFFD or PNFFD by a Board examining physician shall, upon the report being received by the Board, immediately be suspended as a pilot trainee with the right to appeal the finding as provided for in the Code and these regulations. If the Board obtains information from a source other than the report of a Board ordered medical examination made pursuant to this section that at any time leads it to believe that a pilot trainee has become unable to comply with the standards of health or physical condition required for the duties of a pilot trainee, he or she shall be required to be examined in accordance with the Code, these regulations and the guidelines set forth in the REFERENCE GUIDE FOR PHYSICIANS cited in

subsection (a)(1) of this section.

(3) Immediately upon receipt of a report that a pilot, an inland pilot, an applicant for an original license, or a pilot trainee is NFFD or PNFFD, the Board shall mail notice to such person that he or she has been placed on medical disability leave, that his or her application has been suspended or that he or she has been suspended from the pilot trainee training program, as applicable.

(4) A pilot, an inland pilot, an applicant for an original license, or a pilot trainee reported by a Board examining physician to the Board as NFFD or PNFFD may file a written notice of appeal with the Board within 60 days following the date of notification by the Board that he or she has been placed on medical disability leave, has had his or her application for a license suspended, or has been suspended as a pilot trainee, as applicable. A notice of appeal shall specify the determination being appealed and shall designate a physician of the appellant's choice to be assigned to the appellate examining panel. Upon receipt of a notice of appeal, the Board shall immediately arrange to have the appellant examined by one physician selected by the Board from its panel of physicians, by the physician designated by the appellant in his or her notice of appeal, and by a third physician selected by agreement of the first two physicians. If a notice of appeal fails to designate a physician of the appellant's choice, it shall not be considered defective; however, in such case the Board shall select three physicians from its panel of physicians to review the previous finding of NFFD or PNFFD.

(5) Following selection of the physicians constituting the appellate examining panel, the Administrative Assistant/Secretary shall immediately arrange for the examination of the appellant by each designated physician and provide written notice to the appellant of the date, time, and location for each scheduled examination. If a designated physician cannot complete the required examination and report by the time set by the Board, then the Board, the appellant, or the two physicians, as appropriate, shall select another physician. If at least two of the designated physicians find the appellant to be FFD, then the appellant, if otherwise qualified, shall be restored to the status held immediately prior to being reported to the Board as NFFD or PNFFD.

(6) In the event that a pilot or inland pilot fails to file a timely notice of appeal from a finding of NFFD, or at least two of the physicians constituting the appellate examining panel find the appellant NFFD, he or she shall be continued on medical disability leave. In the event that a pilot or inland pilot fails to file a timely notice of appeal from a finding of PNFFD, or at least two of the physicians constituting the appellate examining panel find the appellant PNFFD, the Board shall hold a hearing within 45 days following the expiration of the appeal period or receipt of the report of the appellate examining panel to determine whether to continue the pilot or inland pilot on medical disability leave or whether to revoke or suspend his or her license, including the placing of any conditions on the suspension if the Board votes for such an action. Unless otherwise ordered by the Board, a decision by it to continue a pilot or inland pilot in a medical disability leave status may subsequently be reviewed by it at the request of the affected pilot or inland pilot or any other interested party, or by the Board on its own initiative. If it is the affected pilot or inland pilot who requests a subsequent hearing, the hearing shall be held within 30 days after the next regularly scheduled meeting of the Board following receipt by it of the request. If it is the Board that acts to hold a subsequent hearing, the hearing shall be held no earlier than 20 days, but no later than 30 days after the date the notice of such a hearing was mailed to the affected pilot or inland pilot.

(7) In the event that an applicant for an original license fails to file a timely notice of appeal from a finding of NFFD, his or her application shall be suspended until the applicant is found FFD, but not to exceed a period of one year. In the event that an applicant for an original license fails to file a timely notice of appeal from a finding of PNFFD, his or her application shall be denied by the Board at its next regularly scheduled meeting.

(8) In the event that a pilot trainee fails to file a timely notice of appeal from a finding of NFFD or PNFFD, the Board shall review the matter to determine whether the pilot trainee shall be continued in the training program subject to attaining a FFD status within a time period specified by the Board, or whether the pilot trainee shall be terminated from the training program. Unless otherwise ordered by the Board either determination may subsequently be reviewed by it at the request of the affected pilot trainee or by the Board on its own initiative.

(9) A hearing conducted by the Board to determine if a pilot or inland pilot complies with the standards of health or physical condition required by the Code, these regulations or the REFERENCE GUIDE FOR PHYSICIANS cited in subsection (a)(1) of this section, shall be conducted in accordance with the provisions of Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code. At such a hearing, the Board shall have all the powers granted therein and by the Code.

Note: Authority cited: Section 1154, Harbors and Navigation Code. Reference: Sections 1106, 1171, 1171.5(a), (c) and (e), 1175(a) and (b), 1176, 1180, 1181(i) and 1183, Harbors and Navigation Code.

### HISTORY

1. New section filed 5-9-88; operative 6-8-88 (Register 88, No. 20). For history of former section, see Registers 59, No. 11 and 57, No. 6.

2. Renumbering of former section 217 to section 219 and renumbering and amendment of former section 214 to section 217 filed 8-12-93; operative 9-13-93 (Register 93, No. 33).

3. Amendment of subsections (a)(1), (d) and (e)(7) filed 6-3-2003; operative 7-3-2003 (Register 2003, No. 23).

7 CCR § 217, **←7 CA ADC § 217→**
1CAC

**←7 CA ADC § 217→**

END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

■ Term

Cite List    Docs In Sequence    Table of Contents

This site is provided by West.
© 2008 West | Privacy |
Accessibility



# EXHIBIT C

State of California                                                                Arnold Schwarzenegger, Governor

**Board of Pilot Commissioners for the Bays**
**of San Francisco, San Pablo and Suisun**
Pier 9, Suite 102, San Francisco, CA 94111
Phone: (415) 397-2253  Fax: (415) 397-9463
E-mail: pilots@earthlink.net



FOR IMMEDIATE RELEASE                                    Contact: Luis R. Farias
Thursday, December 6, 2007                                   (916) 826-6069, cell

Today, the Board of Pilot Commissioners' Incident Review Committee filed written charges of
misconduct (an accusation) against Captain John Cota arising from his piloting of the COSCO
BUSAN on November 7, 2007.

In dense fog, the ship he piloted struck the fendering system of one of the towers of the San
Francisco-Oakland Bay Bridge, damaging the ship, the fendering system, and releasing 58,000
gallons of fuel oil into the waters of San Francisco Bay.

"This Board takes seriously the events of November 7th, the resulting oil spill, and Capt. Cota's
involvement as the pilot," said Board President Knute Michael Miller. "The Board's Incident
Review Committee has carried out its investigation resulting in the charges filed today. We will
proceed judiciously to determine whether Captain Cota was negligent and whether he should be
allowed to continue piloting on San Francisco Bay. In the meantime, his license remains
suspended pending a hearing."

Captain Cota is charged with having reason to doubt whether the ship could safely proceed under
the prevailing circumstances and proceeding on his course with insufficient information about
the level of visibility along his intended route. He is also charged with proceeding at a speed that
was excessive for the circumstances and failing to make full use of all available resources,
including a tugboat, the Vessel Traffic Service of the Coast Guard, and his ship's lookout. The
tug remained tethered to the ship's stern; the Vessel Traffic Service of the Coast Guard could
have provided more information if Captain Cota had requested it; and the ship's lookout could
have been better instructed. The charges allege that Captain Cota's conduct warrants the
suspension or revocation of his state pilot license.

Captain Cota will have 15 days in which to file a written response with his defenses to the
charges and to request a hearing.

If the pilot requests a hearing, the Board will decide whether it will hear the case or submit the
matter to an Administrative Law Judge for a hearing. That decision may come as early as the
Board's next meeting scheduled for December 13, 2007.

A hearing may be scheduled as early as January, depending on the defenses raised by the pilot
and any requests for continuances to accommodate witnesses or access to evidence needed by
either side to present their case.

If the pilot does not request a hearing, the Board may act on the charges without a hearing.

**- MORE -**

COTA
December 6, 2007
Page 2

*As the state agency that licensed Captain Cota, the Pilot Commission has various roles to perform in the aftermath of this accident. Immediately after the accident, the Board's Incident Review Committee (IRC), which has the responsibility of investigating navigational incidents involving Board licensed pilots, commenced its investigation of this incident. To the fullest extent possible under the law, the Board will share the results of that investigation with the public and make them available to lawmakers to assist in other investigations.*

###

1.    At a further prehearing conference held February 21, 2008, the Administrative Law Judge granted a continuance requested by Captain Cota due to ongoing difficulties with obtaining admissible evidence, to permit other matters to be resolved, and to ensure a fair hearing. Captain Cota, through his counsel, agreed that his state pilot license will remain suspended pending the completion of these proceedings.

2.    The tentative hearing date of April 28, 2008 was vacated. The ALJ ordered a new hearing date of September 2, 2008. Current estimates for the length of the hearing is 15 days. The hearing will be held for four days each week until completed as follows: September 2 - 5, 8 - 11, 15 - 18, and 22 - 25. The hearing will commence each day at 9:00 a.m. and will be held in an Office of Administrative Hearings' courtroom in the Elihu Harris State Building, 1515 Clay Street, Oakland, California.

3.    The hearing is open to the public. This notice of the hearing will be updated once the courtroom number is known. The length of the hearing is subject to change.

# EXHIBIT D

MEMORANDUM OF AGREEMENT

ON

OIL POLLUTION PREVENTION AND RESPONSE

BETWEEN

THE COMMANDER, ELEVENTH COAST GUARD DISTRICT

AND

THE STATE OF CALIFORNIA

WHEREAS, Congress enacted the Oil Pollution Act of 1990 (OPA 90) to protect the waters of the United States from oil pollution and to plan for the effective and immediate response in the event of an oil spill, and the President subsequently designated the Coast Guard as the Federal On Scene Coordinator ZOSC) within the California coastal zone; and

WHEREAS, Congress has decided in a number of enactments, including OPA 90, not to preempt the various States from regulating certain matters associated with the protection of waters within their jurisdiction from oil pollution, which matters are also subject to regulation by the Coast Guard under OPA 90 and other statutes; an

WHEREAS, Congress explicitly provided that the provisions of OPA 90 do not: (1) preempt or affect the authority of any state to impose additional liability or requirements respecting oil discharges or other oil pollution within such a state or removal activities in connection with such a discharge; (2) affect the authority of any state to establish or continue to fund, any purpose of which, is to pay for oil pollution or the substantial threat of oil pollution costs or damages, or to require any person to contribute to such a fund; or (3) affect the authority of any state to impose any fine or penalty for violation of law relating to a discharge; and

WHEREAS, the State of California has enacted the LempertKeene-Seastrand Oil Spill Prevention and Response Act of 1990, hereinafter referred to as the California Act, to protect the waters of the State from oil pollution and to plan for the effective and immediate response, removal, abatement, and cleanup in the event of an oil spill and to augment State authority for the prevention and response to spills in waters under the jurisdiction of the State; and

WHEREAS, the California Act provides that the Administrator of the Office of Oil Spill Prevention and Response (OSPR) is appointed by and acts at the direction of the Governor. The Administrator acts as chairperson of the State Interagency Oil Spill Committee (SIOSC) and coordinates actions through the State committee and review subcommittee; and

WHEREAS, the Administrator, subject to the Governor, and through the Department of Fish and Game, has the primary State authority to direct prevention, removal, abatement, response containment and cleanup efforts, with regard to all aspects of any oil spill in the State waters, in accordance with any applicable marine facility or vessel contingency plan, and the State Oil Spill Contingency Plan; and

WHEREAS, the State Lands Commission has the primary State authority to adopt rules, regulation, guidelines and commission leasing policies for reviewing the location, type, character, performance standards, size, and operation of all marine facilities on lands leased from the Commission and all existing and proposed marine terminals within the State; and

WHEREAS, the Commander, Eleventh Coast Guard District is the senior Coast Guard officer within the State of California, exercising Federal authority under the Oil Pollution Act of 1990 and other Federal laws with respect to oil pollution planning and response in waters subject to the jurisdiction of the United States in and outside the State of California and matters dealing with areas of vessel manning and safety equipage; and

WHEREAS, marine oil spills require a rapid, efficient, and coordinated response and cleanup by Federal, State, and local agencies as well as from private entities to minimize the deleterious effects on human, wildlife, and other natural resources; and

WHEREAS, both the Coast Guard and the State recognize the critical roles each has within their respective areas of authority in preventing oil-spills and in planning for and responding to oil spills; and

WHEREAS, the Parties recognize the cooperation between them in the implementation and exercise of their respective statutory and regulatory authority is essential to avoid conflict and unnecessary duplication; and

WHEREAS, the Parties believe and intend that by acting in a cooperative and coordinated manner, the effect will be a synergistically enhanced oil spill prevention and response effort in the State of California;

NOW THEREFORE, the Parties agree, to the extent permitted by law, and as consistent with their respective policies and available resources, to cooperate and to coordinate their efforts in implementing and exercising their respective statutory and regulatory duties related to oil spill prevention and response.

I

## PARTIES

The Parties to this Memorandum of Agreement are the Eleventh Coast Guard District ("Coast Guard") and the State of California ("State").

II

## PURPOSE OF THE AGREEMENT

The purpose of this Memorandum of Agreement (MOA) is to ensure the Parties exercise their respective authorities regarding oil spill prevention, planning, and response in a manner so as to avoid unnecessary duplication and conflict and to ensure best achievable protection from the impact of pollution incidents for the navigable waters of the United States which are within or may impact the State waters of California; subject to each Party's statutory, regulatory, and policy requirements.

III

## DEFINITIONS

Except where otherwise specifically defined in the context of its use herein, or where specifically set forth below, terms used in this Memorandum of Agreement (MOA) shall have the meaning as set forth in Federal law and applicable State law.

### A.    Specific definitions:

1.    State Waters: Federal regulations designate the Coast Guard as the Federal On Scene Coordinator (OSC) within the California coastal zone. The Environmental Protection Agency (EPA) is the OSC for oil spills within the inland zone. The jurisdictional boundary between these zones is specified in the Federal Region IX Regional Response Team Contingency Plan. The term "State waters" shall mean those navigable waters of the United States which lie within the jurisdiction of the State of California and over which the Coast Guard has concurrent Federal authority for oil spill response.

2.    Marine Oil Spill Contingency Plan: The Marine Oil Spill Contingency Plan is an addendum to the State Oil Spill Contingency Plan, which in turn is a part of the State Hazardous Materials Incident Contingency Plan. Under this scheme the Department of Fish and Game Director is the State Incident Commander for inland oil spills and the Administrator of OSPR is the State Incident Commander for marine oil spills.

### IV

### INFORMATION SHARING

The exchange of information between the Federal government and the State relative to historic pollution events and current risks is necessary to develop appropriate prevention and response systems. Both Parties maintain information systems that are relevant to both historical and real-time incidents. The Parties require the fullest degree of information sharing from available and pertinent data bases in order to make accurate and timely decisions to prevent and or respond to oil pollution.

Transmissions of information shall be in accordance with procedures adopted by the Parties for that purpose.

### A. Action:

1.    The Parties agree to share information on Prevention Through People (PTP) programs sponsored by Coast Guard, or other human factor initiatives that either party may undertake.

2.    The Eleventh Coast Guard District will advise the State of information it receives of the following events occurring in the navigable waters, or that may impact the State, involving vessel disablings, collisions, groundings, explosions, rammings, allisions, distress and other events when oil pollution or substantial threat of oil pollution results. The State will ensure that its emergency notification systems report these incidents to the Coast Guard.

3.    The Parties agree to identify and share existing data bases, including the Marine Safety Information System (MSIS), and work toward developing risk management programs that provide risk data sharing for vessels and access by both parties to all data, subject to the requirements of applicable law, regulation, and policy, in a manner to conserve and leverage agency resources.

4.    Initiatives taken to limit the introduction on nonindigenous aquatic nuisance species into State waters will be sought through appropriate State or federal regulation.  Information concerning aquatic nuisance species programs shall be shared by the Parties as appropriate.

5.    The Parties agree, subject to limitations imposed by applicable law or regulations, to share information from relevant studies.

## V

### OIL SPILL RESPONSE PREPAREDNESS

The National Contingency Plan (NCP) establishes the response organization within the United States and requires tiered contingency planning efforts.  The State, consistent with the NCP, defines its response organization through the State Hazardous Material Plan and addenda to the Oil Spill Contingency Plan.

### A.    Planning Documents

1.    National Oil and Hazardous Substances Pollution Contingency Plan ("National Contingency Plan - NCP"):

The Environmental Protection Agency (EPA) is the lead agency in drafting, and the Coast Guard and EPA are jointly responsible for implementing, the NCP which governs actions concerning spill response and cleanup for Federal, State, local agencies, responsible parties, clean-up contractors and others participating in such actions in United States waters.

   a. Action: The State will work with the Coast Guard to ensure State plans and policies for marine environmental protection are consistent with the NCP.

2.    State Hazardous Material Incident Contingency Plan and the State Oil Spill Contingency Plan:

The State Office of Emergency Services (OES) is responsible for developing and maintaining the Statewide Contingency Plan that details State responsibilities, policies, and actions governing response to spills in waters of the State.  The OSPR has specific statutory authority and responsibility concerning oil spills.

   a. Action: The Coast Guard will consult with the State to ensure State plans and policies for marine environmental protection are consistent with the NCP.

3. Area Contingency Plan:

The Area Committees, established by the President under the authority of the Oil Pollution Act of 1990, are responsible for the development of Area Contingency Plans for those Areas under the direction of the Federal On Scene Coordinator (OSC). The Area Contingency Plans describe the responsibilities of owners, operators and Federal, State and local agencies in responding to oil spills or threats of spills, list equipment and personnel available to respond, describe procedures for the use of dispersants and describe how the Area Contingency Plan integrates with other plans. Area Contingency Plans are adopted by amendments to the State Contingency Plan to facilitate and coordinate on-going work with local municipalities and coastal counties. Through the OSPR Local Grant Program, municipal and county governments are also included in State and Federal planning documents. The objective is to create consistency between the local, State, and national contingency plans.

a. Action: The Parties agree to consult with each other to enhance contingency planning and to ensure that the Area Contingency Plans and Statewide Master Plan are consonant and uniform, subject to the requirements of existing law.

4.    Facility Oil Spill Response Plans:

Facility Oil Spill Response Plans are required by both Federal and State law. These plans describe facility capabilities to prevent and respond to pollution emergencies. The State and the Coast Guard will coordinate with the Department of Transportation (DOT), Mineral Management Service (MMS), and the Environmental Protection Agency (EPA) in assessing facility contingency plans.

a. Action:

(i)    Subject to the requirements of applicable law, regulations and policy, the Parties will develop a system to coordinate, to the extent practicable, the Parties' cooperative review and approval of facility contingency plans. The Parties agree to conduct reviews of facility contingency plans in as much of a coordinated and non-duplicative manner as is permitted by applicable laws, regulations and procedures.

(ii)    The Coast Guard and the State will cooperate to ensure that requirements for facility response plans are compatible and do not conflict. The Parties will work together to determine the feasibility of the Coast Guard accepting State review of facility contingency plans, subject to Coast Guard oversight.

5.    Vessel Oil Spill Response Plans:

Vessel oil spill response plans are required by both
Federal and State law. These plans describe vessel capabilities to prevent and respond to pollution emergencies.

a. Action:

(i)      Although the Parties recognize the need to independently review vessel plans for compliance with their respective laws and regulations, the Parties agree to conduct reviews of vessel contingency plans in as much of a coordinated and non-duplicative manner as permitted by applicable laws, regulations and procedures.

(ii)     The State shall accept to the maximum extent practicable the Federal vessel contingency plan requirements and shall prepare supplementary forms for parties to comply with State requirements in areas such as preventive measures which are in addition to Federal requirements.

(iii)    The Parties will cooperate to ensure that requirements for vessel contingency plans are compatible and do not conflict.  The Parties will work together to determine the feasibility of the Coast Guard accepting State review of vessel contingency plans, subject to Coast Guard oversight.

## B.      Government Committees

The National Contingency Plan (NCP) directs the organization of government committees to prevent and respond to pollution emergencies.

1.  Regional Response Team:

The Region IX - Regional Response Team (RRT) is

established as a coordinating committee by the NCP and includes the State along with the Federal agencies with pollution prevention and pollution response responsibilities.

a. Action: The Parties agree to jointly participate as members of the Regional Response Team (RRT).  RRT participation includes both attending regularly scheduled meetings and responding during incident specific RRT mobilization.

2.  Area Committees:

Area Committees were established by OPA 90 to maximize

State and local participation in contingency planning.

a. Action: The Parties agree to coordinate local response planning by jointly participating in the Area Committee planning process.  Both Parties are strongly committed to participating in Area Committee Plan development and the use of the Area Committees in conducting exercises and drills, consistent with the provisions of the NCP and applicable State contingency plan.

3.  Mexico/United States Pact (MEXUSPAC) Joint Regional Response Team:

The MEXUSPAC Joint Regional Response Team (JRRT) is established in accordance with the NCP to prepare for and respond to pollution emergencies that may impact the international border area between the United States and Mexico on the Pacific coast.

a. Action: The Coast Guard will advise the State of all agreements, plans, and standard operating procedures (SOP) developed to coordinate pollution response with Mexico. During an incident specific mobilization of the MEXUSPAC JRRT, the State will be represented through the State RRT representative who will be from the Department of Fish and Game.

4. State Interagency Oil Spill Committee (SIOSC): SIOSC is responsible for coordinating oil spill prevention, response, planning and policy at the State level.

a. Action: The Coast Guard is invited to provide input and recommendations to the SIOSC.

5. State Harbor Safety Committees: State Harbor Safety Committees are responsible to evaluate and recommend ways to improve the safety of navigation in harbors and harbor approaches.

a. Action: The Coast Guard is invited to provide input and recommendations to the Harbor Safety Committees.

**C.    Drills and Exercises:**

Drills and exercises are required by both Parties to ensure the readiness and interoperability of pollution response organizations.  It is the intention of the Parties to encourage coordination, participation, and cross-training in periodic drills and exercises to facilitate a better understanding of each Party's duties and responsibilities as well as to ensure a combined, effective, familiar working relationship at oil spill incidents.

a. Action:

(i)    The Parties agree to interact in the planning, scheduling, design, conduct and evaluation of exercises as time and resources permit.  In this context, the Parties recognize the role of the National Strike Force Coordination Center, as the focal point for exercise strategy for all elements of the National Response System, in scheduling, designing, executing, evaluating and providing feedback on all National Response System PREP exercises in conjunction with the appropriate RRT and Area Committees.

(ii)    The Parties agree to make available, as time and resources permit, any published annual reports as required by OPA 90 and State statutes concerning evaluations of drills and recommended changes to the National and Area Contingency Plans.

**D.    Certification of Oil Spill Response Organizations:**

Both Parties evaluate, categorize, and certify oil spill response organizations.

1. Action:

a.    The Coast Guard and the State will cooperate to the maximum extent practicable to evaluate, categorize, and certify oil spill response organizations.  The Parties will develop joint certification guidelines and conduct independent or joint reviews as necessary or desirable.

b.    The State shall accept to the maximum extent practicable the Federal compliance documents for Federal certification and shall prepare supplementary forms for compliance with State regulations.

## VI

### PREVENTION OF OIL SPILLS

**A.    Cooperative Implementation:**

The Parties are coordinating their efforts to prevent oil spills in the marine environment.

1.  Action: To the extent permitted under applicable laws, the Parties agree to cooperate in the execution of their respective regulatory responsibilities, to minimize duplication of effort, and to identify opportunities for innovative implementation of casualty prevention plans. Both Parties recognize the importance to encouraging cross-training in each other's regulations and rules including the areas of inspection and response. Each Party must exercise its own rulemaking implementation responsibilities independently and in accordance with applicable rulemaking procedures. Federal inspection requirements associated with vessel safety are not subject to supplemental State regulation.

**B.    Vessel Inspections:**

Each Party recognizes that the other must independently exercise its respective examination responsibilities in accordance with applicable law, regulations and policies. The Coast Guard conducts inspection programs for the purpose of enforcing both international agreements and domestic law aboard United States and foreign flagged vessels. The State, under the California Act, is required to evaluate that inspection process and make recommendations for improvement.

1. Action:

a.    The Parties agree to work together to avoid inconsistent requirements and to find ways to conduct vessel inspections in such a way that disruption to the industry is minimized and efficiency and safety maximized.

b.    In implementing any State examination programs, the State agrees to avoid conflicts and unnecessary duplication in reviewing Federal inspection programs by on-going consultation with the Coast Guard.

c.    Review of inspection records: The Parties agree to make inspection records available to the other and to cooperatively review inspection results, subject to applicable laws, regulations, and procedures.

d.    The State shall report to the responsible officer in charge, marine inspection (OCMI), recognized discrepancies in meeting the requirements of international agreements believed to exist aboard United States and foreign flagged vessels.

e.      Requirements in State Waters:  The Parties will cooperate to establish consistent pollution prevention requirements, and to cooperatively monitor, examine and exchange information relative to those requirements, for vessels to operate in State waters.

f.      The State will promptly inform the cognizant OCMI, and the Coast Guard will promptly inform the Administrator or his designee, of any situation or circumstance relative to a vessel whose condition or equipment may significantly increase the potential for an unauthorized discharge or create an unusual or an unacceptable risk to public health and safety or the safety of navigation within State waters.

g.      The Parties agree to share all applicable information obtained from their respective vessel inspections and examinations.

## C.    Vessel Screening:

The Coast Guard, under Federal law, through the District Commander and the Captain of the Port (COTP), has the authority to regulate the entry of vessels, including those determined to be a threat to the environment.  The State may establish the means by which it can determine whether tank vessels entering the State waters pose a substantial risk of harm to public health and safety and the environment.

1.  Action: When the State determines that a particular vessel or vessels pose a substantial risk, that determination will be forwarded to the cognizant Captain of the Port (COTP).  The COTP shall consider that information in making a determination under Federal law as to appropriate action to be taken, if any, including the possibility of denial of entry.

## D.    Tank Vessel Equipment:

The Coast Guard conducts inspections and examinations to ensure compliance with requirements for equipment to ensure safety of life at sea aboard vessels.  The California Act authorizes the Administrator to conduct vessel inspections.  Both Parties conduct examinations to ensure compliance with requirements for pollution prevention and pollution response equipment.

1.  Action: The Parties will cooperatively examine pollution prevention and pollution response equipment aboard vessels and report noncompliance to the other Party.

## E.    Tank Vessel Manning:

The Coast Guard establishes and enforces requirements for manning, competence, and documentation of personnel aboard tank vessels.

1.  Action:

a.      The State will assist the Coast Guard to evaluate and coordinate additional requirements for manning, training, and qualification requirements through the manning standards process.

b.      The Parties agree to actively promote and coordinate research projects, such as PTP, to identify human factors which need to be regulated to prevent pollution incidents.

**F.      Tank Vessel Transfer Operations:**

Monitoring tank vessel transfer operations has been identified as an effective pollution prevention action.

1. Action:

a.      The Parties will cooperate to monitor transfer operations aboard tank vessels, including, but not limited to, dockside transfers at facilities and lightering and bunkering operations.  The Coast Guard acting through the Marine Safety Offices (MSO's) and the State agree to cooperate in the scheduling of monitoring vessel transfer operations to make best use of limited resources and avoid redundant oversight and disruptions to industry.  Each Party will advise the other of violations observed.

b.      The Parties will cooperatively monitor and examine pollution prevention and pollution response equipment during transfer operations.  Each Party will advise the other of violations observed.

c.      The Parties agree to make transfer monitor records available to each other and to cooperatively review monitoring results, subject to applicable laws, regulations and procedures.

**G.      MARPOL 73/78**

MARPOL 73/78 is the International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocol of 1978 relating thereto:

MARPOL 73/78 is an international agreement implemented to reduce pollution from vessels.

1. Action: The Parties will cooperate in the enforcement of existing MARPOL requirements. The Coast Guard will keep the State informed concerning MARPOL regulations, and both Parties will work together to develop disposal services adequate to support port operations.

**H.      Facility Inspections:**

Facility,inspections are conducted by both Parties to ensure compliance with pollution prevention and pollution response regulations.  The State has statutory responsibility for oil transfer facilities and their operation within the State.  Included in this responsibility is the requirement to establish regulation and inspection programs governing oil transfer facilities. This includes regulation and inspection of oil transfer operations between marine facilities and tank vessels.

1. Action:

a. Facility Inspection: The Parties will coordinate their respective inspection and monitoring activities to the extent practicable to utilize the resources of both Parties efficiently and effectively.  Cognizant inspectors from both Parties may carry out inspections and other activities jointly where appropriate.

b. Equipment: The Parties will cooperatively enforce requirements for pollution prevention and pollution response equipment at marine facilities.

c. Manning: The Parties will cooperatively enforce requirements for trained and qualified personnel to be responsible for transfer operations at marine facilities.

d. MARPOL Reception Facilities: The Parties will work together to ensure adequate facilities are present to receive garbage, sewage, and oily wastes from vessels.

e. The State will promptly inform the COTP, and the USCG will promptly inform the State, of any situation or circumstance relative to facilities whose operation or equipment may significantly increase the potential for an unauthorized discharge or create an unusual or an unacceptable risk to public health and safety, or the safety of navigation within State waters.

I.    **Waterways Management:**

1. Port and Waterways Safety

The Captain of the Port (COTP) is the predesignated Federal official with primary responsibility to exercise control of vessels to ensure the safety and security of ports and waterways.  Under the California Act, Harbor Safety Committees are created and are responsible for the planning of safe navigation and operation of tankers, barges, and other vessels in harbors and harbor approaches.

a. Action

(i)    The State will promptly inform the COTP, and the Coast Guard will promptly inform the appropriate State authority, of any situation or circumstance relative to vessels whose operation or equipment may significantly increase the potential for an unauthorized discharge or create an unusual or an unacceptable risk to public health and safety, or the safety of navigation within State waters.

(ii)    The State is guided by recommendations from the Harbor Safety Committee for the planning of safe navigation and operation of tankers, barges and other vessels within each harbor.  The State, in adopting regulations to implement the Harbor Safety Plan will coordinate with the COTP.

2.  Vessel Traffic Services (VTS)

The Ports and Waterways Safety Act authorizes the Coast

Guard to construct, operate and maintain vessel traffic services in the areas subject to the jurisdiction of the United States. The Federal system of VTS is designed and empowered to inform, advise, and direct marine traffic in designated areas. Federal VTSs require the participation of certain classes of vessels and may direct the movement of those vessels to reduce navigational risks.

In 1991, the Coast Guard completed a VTS Ports Needs Study to determine which United States ports would gain the most benefit from the presence of a Federal VTS. The California ports and waterways included in the Port Needs Study were Los Angeles/Long Beach, Santa Barbara Channel and the ports in and around San Francisco Bay.

a. Action:

(i)    The Coast Guard maintains a Federal VTS in San Francisco Bay. The State will cooperate with the Coast Guard to ensure expansion of the existing VTS system within San Francisco, San Pablo, Suisun Bays as well as the Gulf of the Farallones.

(ii)    A Vessel Traffic Information System (VTIS) for Los Angeles/Long Beach is maintained under a joint partnership between the Marine Exchange, the State and the Coast Guard.

3.  Pilots

Federal law requires pilots aboard vessels sailing within the coastwise trade. Foreign vessels or United States vessels engaged in foreign trade may be controlled by State pilotage requirements. In the absence of State pilotage regulations, the Federal government may impose pilotage requirements on those vessels.

a.    Action: The Coast Guard and the State intend to enter into a memorandum of agreement with California's port and harbor authorities for the purpose of creating a state pilotage system ; except for the port and harbor authorities falling under pilotage jurisdiction of the Board of Pilot Commissioners for San Francisco, San Pablo and Suisun Bays, where the Coast Guard recognizes the State regulation of pilotage.

4.  Tug Escorts

Federal and State law authorize the regulation of the

use of tug escorts and may require either equipment or standards of performance deemed necessary for the function.

a. Action:

(i)    The State and the Coast Guard agree to consult with each other in issuing any regulations requiring tug escorts to ensure that they are consistent to the extent permitted by law.

(ii)    Towing Equipment: The Parties agree to review requirements for tow equipment for barges and tank vessels carrying oil in bulk, with the purpose of determining whether additional standards for equipment, maintenance, operation, and inspection should be adopted.

5.  Aids to Navigation (ATON)

The Coast Guard establishes, regulates, and maintains a uniform system of aids to navigation within the United States.

Action: The State will assist the Coast Guard by recommending changes, improvements, or repairs that may improve aids to navigation, in cooperation with the Harbor Safety Committees.

## J.    Public Information/Education

The Parties agree that public education in areas of pollution prevention, which includes oil, hazardous substances and garbage, is a high priority and that each agency shall seek opportunities to coordinate pollution prevention public awareness and education programs.

1. Action:

a.     Marinas: Public information and education will be cooperatively developed and implemented targeting marina operations to reduce pollution from oil, toxic substances, garbage, and sewage.

b.     Small Oil Transfer Facilities: Public information and education will be cooperatively developed and implemented targeting small oil transfer facilities to reduce pollution from oil, toxic substances, garbage, and sewage.

c.     Recreational Vessels: Public information and education will be cooperatively developed and implemented targeting the recreational boating community to reduce pollution from oil, toxic substances, garbage, and sewage.

## VII

## RESPONSE

Federal law established the Coast Guard as the primary Federal agency tasked with responding to oil spills on the navigable waters of the United States. In such cases, the Federal On Scene Coordinator (OSC) is the predesignated official responsible for directing response actions. The OSC may direct or monitor all Federal, State, and private actions in response to an oil spill or a potential oil spill in State waters. The Parties will respond to marine oil spills as required by and in accordance with the National Contingency Plan (NCP). The OSC will consult, as required by OPA 90 and other applicable Federal law, with the OSPR Administrator or designee concerning oil spill response activities. State law provides that OSPR is responsible for coordinating State oil spill cleanup efforts.

A.     Notification:

The Parties agree to provide the earliest possible notification of discharges of oil and hazardous substances and imminent threats of such discharges to each other in accordance with applicable law, regulations and policies consistent with the National Oil and Hazardous Substances Pollution Contingency Plan and applicable area contingency plans. In order to provide a single point of contact for the OSC in the event of a marine oil spill, the OSPR Administrator or designee will represent all State agencies and will be the primary point of contact.

B.    Incident Command System (ICS)/Unified Command Structures (UCS):

The Incident Command System (ICS)/Unified Command Structure (UCS) establishes functional responsibilities, lines of communication, information sharing and control for the conduct of an oil spill response operation.

1. Action:

a.    The Parties agree to work together within the framework of their respective authorities to ensure a coordinated effort with a minimum of duplication in response to oil spills.

b.    The Parties agree to implement an ICS/UCS to ensure coordination of emergency response decision-making during a pollution incident. In those circumstances where governmental action is required to develop and direct action to clean up or abate the effects of an oil spill, the Parties agree to consider best utilization of existing resources, avoiding duplication, while taking advantage of resource availability. The OSC may request the State to undertake response actions on a case-by-case basis. If the State assumes responsibility for response activity, the State will conduct those activities, as directed by the OSC, in accordance with the National Contingency and Area Contingency Plans.

c.    Response Decisions: The OSC will coordinate with the State in decision-making relating to the conduct of oil spill response operations including, but not limited to: salvage, lightering, safe haven and other matters affecting the discharge of spilled oil, its containment or its cleanup.

d.    The Parties agree to establish a joint public information center to provide for the coordinated dissemination of information during a response operation. This provision does not preclude the Parties from making independent responses to the media and the public.

C.    Natural Resource Protection

Both Parties recognize the importance of protecting and preserving natural resources in responding to an oil spill. Both Parties agree that response strategies and procedures will be established through the Unified Command Structure (UCS), in accordance with applicable laws, regulations, and policies, and procedures. The Area Contingency Plan (ACP) will be used as the primary guidance document regarding resource protection.

D.    Response Monitoring and Technology

Both Parties agree that the methods used to clean up oil and oily debris shall be established through the Incident Command System (ICS)/UCS which will determine the level of action which is required.

1. Action:

a.      Both Parties agree, through the Incident Command System, to provide timely input and recommendations to the Unified Command, to the extent practicable, on dispersant usage, in situ burning, bioremediation, and other non-mechanical cleanup technologies.

b.      Both Parties agree that decisions to discontinue clean up operations and demobilize response activities shall be made through the Unified Command Structure. The State retains the right to undertake response, remedial or mitigating actions beyond the response actions completed by the OSC.

E.      Incident Command System (ICS) Training

Both Parties acknowledge the necessity for increased and ongoing training in ICS procedures to maintain a qualified pool of response personnel.

1. Action:

a.      Both Parties agree to establish training criteria appropriate to their agencies.

b.      Both Parties agree to pursue joint training opportunities and instruction.

c.      To better prepare for an oil spill where a responsible party is not present or not identified, the State and each COTP shall prepare an action plan for, and exercise the Incident Command System.  Such action plans shall be reviewed, updated, and exercised as needed.

## VIII

## NATIONAL POLLUTION FUNDS CENTER INFORMATION

A.      The Oil Spill Liability Trust Fund (The Fund).

The Fund provides funding under certain conditions for oil discharge removal actions.  The Fund is available in certain circumstances to compensate the State for incurred costs and damages associated with oil discharges.  To the extent allowed, a State may access the Fund under current regulations and National Pollution Fund Center (NPFC) procedures.

1. Action: Upon the publication of regulations implementing Section 1012(d)(2) of OPA 90, the State may negotiate directly with the NPFC to establish a cooperative agreement to provide access to the Fund under Section 1012(d)(2).  Any agreement between the State of California and the National Pollution Fund Center shall be attached as an annex to this MOA.

B.      The National Pollution Fund Center (NPFC)

1. The NPFC administers the Oil Spill Liability Trust Fund (The Fund) in order to: provide funding for oil removal activities, provide State access to the Fund, conduct cost recovery, accept and process claims, and evaluate requests by Federal trustees to fund initiation of natural resource damage assessments. The NPFC also administers Certificates of Financial Responsibility and provides CERCLA/Superfund funding to Coast Guard On Scene Coordinators (OSC) responding to hazardous material incidents.

2. The State may receive payment from the Fund in the State's role as a response organization engaged in removal activities consistent with the National Contingency Plan, as an appropriate claimant for damages, and in the State's role as a natural resource trustee. In addition to the text herewith concerning Section 1012(d)(2) of the Oil Pollution Act of 1990 (OPA 90), the State recognizes the following provisions outline alternative funding methods for State removal activity:

   a.    Section 1012(d)(1). Regulations under Section 1012(d)(1) of OPA 90 allow the NPFC, upon request of the Governor of a State and as authorized by the Federal On Scene Coordinator (OSC), to obligate The Fund for payment in an amount not to exceed $250,000 for removal costs, consistent with the National Contingency Plan (NCP), required for the immediate removal of a discharge, or the mitigation or prevention of a substantial threat of a discharge, of oil. The NPFC's Technical Operating Procedures (TOPS) for State access under Section 1012(d)(1) of OPA 90, and the TOPS for resource documentation under OPA 90 are approved guidelines for State use to access the Fund under this section.

   b.    Claims. Regulations under Section 1012(a)(4) of OPA 90 authorize use of The Fund for the "payment of claims in accordance with Section 1013 of OPA 90 for uncompensated removal costs determined by the President [Coast Guard] to be consistent with the NCP or [for] uncompensated damages." Procedures for claims are found in 33 CFR Part 136. States have a special status under Section 1013 of OPA 90 regarding claims for uncompensated costs which allows States to make such claims directly to The Fund rather than first to the responsible party.

   c.    The State agrees to eliminate excessive overhead expenses associated with the cost recovery program so that only those individual claims in excess of a dollar amount to be determined through consultation with the Coast Guard and eligible for compensation shall be submitted to the Fund.

   d.    Working Directly for the OSC. State agencies may work directly for the On Scene Coordinator (OSC) in performing removal actions. In these situations, the OSC issues a Pollution Removal Funding Authorization (PRFA) to the State to establish a contractual relationship and to obligate The Fund. The OSC actively directs and is responsible for the response actions. The OSC may request State assistance and participation in emergency removal actions under CERCLA in response to a hazardous materials incident or threatened incident and where funding for these actions is established in a PRFA.

3. Natural Resource Damage Assessments. A State natural resource Trustee may request access to the Fund for the initiation of an assessment of natural resource damages resulting from a discharge of oil, through a Federal Lead Administrative Trustee (one of the Federal Trustees designated in the NCP), in accordance with the procedures established by the NPFC (Section 6002(b) of OPA 90).

## IX

## ENFORCEMENT

Enforcement action by either Party may include civil and criminal penalties. The Coast Guard may also take action against Coast Guard merchant marine licenses and seamen's documents.

A. Action:

1.      Subject to the requirements and limitations of applicable State and Federal law, the Parties agree to cooperate to the fullest extent possible in marine casualty investigations and pollution investigations including, but not limited to: the sharing of information regarding witnesses, reports, analyses, and other available information, or evidence that may assist in determining the cause of the casualty or pollution incident.

2.      Enforcement action undertaken by each of the Parties must occur independently in accordance with applicable laws and regulations. The Parties agree that to the extent they can, they will consult with each other as to intended enforcement action.

3.      The Parties agree to investigate the feasibility of the Coast Guard utilizing the Department of Fish and Game Petroleum Chemistry Laboratory for the analysis of Coast Guard oil samples.

## X

## RULEMAKING

A.      Issuance of Regulations

The Oil Pollution Act of 1990 and other-Federal law provides for the issuance of regulations pertaining to the prevention of oil spills from vessels. The Commandant of the Coast Guard has the authority to promulgate such regulations. The Commander, Eleventh Coast Guard District, and the respective Captains of the Port have limited authority to promulgate local regulations. Acting under its inherent regulatory authority and under authority not preempted by Federal law, the State has the authority to promulgate regulations concerning oil spill prevention which do not conflict with, and which are not otherwise preempted, by Federal law. It is the intention of the parties to maintain close communications to reduce conflict between each Party's permits, directives, and instructions.

1. Action:

a.      The intent of this section is to avoid conflict and inconsistent regulation in rulemaking wherever possible, subject to applicable procedural rules, and to endeavor to provide a coordinated, synergistic response to oil pollution planning and response. It is the intent of the Parties to endeavor under their respective authorities to assure the best achievable protection for the waters of the State.

    b.     In addition, the respective Federal and State procedures for noticing the opportunity to comment on proposed rules, the Parties anticipate that through their participation on committees and day-to-day working communications, the concerns of each will be discussed and given due consideration.

B.     Containment and cleanup for refueling, bunkering or lightering operations OPA 90 and other Federal laws regulate refueling, bunkering and lightering operations.  Federal regulations enforced by the Coast Guard govern these operations.  Subject to the requirement that they be consistent with Federal regulations, the State may issue its own regulations relating to these same operations.

C.     Tank Vessel Response Equipment Rules

Federal law governs the standards for response equipment.  State law authorizes the adoption of State standards for spill response equipment to be maintained on tank vessels operating in waters of the State.  State rules must be consistent with Federal spill response equipment standards.

# XI

# AGREEMENT

A.     This agreement represents a voluntary understanding between the Eleventh Coast Guard District and the State of California.

B.     The terms of this agreement may be changed at any time by the Parties by a written, signed amendment hereto with or without notice to any other person.

C.     The agreement may be terminated by either party at any time without notice to any person other than the other party.

D.     No rights, duties, obligations, or liabilities enforceable at law are created by this agreement.

E.     No action based upon this agreement may be brought against the United States or the State of California by any person.

F.     This agreement does not alter, modify, abridge, or in any way affect any rights, duties, obligations, or liabilities of any person under the laws of the United States or the State of California.

G.     In the event that individual and severable portions of this agreement are found to be in conflict with either State or Federal law, regulations or policies, and therefore of no effect, the agreement will remain in effect without those provisions, unless either Party notifies the other in writing that the entire agreement is terminated.

H.     Any action to modify, amend or terminate this agreement may only be taken by the Governor of the State of California or the Commander, Eleventh Coast Guard District or person to who this authority is specifically delegated by them.

I.     This MOA supercedes and replaces the MOA signed on June 2, 1993.

**FOR THE STATE OF CALIFORNIA:**

ARNOLD SCHWARZENEGGER
Governor
State of California

Date:

**FOR THE UNITED STATES COAST GUARD:**

R. T. RUFE
Vice Admiral, USCG
Commander,
Eleventh Coast Guard District

Date:

# EXHIBIT E



# National Transportation Safety Board
Washington, D.C. 20594

## Safety Recommendation

**Date:** March 18, 2005

**In reply refer to:**    M-05-04 through -06

Admiral Thomas H. Collins
Commandant
U.S. Coast Guard
Washington, D.C. 20593-0001

About 1520 on October 15, 2003, the Staten Island Ferry *Andrew J. Barberi*, owned and operated by the New York City Department of Transportation, was at the end of a regularly scheduled trip from Manhattan to Staten Island when it allided at full speed with a maintenance pier at the St. George ferry terminal. Fifteen crewmembers and an estimated 1,500 passengers were on board. The assistant captain was at the controls but, for reasons that could not be determined, was unresponsive to cues of the impending allision. Except for one deckhand, the crewmembers also did not recognize that the ferry was in danger. Ten passengers died in the accident and 70 were injured. An eleventh passenger died 2 months later as a result of injuries sustained in the accident. Damages totaled more than $8 million, including repair costs of $6.9 million for the *Andrew J. Barberi* and $1.4 million for the pier.[1]

The National Transportation Safety Board (Safety Board) determined that the probable cause of the accident was the assistant captain's unexplained incapacitation and the failure of the New York City Department of Transportation to implement and oversee safe, effective operating procedures for its ferries. Contributing to the cause of the accident was the failure of the captain to exercise his command responsibility over the vessel by ensuring the safety of its operations.

To determine whether the assistant captain's incapacitation had a medical explanation, the Safety Board studied his sleep, work, and medical history, including the results of medical evaluations required by the U.S. Coast Guard. The Board's review of the records maintained by the assistant captain's personal physician and his pharmacy revealed medical conditions and medications that should have called into question the assistant captain's ability to safely pilot a vessel. However, none of the medical evaluation forms submitted by the assistant captain and his physician to the Coast Guard

---

[1] For further information, see *Allision of Staten Island Ferry* Andrew J. Barberi, *St. George, Staten Island, New York, October 15, 2003*, Marine Accident Report NTSB/MAR-05/01 (Washington, DC: National Transportation Safety Board, 2005). The report will be available on the Safety Board's website <www.ntsb.gov/publictn/M_Acc.htm>.

7628A

2

listed such conditions and medications. All the forms the Board examined (from 1986, 1989, 1995, and 2000) falsely indicated that the assistant captain was not taking any prescribed medications and had no medical condition that required the use of medication, with the last form indicating that he had "no significant medical history." The Board concluded that because of this false information, the Coast Guard had no opportunity to evaluate the assistant captain's medical fitness to maintain his mariner's license. The Board was unable to determine whether any medical factor, such as the assistant captain's regular use of the prescription medication tramadol, accounted for his failure to respond to clear indications of the impending allision.

The Safety Board previously recommended that various Federal agencies take actions to address issues pertaining to the use of licit medications by vehicle operators. The Board recommended that the U.S. Department of Transportation (DOT) work with the Federal Motor Carrier Safety Administration, the Federal Railroad Administration, the Federal Transit Administration, and the Coast Guard to obtain more comprehensive data on the nature and extent of the role of medication in fatal surface mode accidents; that the DOT establish a list of approved medications or classes of medications that may be used safety when operating a vehicle, and expressly prohibit the use of any medication not on that list except in certain situations; and that the DOT evaluate the applicability of similar restrictions for transportation employees in all safety-sensitive positions.[2] The Board specifically requested the Coast Guard to publish general guidance on the use of licit drugs by mariners.[3] At a meeting with the Board on September 9, 2004, the Coast Guard agreed to take action and said that it will provide the Board with a formal response when the action is complete.

The Safety Board's investigation of the *Andrew J. Barberi* accident identified weaknesses in the Coast Guard's medical oversight of mariners. The Board concluded that the weaknesses were unrelated to the accident, but believes that they represent opportunities for the Coast Guard to improve its medical oversight system:

- Although Coast Guard regulations at Title 46 *Code of Federal Regulations* (CFR), Part 10, Section 709, require licensed pilots to undergo an annual physical examination, the Coast Guard does not provide guidance on acceptable methods of meeting the requirement. Nor does it require pilots to report the results of their annual medical appraisal to either the Coast Guard or their employer. The only requirement is that pilots make the results of their most recent physical examination available to the Coast Guard "upon request."

- The Coast Guard does not require mariners to report changes in medical condition between examinations, despite the possibility that in the intervals between examinations, a mariner could experience new medical

---

[2] Safety Recommendations I-00-1 through I-00-4 (letter to Secretary, U.S. Department of Transportation, from Chairman, National Transportation Safety Board, January 13, 2000).

[3] Safety Recommendations M-00-2 and M-00-3 (appendix C of letter to Secretary, U.S. Department of Transportation, from Chairman, National Transportation Safety Board, January 13, 2000).

3

symptoms, take new medications, or be hospitalized. The Coast Guard publishes an extensive list of disqualifying conditions in its "Physical Evaluation Guidelines for Merchant Mariner's Documents and Licenses" (Navigation and Inspection Circular No. 2-98), including conditions that pose a risk of incapacitation or debilitating complication or that require medication impairing judgment or reaction time. The Coast Guard, however, has no formal mechanism for being informed about a mariner who has a disqualifying physical condition.

- The Coast Guard's system of storing medical data does not track whether all required examinations are performed, nor, as noted above, does the Coast Guard require all such records to be submitted. Thus, the Coast Guard could not tell the Safety Board whether the assistant captain of the *Andrew J. Barberi* had had his required annual medical examination the year before the accident. The Safety Board determined that the Coast Guard had not asked any Staten Island Ferry captain or assistant captain for proof of the required annual medical evaluation in the 12 months before the accident.

- The Coast Guard's medical data storage system does not allow the Coast Guard to study trends in evaluation results, differences between physicians who perform the evaluations, or inconsistencies in Coast Guard reviews of the medical evaluation forms. Thus, the Coast Guard cannot ascertain whether certain physicians do not perform the evaluations properly and therefore should not be allowed to assess mariners' medical fitness. Further, the Safety Board found that headquarters Coast Guard personnel overseeing the medical evaluation process knew little about the quality of regional reviews of medical evaluations. Because the Coast Guard leaves the certification of mariners to regional evaluation centers that have widely varying standards, the Board is concerned that an individual such as the assistant captain, with multiple medication use and multiple medical conditions, might receive certification even if accurate information was provided on the medical evaluation form.

- The Coast Guard has only limited ability to review the medical evaluations made by personal health care providers. The senior medical officer, the final authority in the mariner medical oversight process, had no formal training in occupational medicine and told Safety Board investigators that he relied on a mariner's health care provider for guidance on whether a mariner was able to perform his or her job.

Having identified serious deficiencies in the safety of the Staten Island Ferry operations, the Safety Board is concerned about the risk to passengers posed by the absence of requirements for an aggressive safety management system on domestic passenger ferries nationwide. Despite the size of the U.S. ferry industry and the capacity of individual vessels to carry thousands of passengers on a single voyage, current Coast Guard regulations stipulate that rules pertaining to safety management systems apply

4

only to ferry operators that operate internationally or that have voluntarily adopted safety management systems. Thus, the Staten Island ferries were not required to have a safety management system, and ferry management had not voluntarily instituted such a system at the time of the accident.

Since the accident, and after an assessment by the Global Maritime and Transportation School, the New York City Department of Transportation has indicated to the Safety Board that it is implementing a safety management system and expects to receive a Document of Compliance by December 2005. The Board is concerned, however, that the absence of safety management systems on other ferries that carry thousands of passengers daily on U.S. waterways could result in the type of safety-deficient operation found in the Staten Island ferries. The Board notes that the Coast Guard has expressed its support for the development of safety management systems on domestic vessels, stating that "the use of safety management systems by all U.S. commercial vessels would result in significant benefits."[4] With the proper legislative authority, the Coast Guard could mandate that all U.S.-flag passenger ferries implement a safety management system. By enforcing such a requirement, the Coast Guard could ensure that U.S. ferries that operate on domestic routes maintain the same high standards of safety that the Coast Guard requires of U.S. oceangoing vessels.

In light of the issues discussed above, the National Transportation Safety Board makes the following safety recommendations to the U.S. Coast Guard:



Revise regulation 46 CFR 10.709 to require that the results of all physical examinations be reported to the Coast Guard, and provide guidance to mariners, employers, and mariner medical examiners on the specific actions required to comply with these regulations. (M-05-04)

In formal consultation with experts in the field of occupational medicine, review your medical oversight process and take actions to address, at a minimum, the lack of tracking of performed examinations; the potential for inconsistent interpretations and evaluations between medical practitioners; deficiencies in the system of storing medical data; the absence of requirements for mariners or others to report changes in medical condition between examinations; and the limited ability of the Coast Guard to review medical evaluations made by personal health care providers. (M-05-05)

Seek legislative authority to require all U.S.-flag ferry operators to implement safety management systems, and once obtained, require all U.S.-flag ferry operators to do so. (M-05-06)

As a result of its investigation of the *Andrew J. Barberi* accident, the Board has also issued safety recommendations to the New York City Department of Transportation, the States and territories that operate public ferries, and the Passenger Vessel Association.

---

[4] *Federal Register*, vol. 62, no. 247 (December 24, 1997), p. 67503.

5

The Board would appreciate a response from you within 90 days addressing actions you have taken or intend to take to implement our recommendations. In your response, please refer to M-05-04 through -06. If you need additional information, you may call (202) 314-6177.

Chairman ENGLEMAN CONNERS, Vice Chairman ROSENKER, and Members CARMODY, HEALING, and HERSMAN concurred in these recommendations.

*[original signed]*

By:    Ellen Engleman Conners
Chairman

# EXHIBIT F

# Allision of Staten Island Ferry *Andrew J. Barberi*
# St. George, Staten Island, New York
# October 15, 2003



## Marine Accident Report

NTSB/MAR-05/01

PB2005-916401
Notation 7628A



**National
Transportation
Safety Board**
Washington, D.C.

# Marine Accident Report

**Allision of Staten Island Ferry *Andrew J. Barberi*
St. George, Staten Island, New York
October 15, 2003**

NTSB/MAR-05/01
PB2005-916401
Notation 7628A
Adopted March 8, 2005



National Transportation Safety Board
490 L'Enfant Plaza, S.W.
Washington, D.C. 20594

National Transportation Safety Board. 2005. *Allision of Staten Island Ferry* Andrew J. Barberi, *St. George, Staten Island, New York, October 15, 2003*. Marine Accident Report NTSB/MAR-05/01. Washington, DC.

**Abstract:** This report discusses the allision of the passenger ferry *Andrew J. Barberi* with maintenance pier B-1 at the Staten Island ferry terminal on October 15, 2003. The ferry carried an estimated 1,500 passengers and 15 crewmembers. Ten passengers died in the accident and 70 were injured. An eleventh seriously injured passenger died 2 months later. Damages totaled more than $8 million, with repair costs of $6.9 million for the *Andrew J. Barberi* and $1.4 million for the pier.

From its investigation of the accident, the Safety Board identified the following safety issues: actions of the assistant captain and captain, oversight of ferry operations by the New York City Department of Transportation, medical oversight of mariners, safety management systems, and the potential contribution of navigation technology to the safety of ferry operations.

On the basis of its findings, the Safety Board made recommendations to the New York City Department of Transportation, the U.S. Coast Guard, the States that operate public ferries, and the Passenger Vessel Association.

The National Transportation Safety Board is an independent Federal agency dedicated to promoting aviation, railroad, highway, marine, pipeline, and hazardous materials safety. Established in 1967, the agency is mandated by Congress through the Independent Safety Board Act of 1974 to investigate transportation accidents, determine the probable causes of the accidents, issue safety recommendations, study transportation safety issues, and evaluate the safety effectiveness of government agencies involved in transportation. The Safety Board makes public its actions and decisions through accident reports, safety studies, special investigation reports, safety recommendations, and statistical reviews.

Recent publications are available in their entirety on the Web at <http://www.ntsb.gov>. Other information about available publications also may be obtained from the Web site or by contacting:

National Transportation Safety Board
Public Inquiries Section, RE-51
490 L'Enfant Plaza, S.W.
Washington, D.C. 20594
(800) 877-6799 or (202) 314-6551

Safety Board publications may be purchased, by individual copy or by subscription, from the National Technical Information Service. To purchase this publication, order report number PB2005-916401 from:

National Technical Information Service
5285 Port Royal Road
Springfield, Virginia 22161
(800) 553-6847 or (703) 605-6000

*The Independent Safety Board Act, as codified at 49 U.S.C. Section 1154(b), precludes the admission into evidence or use of Board reports related to an incident or accident in a civil action for damages resulting from a matter mentioned in the report.*

719K. Mariners then submit proof of their fitness to the Coast Guard, according to regulations at 46 CFR 10.209(d) or (e). Form 719K provides information to the examining health practitioner on the medical evaluation and on general duties required of licensed mariners.

The Coast Guard requires mariners with pilot endorsements, which includes captains and assistant captains on the Staten Island Ferry, to be examined annually (46 CFR 10.709). Form 719K does not apply to the annual pilot medical evaluation, and the regulations and other published material do not provide additional information on the medical evaluation or the documentation necessary after the evaluation is completed. Mariners with pilot endorsements do not have to submit proof of their medical examinations outside the 5-year or license-upgrade interval. The regulations require pilots to possess such proof, however, and make it available to Coast Guard personnel on demand (46 CFR 10.709[e]).[53]

Neither Coast Guard Activities New York nor representatives of the Coast Guard's New York regional examination center (REC), the office responsible for overseeing and approving mariner licensing in the New York area, requested proof of compliance with the annual medical evaluation requirement from either the captain or the assistant captain of the *Andrew J. Barberi*. Coast Guard personnel also did not ask any Staten Island Ferry captain or assistant captain for such proof in the 12 months before the accident. The Safety Board was unable to establish that the Coast Guard enforced compliance by ferry operating personnel with the annual examination requirement in that interval or at any other time.

Medical standards differ according to the general assignment of applicants (deck or engineering). For example, deck officers are required to have vision correctable to 20/40 in each eye, engineering officers to 20/50 in each eye. After completing the examination, the health practitioner signs Coast Guard form 719K and indicates whether the applicant is considered medically qualified. (The Coast Guard makes the final determination of a mariner's qualifications.) Other forms may be used, provided that the examination is carried out in accordance with the standards listed in form 719K. At the end of the examination, the examiner provides the applicant with form 719K or, if warranted, with a certificate that the applicant is in good health and otherwise meets the physical requirements at 46 CFR 10.209(d) or 12.02-27(d). Applicants can choose whether to submit the evaluation results to the Coast Guard.

---

[53] "Upon request, a first class pilot shall provide the Coast Guard with a copy of his or her most recent physical examination."

**To the Passenger Vessel Association:**

Encourage your member ferry operators to voluntarily request application of the Federal requirements at 33 CFR 96 for implementing a safety management system, if they have not already done so. (M-05-08)

# BY THE NATIONAL TRANSPORTATION SAFETY BOARD

**ELLEN ENGLEMAN CONNERS**
Chairman

**MARK V. ROSENKER**
Vice Chairman

**CAROL J. CARMODY**
Member

**RICHARD F. HEALING**
Member

**DEBORAH A. P. HERSMAN**
Member

**Adopted: March 8, 2005**

# EXHIBIT G

not cause of a maritime mishap. The TSB, in their report on the 2003 collision of the Staten Island ferry ANDREW J. BARBERI, determined that the assistant captain's unexplained incapacitation was a causal factor in the casualty, resulting in the deaths of 10 passengers and injuries to 70 others. The report recommended that the Coast Guard review several issues in the merchant mariner physical and medical evaluation process. The proposed NVIC is a critical component of the Coast Guard's response to the NTSB report.

### Does this change current practices?

The information contained in the proposed NVIC does not change current Coast Guard practices with respect to the physical and medical evaluation process. Rather, it puts the current practices into writing, making them transparent for all to see and promoting their consistent application. As such, it is not anticipated that the proposed NVIC will result in significantly higher rates of disqualification for mariners, nor in increased processing time for credential applications with physical and/or medical issues. To the contrary, as explained above, the Coast Guard expects the process to be fairer and less subjective, and we anticipate a reduction in application processing time, because all parties will know precisely what information is needed at the outset of the application process.

### How does the proposed NVIC differ from the current NVIC 2–98?

The current NVIC 2–98 defines approximately forty-seven medical conditions as potentially disqualifying, but provides specific guidance for only two of those conditions. The proposed NVIC has a more extensive list of medical conditions and guidance on how to address the Coast Guard's safety concerns with respect to those conditions.

### What are the contents of the proposed NVIC?

The guidance in the proposed NVIC has been developed by Coast Guard medical officers in consultation with MERPAC and experienced maritime community medical practitioners. The proposed NVIC reflects a synthesis of their recommendations, regulatory requirements, and the recommendations of leaders of other Federal transportation modes as to appropriate medical and physical standards.

Enclosure (1) of the proposed NVIC provides guidance on medical certification standards. It lists the standards that apply to applicants for each of the various types of credentials.

Enclosure (2) provides guidance for determining if mariners are physically able to perform their duties. Enclosure (3) contains a list of potentially disqualifying medical conditions, medications and supplemental medical data to be submitted for medical review. Enclosure (4) contains guidance for evaluating vision and hearing. Enclosure (5) describes the medical review process.

Once the Coast Guard has considered all comments and related material, we will publish a final, effective version of the NVIC for use as guidelines by the general public, mariners, and specifically, those professionals assessing the physical and medical condition of merchant mariners. The final, effective version of the NVIC will be posted on the electronic docket for this rulemaking as well as the NMC Web site at *http://www.uscg.mil/hq/g-m/nmc/web/index.htm.*

Dated: September 21, 2006.

**J.G. Lantz,**

*Director of National and International Standards, Assistant Commandant for Prevention.*

[FR Doc. 06–8305 Filed 9–22–06; 4:33 pm]

**BILLING CODE 4910–15–P**

## DEPARTMENT OF HOMELAND SECURITY

### Coast Guard

[USCG 2006–25522]

### Exercise of Authority To Require Pilots To Submit Annual Physical Examinations

**ACTION:** Notice.

**SUMMARY:** By this notice, the Coast Guard is exercising authority currently set forth in Coast Guard regulations to require all first class pilots on vessels greater than 1600 GRT, and other individuals who "serve as" pilots on certain types of vessels greater than 1600 gross registered tons (GRT), to provide a copy of their annual physical examination to the Coast Guard.

**FOR FURTHER INFORMATION CONTACT:** Mr. Stewart A. Walker, National Maritime Center. Phone: 202–493–1022, e-mail: *Stewart.A.Walker@uscg.mil.*

**DATES:** All first class pilots on vessels greater than 1600 GRT, and other individuals who "serve as" pilots on certain types of vessels greater than 1600 GRT (as described in **SUPPLEMENTARY INFORMATION** below), must submit a copy of their most recent annual physical examination to the Coast Guard on or before December 27,

2006. After that, pilots must submit a copy of their annual physical examination to the Coast Guard no later than 30 calendar days after completion of the physical examination each year. The annual physical examination must, by regulation, be completed within 30 calendar days of the anniversary date of the individual's most recent satisfactorily completed physical examination.

**SUPPLEMENTARY INFORMATION:** This notice implements the recommendation made the National Transportation Safety Board (NTSB), in their report on the 2003 allision of the Staten Island Ferry ANDREW J. BARBERI, that the Coast Guard require submission of annual pilot physicals. The Coast Guard agrees with the NTSB that it is not effective to require pilots to undergo annual physical examinations without an affirmative obligation for pilots to actually submit them to the Coast Guard for review.

Title 46 CFR 10.709 already requires that first class pilots on vessels of 1600 GRT or more provide the Coast Guard with a copy of their most recent annual physical examination upon request, and that this physical examination must meet the requirements specified in Title 46 CFR 10.205(d). This includes those individuals who "serve as" pilots in accordance with Title 46 CFR 15.812(b)(3) & (c). Individuals who "serve as" pilots on vessels of not more than 1600 GRT in accordance with 46 CFR 15.812(b)(2) do not have an annual physical examination requirement.

This document serves as the request, pursuant to the authority set forth in 46 CFR 10.709(e), that all first class pilots on vessels greater than 1600 GRT, and all other individuals who "serve as" pilots in accordance with 46 CFR 15.812(b)(3) & (c), provide a copy of their annual physical examination to the Coast Guard.

The report of physical examination should be submitted to the Regional Examination Center (REC) which issued the mariner's license. The report of physical examination will be reviewed by the Coast Guard in accordance with the standards in 46 CFR 10.205(d), as supplemented by the guidance contained in Navigation and Vessel Inspection Circular (NVIC) 2–98, "Physical Evaluation Guidelines for Merchant Mariner's Documents and Licenses" or any superseding NVIC revising or replacing NVIC 2–98.

The Coast Guard may initiate appropriate administrative action in the event any first class pilot—or any other individual "serving as" a pilot (as described above)—does not meet the

ysical examination requirements ..ecified in 46 CFR 10.205(d), up to and including suspension or revocation of the mariner's credential in accordance with Title 46 CFR Part 5. The Coast Guard may also initiate appropriate administrative action, up to and including suspension or revocation of the mariner's credential in accordance with 46 CFR Part 5, if any first class pilot—or any other individual "serving as" a pilot (as described above)—fails to submit their annual physical examination to the Coast Guard.

Individuals with pilot licenses, pilot endorsements, master licenses and mate licenses (and individuals applying for those credentials) who do not in fact serve as a first class pilot or otherwise "serve as" a pilot in accordance with 46 CFR 15.812(b)(3) & (c) do not need to submit an annual physical examination to the Coast Guard pursuant to 46 CFR 10.709(e); however, these individuals must submit an annual physical examination before serving as a first class pilot or otherwise "serving as" a pilot in accordance with 46 CFR 15.812(b)(3) & (c).

Dated: September 21, 2006.

**J. G. Lantz,**

*Director of National and International ..andards, Assistant Commandant for ..evention.*

[FR Doc. 06–8306 Filed 9–22–06; 4:33 pm]

BILLING CODE 4910–15–P

---

**DEPARTMENT OF HOMELAND SECURITY**

**Customs and Border Protection**

**Notice of Withholding of Certain Distributions on Continued Dumping and Subsidy Offset to Affected Domestic Producers**

**AGENCY:** Customs and Border Protection, Department of Homeland Security.

**ACTION:** Notice of the withholding of certain offset distributions for Fiscal Year 2006 and subsequent years.

**SUMMARY:** This document notifies the public that Customs and Border Protection (CBP), consistent with the Court of International Trade's recent decision in *Canadian Lumber Trade Alliance et al. v. United States*, will be withholding distributions under the Continued Dumping and Subsidy Offset Act of 2000 that derive from antidumping and countervailing duties assessed on goods from Canada or Mexico. Fiscal year 2006 CDSOA ..istributions that derive from antidumping or countervailing duties on

other than Canadian or Mexican goods are not affected.

**DATES:** *Effective Date:* September 28, 2006.

**FOR FURTHER INFORMATION CONTACT:** Leigh Redelman, Revenue Division, Programs Branch, Office of Finance, (317) 614–4462.

**SUPPLEMENTARY INFORMATION:**

Background

The Court of International Trade (CIT) held in *Canadian Lumber Trade Alliance et al. v. United States*, Slip Op. 06–48 (April 7, 2006) (CLTA I) and Slip Op. 06–104 (July 14, 2006) (CLTA II), that pursuant to Section 408 of the North American Free Trade Agreement Implementation Act (codified at 19 U.S.C. 3438), the Continued Dumping and Subsidy Offset Act of 2000 (CDSOA) (codified at 19 U.S.C. 1675c) does not apply to antidumping and countervailing duties assessed on imports of goods from Canada or Mexico.

Specifically, the CIT held in CLTA I that the Commissioner of Customs and Border Protection (CBP) "has no authority either under an Act of Congress or under the Constitution" to make distributions that derive from antidumping and countervailing duties assessed on goods from Canada or Mexico, and that the Commissioner's actions in having previously distributed such funds were "ultra vires and therefore unlawful."

Consequently, pending the outcome of any appeal, CBP will withhold fiscal year 2006 and subsequent years' CDSOA distributions to the extent they derive from duties assessed pursuant to countervailing duty orders, antidumping duty orders, or findings under the Antidumping Act of 1921, on imports of goods from Canada or Mexico. Any funds inadvertently distributed under these cases for fiscal year 2006 or subsequent years will be subject to immediate recovery under applicable statutes and regulations, including 19 CFR 159.64.

Fiscal year 2006 CDSOA distributions that derive from antidumping or countervailing duties on other than Canadian or Mexican goods will be made in accordance with established procedures in accordance with the "Notice of intent to distribute offset for Fiscal Year 2006," as published in the **Federal Register** (71 FR 31336) on June 1, 2006.

Dated: September 22, 2006.

**Deborah J. Spero,**

*Acting Commissioner, Customs and Border Protection.*

[FR Doc. E6–15886 Filed 9–27–06; 8:45 am]

BILLING CODE 9111–14–P

---

**DEPARTMENT OF HOMELAND SECURITY**

**Bureau of Customs and Border Protection**

**[Docket No. USCBP–2006–0116]**

**Notice of Meeting of The Departmental Advisory Committee on Commercial Operations of Customs and Border Protection and Related Homeland Security Functions (COAC)**

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security (DHS).

**ACTION:** Notice of meeting.

**SUMMARY:** The Departmental Advisory Committee on Commercial Operations of U.S. Customs and Border Protection and Related Homeland Security Functions (popularly known as "COAC") will meet in open session.

**DATES:** Thursday, November 9, 2006, 9 a.m. to 1 p.m.

**ADDRESSES:** The meeting will be held at U.S. Customs and Border Protection, Office of Field Operations, One Penn Plaza, Suite 1100, New York, NY. If you desire to submit comments, they must be submitted by November 2, 2006. Comments must be identified by USCBP–2006–0116 and may be submitted by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *E-mail:* traderelations@dhs.gov. Include docket number in the subject line of the message.

• *Mail:* Ms. Wanda Tate, Office of Trade Relations, U.S. Customs and Border Protection, Department of Homeland Security, Washington, DC 20229.

• *Facsimile:* 202–344–1969.

*Instructions:* All submissions received must include the words "Department of Homeland Security" and the docket number for this action. Comments received will be posted without alteration at *http://www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket to read background documents or comments received by the COAC, go to *http://www.regulations.gov.*

levelop, evaluate, or commercialize phospho-specific PDK–1 antibody and insulin signaling. Please contact Michael J. Quon, Chief, Diabetes Unit, NCCAM, NIH at *quonm@nih.gov* for more information.

Dated: December 6, 2006.

**Steven M. Ferguson,**

*Director, Division of Technology Development and Transfer, Office of Technology Transfer, National Institutes of Health.*

[FR Doc. E6–21037 Filed 12–11–06; 8:45 am]

BILLING CODE 4140-01-P

---

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## National Institutes of Health

## National Library of Medicine; Notice of Meeting

Pursuant to section 10(d) of the Federal Advisory Committee Act, as amended (5 U.S.C. Appendix 2), notice is hereby given of the following meeting.

The meeting will be open to the public as indicated below, with attendance limited to space available. Individuals who plan to attend and need special assistance, such as sign language interpretation or other reasonable accommodations, should notify the Contact Person listed below in advance of the meeting.

The portions of the meeting devoted to the review and evaluation of journals for potential indexing by the National Library of Medicine will be closed to the public in accordance with the provisions set forth in section 552b(c)(9)(B), Title 5 U.S.C., as amended. Premature disclosure of the titles of the journals as potential titles to be indexed by the National Library of Medicine, the discussions, and the presence of individuals associated with these publications could significantly frustrate the review and evaluation of individual journals.

*Name of Committee:* Literature Selection Technical Review Committee.

*Date:* February 22–23, 2007.

*Open:* February 22, 2007, 9 a.m. to 11 a.m.

*Agenda:* Administrative reports and program discussions.

*Place:* National Library of Medicine, Building 38, Board Room, 2nd Floor, 8600 Rockville Pike, Bethesda, MD 20894.

*Closed:* February 22, 2007, 11 a.m. to 5 p.m.

*Agenda:* To review and evaluate journals as potential titles to be indexed by the National Library of Medicine.

*Place:* National Library of Medicine, Building 38, Board Room, 2nd Floor, 8600 Rockville Pike, Bethesda, MD 20894.

*Closed:* February 23, 2007, 8:30 a.m. to 2 p.m.

*Agenda:* To review and evaluate journals as potential titles to be indexed by the National Library of Medicine.

*Place:* National Library of Medicine, Building 38, Board Room, 2nd Floor, 8600 Rockville Pike, Bethesda, MD 20894.

*Contact Person:* Sheldon Kotzin, MLS, Associate Director, Division of Library Operations, National Library of Medicine, 8600 Rockville Pike, Bldg 38/Room 2W06, Bethesda, MD 20894, 301–496–6921. *Sheldon_Kotzin@nlm.nih.gov.*

Any interested person may file written comments with the Committee by forwarding the statement to the Contact Person listed on this Notice. The statement should include the name, address, telephone number and, when applicable, the business or professional affiliation of the interested person.

In the interest of security, NIH has instituted stringent procedures for entrance into the building by non-government employees. Persons without a government I.D. will need to show a photo I.D. and sign in at the security desk upon entering the building.

(Catalogue of Federal Domestic Assistance Program No. 93.879, Medical Library Assistance, National Institutes of Health, HHS)

Dated: December 4, 2006.

**Anna Snouffer,**

*Acting Director, Office of Federal Advisory Committee Policy, NIH.*

[FR Doc. 06–9631 Filed 12–11–06; 8:45 am]

BILLING CODE 4140-01-M

---

# DEPARTMENT OF HOMELAND SECURITY

## Coast Guard

[USCG 2006–25522]

## Exercise of Authority To Require Pilots To Submit Results of Annual Chemical Test for Dangerous Drugs and Extension of Deadline for Pilots To Submit Most Recent Annual Physical Examination

**ACTION:** Notice.

**SUMMARY:** By this notice, the Coast Guard is exercising authority currently set forth in Coast Guard regulations to require all first class pilots on vessels greater than 1600 gross registered tons (GRT), and other individuals who "serve as" pilots on certain types of vessels greater than 1600 GRT, to provide the passing results of their annual chemical test for dangerous drugs to the Coast Guard, subject to certain exceptions. In addition, the Coast Guard is extending the deadline for pilots to submit the most recent copy of their annual physical examination.

**FOR FURTHER INFORMATION CONTACT:** Mr. Stewart A. Walker, National Maritime

Center. Phone: 202–493–1022, e-mail: *Stewart.A.Walker@uscg.mil*

**DATES:** Unless excepted under 46 CFR 16.220(c), each pilot must do the following: Submit the passing results of his or her most recent annual chemical test for dangerous drugs to the Coast Guard on or before April 11, 2007; submit the passing results of his or her annual chemical test for dangerous drugs to the Coast Guard no later than 30 calendar days after receiving the results of the test; and undergo a chemical test for dangerous drugs annually within 30 calendar days of the anniversary date of the individual's most recent chemical test for dangerous drugs.

In addition, the Coast Guard is extending the deadline for pilots to submit a copy of their most recent physical examinations until April 11, 2007. This information was initially requested to be submitted to the Coast Guard no later than December 27, 2006 in a **Federal Register** notice published on September 28, 2006 at 71 FR 56999.

**SUPPLEMENTARY INFORMATION:** On September 28, 2006, the Coast Guard provided notice that it is exercising its authority to require first class pilots on vessels greater than 1600 GRT, and those individuals who "serve as" pilots in accordance with 46 CFR 15.812(b)(3) & (c) on vessels greater than 1600 GRT, to submit copies of their annual physical examinations to the Coast Guard. 71 Fed. Reg. 56999. Copies of that notice, as well as this notice are available electronically by searching for docket number USCG–2006–25522 at *http://dms.dot.gov.* The purpose of the physical examination notice was to implement the recommendation made by the National Transportation Safety Board (NTSB), in their report on the 2003 allision of the Staten Island Ferry ANDREW J. BARBERI, that the Coast Guard require submission of annual pilot physicals. This notice is a continuation of the Coast Guard's efforts to fully implement the NTSB's recommendation.

Coast Guard regulations require that, unless excepted under 46 CFR 16.220(c), each pilot who is required to complete an annual physical examination must also pass a chemical test for dangerous drugs, and that he or she must submit the passing (i.e. negative) results of the chemical test to the Coast Guard when applying for license renewal, or when requested by the Coast Guard. 46 CFR 16.220(b). This includes first class pilots on vessels greater than 1600 GRT, and those individuals who "serve as" pilots in accordance with 46 CFR 15.812(b)(3) &

KLG_217

on vessels greater than 1600 GRT. ...dividuals who "serve as" pilots on vessels of not more than 1600 GRT are not required to complete an annual physical or pass an annual chemical test for dangerous drugs. Positive results of any Coast Guard required chemical test must be reported to the Coast Guard under other existing regulatory authority in 46 CFR part 16.

In accordance with 46 CFR 16.220(c), individuals are excepted from the chemical test requirements if they provide satisfactory evidence that they have: (1) Passed a chemical test for dangerous drugs required by 46 CFR part 16 within the previous six months with no subsequent positive chemical tests during the remainder of the six-month period; or (2) during the previous 185 days been subject to a random testing program required by 46 CFR 16.230 for at least 60 days and did not fail or refuse to participate in a chemical test for dangerous drugs pursuant to 46 CFR part 16.

This notice serves as the request, pursuant to the authority set forth in 46 CFR 16.220(b), that all first class pilots on vessels greater than 1600 GRT, and all other individuals who "serve as" pilots in accordance with 46 CFR ⁻⁵.812(b)(3) & (c) on vessels greater than )0 GRT, provide the passing results of ...eir annual chemical tests for dangerous drugs to the Coast Guard, unless they provide satisfactory evidence that they have met the exceptions stated in 46 CFR 16.220(c). This information should be submitted to the Regional Examination Center (REC) which issued the mariner's license.

The Coast Guard may initiate appropriate administrative action, up to and including suspension or revocation of the mariner's credential in accordance with 46 CFR part 5, if any licensed pilot serves as a first class pilot on vessels greater than 1600 GRT, or any other individual who "serves as" a pilot in accordance with 46 CFR 15.812(b)(3) & (c) on vessels greater than 1600 GRT, fails to submit the results of his or her annual chemical test for dangerous drugs or satisfactory evidence that he or she has met the exceptions in 46 CFR 16.220(c).

Individuals with pilot licenses, pilot endorsements, master licenses and mate licenses (and individuals applying for those credentials) who do not serve as first class pilots on vessels greater than 1600 GRT, and do not otherwise "serve as" pilots in accordance with 46 CFR 15.812(b)(3) & (c) on vessels greater than ⁻00 GRT, do not need to submit the ...ising results of an annual chemical ...est for dangerous drugs pursuant to 46 CFR 16.220(b); however, they must do

so before serving as first class pilots on vessels greater than 1600 GRT, or before otherwise "serving as" pilots in accordance with 46 CFR 15.812(b)(3) & (c) on vessels greater than 1600 GRT.

In addition, in response to the notice published September 28, 2006 referenced above, the Coast Guard received a number of requests to extend the initial deadline of December 27, 2006 for pilots to submit a copy of their most recent physical examination in order to provide more time for compliance. The Coast Guard agrees and is extending the deadline to April 11, 2007.

Dated: December 5, 2006.

**L.W. Thomas,**

*Acting Director of National and International Standards, Assistant Commandant for Prevention.*

[FR Doc. E6–21017 Filed 12–11–06; 8:45 am]

BILLING CODE 4910–15–P

---

# DEPARTMENT OF THE INTERIOR

## Bureau of Land Management

[WY–920–1320–EL]

## Powder River Regional Coal Team Activities: Notice of Public Meeting in Casper, WY

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of public meeting.

**SUMMARY:** The Powder River Regional Coal Team (RCT) has scheduled a public meeting for January 18, 2007, to review current and proposed activities in the Powder River Coal Region and to review pending coal lease applications (LBA).

**DATES:** The RCT meeting will begin at 9 a.m. MST on January 18, 2007. The meeting is open to the public.

**ADDRESSES:** The meeting will be held at the Wyoming Oil and Gas Conservation Commission, 2211 King Boulevard, Casper, Wyoming.

**FOR FURTHER INFORMATION CONTACT:** Robert Janssen, Regional Coal Coordinator, BLM Wyoming State Office, Division of Minerals and Lands, 5353 Yellowstone Road, Cheyenne, Wyoming 82009: telephone 307–775–6206 or Rebecca Spurgin, Regional Coal Coordinator, BLM Montana State Office, Division of Resources, 5001 Southgate Drive, Billings, Montana 59101: telephone 406–896–5080.

**SUPPLEMENTARY INFORMATION:** The purpose of the meeting is to discuss pending coal lease by applications (LBA's) in the Powder River Basin as well as other federal coal related actions

in the region. Specific coal lease applications and other matters for the RCT to consider include:

1. The Maysdorf II LBA, a new lease application filed by Cordero Mining Co. on September 1, 2006, is adjacent to the Cordero-Rojo mine. Approximately 4,654 acres and 483 million tons of Federal coal are involved. More details will be presented at the meeting. The RCT needs to consider the BLM processing schedule for the Maysdorf II LBA.

2. The Porcupine LBA, a new lease application filed by BTU Western Resources on September 27, 2006, is adjacent to the North Antelope-Rochelle mine. Approximately 5,116 acres and 598 million tons of Federal coal are involved. More details will be presented at the meeting. The RCT needs to consider the BLM processing schedule for the Porcupine LBA.

3. The BLM is doing a coal review study in the Powder River Basin. The results of this review will be used in the preparation of coal related NEPA documents in the Powder River coal region. The RCT will be updated on the progress and results of this study.

4. Update on U.S. Geological Survey coal inventory work.

5. The RCT will hear a discussion on coal conversion technologies and projects in Wyoming.

6. Update on BLM land use planning efforts in the Powder River Basin of Wyoming and Montana.

7. Other Coal Lease Applications and issues that may arise prior to the meeting.

The RCT may generate recommendation(s) for any or all of these topics and other topics that may arise prior to the meeting date.

The meeting will serve as a forum for public discussion on Federal coal management issues of concern in the Powder River Basin region. Any party interested in providing comments or data related to the above pending applications, or any party proposing other issues to be considered by the RCT, may either do so in writing to the State Director (922), BLM Wyoming State Office, P.O. Box 1828, Cheyenne, WY 82003, no later than January 5, 2007, or by addressing the RCT with his/her concerns at the meeting on January 18, 2007.

*The draft agenda for the meeting follows:*

1. Introduction of RCT Members and guests.

2. Approval of the Minutes of the April 19, 2006 Regional Coal Team meeting held in Casper, Wyoming.

3. Coal activity since last RCT meeting.



U.S. Department of
Homeland Security

United States
Coast Guard

Commanding Officer
U. S. Coast Guard
National Maritime Center

4200 Wilson Boulevard, Suite 630
Arlington, VA 2220-1804
Staff symbol: NMC-1
Phone: 202-493-1022
Fax: 202-493-1060

16721

DEC 1 8 2006

Mr. Paul Kirchner
Executive Director
American Pilots' Association
499 South Capitol Street, SW
Washington, DC 20003

Dear Mr. Kirchner:

This is a response to your letter dated December 6, 2006, regarding the submission of annual pilot physicals and drug test results to the Coast Guard.

The notice extending the deadline for initial submission of a copy of the most recent annual pilot physical was published in the Federal Register on December 12, 2006. The deadline has been extended to April 11, 2007.

The notice calls for a copy of the annual physical to be submitted to the Coast Guard. It does not require pilots to submit the original CG-719K. The notice leaves open the possibility of requiring a certified copy; however, at this time, we only intend to require a copy, unless there is some question or doubt as to the copy's authenticity. We may, of course, adjust our policy in the future as our mariner medical certification program matures.

As for your concerns regarding submission of the annual drug test results, 46 CFR 16.220(b) gives the Coast Guard the discretion to request this documentation from pilots. We have elected to exercise this discretion in the December 12, 2006 Federal Register notice, which requires submission of annual negative drug test results, unless one of the exceptions in 46 CFR 16.220(c) applies.

Since most - if not all - of the pilots you represent actively participate in random drug testing programs, I refer you to enclosure (5) of NMC Guidance Document 03-04, which provides a sample letter for mariners in random drug testing programs. The letter is very brief (about 1 paragraph), and it should be all that is required for pilots in random drug testing programs to submit to the Coast Guard each year.

KLG_204

16721

Subj: RESPONSE TO AMERICAN PILOTS' ASSOCIATION ABOUT PHYSICALS
AND DRUG TESTS

Thank you for your interest in this matter, and please do not hesitate to call upon me if
you have any additional questions.

Sincerely,

E. J. FINK

Copy: COMDT (CG-3PSO)

2

# EXHIBIT H

# (FILED UNDER SEAL)

# EXHIBIT I

# REPORT OF MEDICAL EVALUATION

## TO THE STATE BOARD OF PILOT COMMISSIONERS

FROM:           *CHARLES E CALZA MD*
                (examining physician)

TO:             STATE BOARD PILOT COMMISSIONERS

SUBJ:           **CAPTAIN JOHN J. COTA**
                (applicant)

    I have examined the above named applicant on the date indicated below.  After reviewing his/her history, physical examination, laboratory results and special studies, and in accordance with the Board's Seafarers Health Improvement Program Guidelines, I have found this applicant physically:

        _____/_____    FIT FOR DUTY  *1/29/06*

        _____    NOT FIT FOR DUTY

        _____    PERMANENTLY NOT FIT FOR DUTY

Signed    _____

Dated:    _____*1/18/06*_____

CHARLES E. CALZA, M.D.
599 SIR FRANCIS DRAKE BLVD.
GREENBRAE, CA ~~~~~

MAIL COMPLETED FORM TO:
BOARD OF PILOT COMMISSIONERS
ATTN:  A. EVANS
PIER 9 SUITE 102
SAN FRANCISCO, CA  94111

FAX:  (415) 397-9463

# EXHIBIT J

# (FILED UNDER SEAL)

# EXHIBIT K

# (FILED UNDER SEAL)

# EXHIBIT L

# REPORT OF MEDICAL EVALUATION

## TO THE STATE BOARD OF PILOT COMMISSIONERS

FROM: _____CHARLES E CALZA, MD_____
(examining physician)

TO: STATE BOARD PILOT COMMISSIONERS

SUBJ: **CAPTAIN JOHN J. COTA**
(applicant)

    I have examined the above named applicant on the date indicated below. After reviewing his/her history, physical examination, laboratory results and special studies, and <u>in accordance with the Board's Seafarers Health Improvement Program Guidelines</u>, I have found this applicant physically:

_____✓_____ FIT FOR DUTY    1/23/07

_____ NOT FIT FOR DUTY

_____ PERMANENTLY NOT FIT FOR DUTY

Signed _____Charles E. Calza_____

Dated: _____1/19/07_____

CHARLES E. CALZA, M.D.
599 SIR FRANCIS DRAKE BLVD.
GREENBRAE CA 94904

CHARLES E. CALZA, M.D.
599 SIR FRANCIS DRAKE BLVD.
GREENBRAE CA 94904

MAIL COMPLETED FORM TO:
BOARD OF PILOT COMMISSIONERS
ATTN: A. EVANS
PIER 9 SUITE 102
SAN FRANCISCO, CA 94111

FAX: (415) 397-9463

CC00002

# EXHIBIT M

# (FILED UNDER SEAL)

# EXHIBIT N

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commander
Sector San Francisco

1 Yerba Buena Island
San Francisco, CA 94130
Phone: (415) 399-3415
Fax: (415) 399-3554

16200
December 7, 2007

VIA FACSIMILE AND U.S. MAIL

John Meadows, Esq.
Jedeiken, Meadows and Schneider
333 Pine Street, 5th Floor
San Francisco, CA 94104
Phone: (415) 477-8826

Dear Mr. Meadows:

In light of your client CAPT. John J. Cota's involvement in the recent allision between the motor vessel COSCO BUSAN and the San Francisco-Oakland Bay Bridge, the Coast Guard conducted a thorough review of the medical information we retain on file pursuant to the requirements of his Coast Guard issued Merchant Marine Officers license. Based on the results of this review, I have a substantial basis to believe that your client is not currently physically competent to perform the duties required of him. As such, pursuant to the provisions contained in 46 CFR § 5.201, I request that your client immediately deposit his license with this office. I am requesting this action in the interest of maritime safety.

Please contact my attorney, CDR Tim Connors, at (510) 437-5815 so that the terms of the voluntary deposit can be arranged expeditiously. The terms of our voluntary deposit agreement will specify the conditions upon which I will be willing to return your client's license. I ask that you advise the Coast Guard of your intentions with respect to this matter not later than close of business December 11, 2007.

Thank you in advance for your immediate attention to this matter.

Sincerely,

J. E. LONG
Captain, U. S. Coast Guard
CG Sector San Francisco

Copy:  Commander, Eleventh Coast Guard District (d, dp, dl)

**KLG_334**

Page 1 of 2

| UNITED STATES OF AMERICA<br>U.S. DEPARTMENT OF HOMELAND SECURITY<br>UNITED STATES COAST GUARD | |
|---|---|
| ADDRESS OF COAST GUARD UNIT:<br><br>**COMMANDER**<br>**COAST GUARD SECTOR SAN FRANCISCO**<br>**PREVENTION DEPARTMENT**<br>**BUILDING 14, COAST GUARD ISLAND**<br>**ALAMEDA, CA 94501**<br><br>INVESTIGATING OFFICER: LT KRIS SZCZECHOWICZ, USCG<br>TELEPHONE: (510) 437-3148 | NAME AND ADDRESS OF MARINER:<br><br>**CAPTAIN JOHN J. COTA**<br>**C/O JOHN MEADOWS, ESQ.**<br>**JEDEIKEN, MEADOWS AND SCHNEIDER**<br>**333 PINE STREET, 5TH FLOOR**<br>**SAN FRANCISCO, CA 94104**<br><br>TELEPHONE: (415) 477-8826 |
| **Voluntary Deposit Agreement** | COAST GUARD ENFORCEMENT ACTIVITY NUMBER:<br>3113517 |

I, **JOHN J. COTA**, have been informed by **LIEUTENANT KRIS SZCZECHOWICZ**, a Coast Guard Investigating Officer, that, based on a review of my current physical in accordance with 46 Code of Federal Regulations 10.709, on **December 21, 2007**, I am presently considered to be **physically incompetent** to serve as a licensed pilot aboard United States and foreign flag merchant vessels.

In order to avoid being issued a complaint for incompetence under the provisions of 46 United States Code Section 7703, I am voluntarily depositing my U.S. Coast Guard issued Merchant Mariner's License number 1100254 with the U.S. Coast Guard on this date. I understand that while this agreement is in effect the Coast Guard will not issue a complaint for incompetence against me.

I understand that this voluntary deposit agreement will remain in effect until I present a report from a third-party, independent licensed physician which states that I am fully fit, in all respects, to perform my duties aboard ship. I agree to allow the Coast Guard to provide this physician with my medical history and information concerning my duties aboard ship. I agree to allow this physician to provide the Coast Guard with medical information concerning my ability to perform my duties aboard ship. I understand that the Coast Guard will promptly return my Credential(s) to me after confirming the physician's report unless the report is withdrawn or amended by the physician.

ORIGINAL – Respondent
COPY – Sector Prevention Office

KLG_335

Page 2 of 2

| Voluntary Deposit Agreement | COAST GUARD ENFORCEMENT ACTIVITY NUMBER: 3113517 |
|---|---|

I agree that during the period the Coast Guard holds my Credential(s), I will not accept employment on any merchant vessel of the United States or foreign flagged vessel. I further agree that I will not make application to the Coast Guard for the renewal, issue or reissue of any Merchant Mariner's Document, License or Certificate of Registry, without stating on such application that this agreement is in effect.

I enter into this agreement freely and voluntarily and I fully understand its meaning and effect.

_____
Signature of Respondent

*************************************************************************************************

U.S. Coast Guard Merchant Mariner's License Number 1100254 received in accordance with the above deposit this **21st** day of **December, 2007**, by U.S. Coast Guard Sector San Francisco.

Signed _____        _____
Investigating Officer for the United States Coast Guard        Type or print name

# EXHIBIT O

## (FILED UNDER SEAL)

# EXHIBIT P



Subscribe | RSS | WT Mobile | Print
**REGISTER |** |

# The Washington Times

US News | National Security | Bookmark This Page | Events

May 27, 2008

World | National | Local | Politics | Security | Business | Entertainment | Technology | Investigation | Election |

Home > Voices > **Commentary**

## COMMENTARY: Information tech for health care

Nancy L. Johnson
Tuesday, May 27, 2008

Comment

Print

Listen

Font Size

Share

Ask a Question

You Report



1 of 1

Advertisement

At a recent doctor appointment, a friend of mine who is about to turn 80 handed the clipboard right back to the receptionist, when asked to "update their records." She exclaimed in annoyance that they should already have all that information, as she had been seeing that doctor for more than four years.

This was her rebellion at being asked to once again retrieve from her failing memory details about insurance, prescriptions, scans, tests, surgeries and more. If amazon.com can remember what books you ordered over the last three years, why can't your doctor's computer remind him what drugs you're taking and determine if there is a potentially dangerous combination?

The technology exists, but our health-care industry has been slow to change. Only about 14 percent of doctors and primarily large hospitals use electronic medical records and most of those don't have systems that can communicate with other caregivers of their mutual patients. The result is incomplete patient records and more than 100,000 deaths annually, due to medical errors caused by missing patient data, illegible prescriptions and other notes, and faulty memories.

Medical technology is advancing rapidly; medical communication is still a morass of paper files, Post-It notes, faxes and phone messages.

Businesses worldwide began employing information technology more than a decade ago to give them an edge with customers, suppliers, employees and investors. Not only did information technology improve customer service and product quality, it gave businesses a competitive edge by allowing them to cut overhead costs and streamline operations. But most doctors' offices and many hospitals continue to rely on their old but comfortable habit of keeping paper records. It's time for comfort to give way to progress.

Health IT will modernize health-care delivery. Through health IT,

doctors' offices and patients can work together to compile comprehensive electronic health records that include allergies, vaccination records, prescriptions, treatments, test results, vital statistics and more. Once an electronic health record is established for a patient, permission can be given to a doctor or nurse to view it and update it. The patient isn't plagued by having to "reinvent the wheel" with every new doctor visit or hospital stay.

There are even greater benefits possible with health IT. With greater efficiency, we can lower the cost of care and improve access. Electronic recordkeeping reduces waiting times and eliminates repeat visits in community clinics because test results and other information are available when the patient arrives. Clinicians can spend more time with patients, improving communication and care quality. Coordinating care among providers is much more easily accomplished, and duplicate tests or treatments can be avoided.

In addition to advances in patient care and electronic medical record keeping, health IT will save the nation at least $81 billion in health-care costs, according to the Rand Corp. Widespread adoption of electronic medical records could reduce spending on health care as much as 30 percent, the Department of Health and Human Services says. These represent significant savings for a nation that spends 16 percent of its gross domestic product on health care.

More importantly, with robust health information systems this country will more effectively institute much-needed reforms to address access, cost, and quality in health-care delivery. For example, when we bring more children into coverage, wouldn't it be better if we knew how many have asthma and how many are receiving appropriate treatment? Is their health improving in the new program or should we do something differently?

Information systems are essential to knowing not only about your own care, but about the effectiveness of our health-care programs overall. To what degree are professionally developed care guidelines being followed? How much does cost vary around the country? Which procedures or drugs are more effective than others? For what types of patients? Answering all these questions requires data that are gathered and analyzed over time.

The U.S. government must take the lead in promoting health IT and its adoption by health-care teams nationwide. In addition to supportive legislation, the government can help by establishing standards for the technology so systems can communicate with each other, providing incentives for health IT use, and using advanced technologies in its own health programs.

U.S. health care is sick. If it's to get better, it needs health IT. It is just what the doctor ordered.

Page 1
Add as Favorite

TIMES NETWORK
**Twitter | MySpace | Flickr | Facebook**

## Comment on this Article

| Username | Password |  | Forgot? |
|---|---|---|---|
| Not a member yet? | | | Register Here |





NEWS

**Power suit of democracy often require**

Democracy has no c
to some reformers i



VIEW ▶

**You Report**



Do you have
another point of
view, photos,
audio, video or
more information
about a story?

**Poll**  MORE >
**Should Sen. Hillary Clinton bow out of the presidential race?**

○  Yes              ○  No

○  Not sure

Submit your Vote



○ Click here

**ADVERTISING LINKS**

Donate car                France Hotels              yellow pa
Donate car                gambling news             new york
Lawyer - Personal Injury  Discount perfume          Wireless S
Hotel paris               Nouveau Riche University   Payslip
Medical Supplies

TWT STORE
**E-Edition | Print Edition | Weekly Washington Times**

AFFILIATES
Middle East Times | Golf | Insight | UPI | Washington T

About TWT | Press Room | F.A.Q. | Work in TWT | Advertise: Online / Print | Sponsors | Contact Us | Privacy Policy | Site Map
All site contents copyright ©2008 The Washington Times, LLC.

# EXHIBIT Q

MERCHANT MARINE PERSONNEL ADVISORY COMMITTEE  (MERPAC)

TASK STATEMENT 46

REVIEW OF DRAFT NVIC CONCERNING THE MEDICAL STANDARDS APPLICABLE
TO MERCHANT MARINERS

I.    Task

Review a draft NVIC on the medical guidelines used to determine the medical qualifications of
applicants for mariners' credentials

II.    Background.

1.  The regulations require that applicants for most transactions provide evidence that they are
physically competent.  The individual regulatory cites are generally vague, often causing
confusion among the RECs and mariners.  This NVIC is part of a continuing attempt to
standardize the requirements for an applicant to qualify for a mariner's credential.

2.  The specific legal cites that relate to medical standards for applicants for mariners' credentials
are:

  a.  Licensing:  46 CFR 10.205(d); 10.207(e) and 10.209(d)

  b.  Seaman's certification:  46 CFR 12.02-17(e);12.02-27(d); 12.05-5; 12.15-5 and 13.125

  c.  STCW:  Regulation I/9 and STCW Code Section B-I/9

3.  The overriding concern of the Coast Guard is to allow the mariner to remain employed in the
maritime industry as long as he or she can safely perform the duties incumbent on the mariner.
In accomplishing this goal, the Coast Guard may:

  a.  Grant a waiver of the medical condition where it does not affect the applicant's ability to
perform his or her duties:

  b.  Restrict the scope of a mariner's credential; i. e.; service on specific routes or on specific
types of vessels; or,

  c.  Where the candidate is not medically competent, denying issuance of a credential.

III. Problem Statement.

1.  The source documents for medical guidelines are generally vague with the exception of vision
requirements.  For the past 15 years the Coast Guard has provided guidelines to medical
practitioners, mariners, and the maritime industry about the physical conditions to be considered
when a mariner applies for a credential.  The last NVIC was issued in 1998.  Since then we have

gathered information on areas where further guidance is required and where changes are needed to the existing guidelines. Based on initial input from a variety of medical and maritime sources, we have updated the NVIC. Request MERPAC's review and recommendations of the draft NVIC.

2. In addition to MERPAC's review, this document will be published in the Federal Register for public review and comment. It is envisioned that a revised NVIC will satisfy the short-term need for additional guidance until the regulations can be amended

IV. Tasks. Determine the following:

1. Determine if the NVIC provides adequate guidance concerning the guidelines that apply to mariners' physical examinations and physical requirements.

V. Time restrictions. TBA. MERPAC members may also comment as members of the public when the document is published in the Federal Register.


_____                    _____
    Mr. Andrew McGovern                                   Brian Peter
    Chairman                                                      Commander, USCG
    MERPAC                                                        Executive Director
                                 MERPAC


Encl:   Draft NVIC, *Physical Evaluations of Applicants for Merchant Mariners' Credentials.*

MERCHANT MARINE PERSONNEL ADVISORY COMMITTEE (MERPAC)

TASK STATEMENT 61

MERCHANT MARINER MEDICAL WAIVER EVALUATION GUIDELINES

**I. Task Title.** Merchant Mariner Medical Waiver Evaluation Guidelines.

**II. Background.** Regulation I/9 of STCW requires that each Party establish standards of medical fitness for seafarers, particularly regarding eyesight and hearing. Further, STCW requires candidates for certification to provide satisfactory proof that they meet the standards of medical fitness and hold a valid document attesting to their medical fitness, issued by a duly qualified medical practitioner recognized by the Party.

Various regulations in 46 CFR Parts 10, 12, and 13 require individuals to be physically qualified to hold certain merchant mariner's licenses and documents. The regulations include requirements for mariners to provide evidence that they are physically able to perform the duties expected of them.

Neither STCW nor the regulations in 46 CFR contain any standards, with the exception of visual acuity and color vision, for determining whether a mariner is physically qualified. With the exception of vision standards, the regulations are non-specific and use terms such as "general physical condition" or "good health."

**III. Problem Statement.** The revision of NVIC 2-98 will describe medical and physical conditions which require waivers, and the supplemental medical information which should be submitted to ensure a complete evaluation of the waiver by Coast Guard personnel. The NVIC will not describe, however, the guidelines used to evaluate the severity and maritime safety risks associated with these conditions. To ensure optimal risk-based and consistent evaluation of waiver requests by MMC applicants, written guidelines are required. A joint process involving the Coast Guard, medical subject matter specialists from the marine industry, and industry stakeholders, accurately reflecting current standards of medical and physical fitness required for mariners to perform their duties, is the optimal method to develop MMC medical waiver evaluation guidelines.

**IV. Task.** Convene a working group to develop recommended waiver evaluation guidelines for U. S. merchant mariners. To the extent possible, this working group shall include practicing maritime medical specialists.

The working group will provide recommendations on medical waivers, functional tests for mariners with physical limitations, and identifying risks of sudden incapacitation. Recommendations should focus on common and/or high-risk conditions that affect maritime safety. These include vision, losses of consciousness/seizure disorders, medical conditions affecting multiple body systems (e.g., pulmonary,

cardiovascular, neurological, musculoskeletal, learning/memory, psychiatric, etc.), and for substance abuse disorders.

The workgroup should include scientific review of complex medical conditions and development of medical and physical criteria/guidelines for medical certification. To prevent the exclusion of specialists other than physicians (e.g., an occupational therapist or registered nurse) from serving on the workgroup, charters should not be written that would define or limit the medical specialties or types of professionals who comprise the workgroup. The workgroup should review current guidelines and standards used by DOT and other federal agencies responsible for medical certification in other transportation modes.

A copy of the draft NVIC is attached. Examples of Federal Motor Carrier Safety Administration medical evaluation guidelines can be found at http://www.fmcsa.dot.gov/facts-research/research-technology/publications /medreports.htm.

**V. Due Date.** Provide recommendations to the Coast Guard by the conclusion of the Spring 2007 meeting.

**VI. Coast Guard Technical Representative.** Dr. Arthur J. French, Captain, USPHS (CG-1122), 202-493-1049, e-mail: Arthur.j.french@uscg.mil
LCDR Derek A. D'Orazio, USCG (G-PSO-1), 202-372-1405, e-mail: Derek.a.dorazio@uscg.mil.


_____                    _____
Mr. Andrew McGovern                        Lorne W. Thomas
Chairman                                   Captain, USCG
MERPAC                                     Executive Director
                                           MERPAC

Enclosure (1): Draft NVIC "Medical and Physical Evaluation Guidelines for Merchant Mariner Credentials"

# EXHIBIT R

| Dept. of Homeland Security<br>United States Coast Guard<br>CG-719K (Draft E) | Coast Guard Maritime Credential Medical Evaluation Report | OMB 00-0000<br>Page 1 |
|---|---|---|

- Detailed guidance on the medical and physical evaluation guidelines for merchant mariner credentials is contained in Navigational and Vessel Inspection Circular (NVIC) XX-07.
- Additional information is also available at the NMC Homeport website at http://homeport.uscg.mil/mmcmedical

**Instructions for Coast Guard Maritime Credential Applicant / Who must submit this form?**

- ► Guidance for who is required to submit this form is contained in Enclosure (1) of NVIC XX-07.
- ► Applicants seeking an original, renewal or raise-in-grade credential are required to complete this form or its equivalent, containing the same information, and submit it to the U.S. Coast Guard.
- ►

**Applicant Information**

- ► Applicants are required to complete the applicant information in section I, and to report all medications, known physical impairments and medical conditions in sections IIa and IIb.
- ► Applicants are required to sign and date the certification in section VIII of this form attesting, subject to criminal prosecution under 18 USC § 1001, that all information reported is true and correct and that they have not knowingly omitted or falsified any material information relevant to this form.
- ► Applicants must also complete the release in section of this form.

**Instructions for Providing Proof of Identity**

- ► **Applicants** shall present acceptable proof of identity to the medical practitioner conducting examinations.
- ► **Medical practitioners** must verify the identity of applicants before conducting examinations.
- ► Proof of identity shall consist of one current form of valid government issued photo identification.

The following credentials are acceptable proof of identity: [Check NVIC XX-XX for list]

1. Unexpired U.S. military identification card.
2. Unexpired U.S. driver's license.
3. Unexpired U.S. passport.
4. Unexpired law enforcement credential, with photograph of the applicant.
5. Unexpired merchant mariner's document issued after February 3, 2003.
6. Unexpired foreign passport.
7. Unexpired official identification card issued by a federal, State, or local government or by a territory or possession of the United States (includes federal employee identification credentials).
8. Unexpired port credential, with photograph of the applicant, issued by a State or local port authority.

**General Instructions for Medical Practitioner**

1. The Coast Guard requires a physical examination and certification be completed to ensure that mariners:
   - Are of sound health;
   - Have no physical limitations that would limit or prevent performance of the tasks associated with operating or working on vessels;
   - Are not taking medications in doses that, as a side-effect, impair cognition, which would limit operating or working on vessels.
2. The verifying medical practitioner must complete sections III, IV, V, VI, VII & IX of this form.
3. Detailed guidelines on potentially disqualifying medical conditions are contained in Navigational and Vessel Inspection Circular (NVIC) XX-XX. Physicians should be familiar with the guidelines contained within this document. NVIC XX-XX may be obtained from http://www.uscg.mil/hq/g-m/index/ or by calling the nearest USCG Regional Examination Center, or the National Maritime Center (http://homeport.uscg.mil/mmcmedical), 1-888-IASKNMC (1-888-427-5662).

**Comments (margin):**
- Comment [dad1]: MERPAC Medical WG recommends that we continue to use the CG-719K/E as is, only modified to account for the changes to encl (2) that MERPAC recommends, i.e. the 719K/E should be consistent w/ the new encl (2). The K/E should also have a BMI block on it.
- Deleted: E
- Comment [dad2]: MERPAC Medical WG agrees to work on this version of the 719K. The group will edit this version for content and format and take it up before the next meeting.
- Deleted: [illegible]
- Deleted: [illegible]
- Deleted: [illegible]
- Formatted: Highlight
- Deleted:
- Deleted: requested by the
- Formatted: Highlight
- Deleted: V
- Deleted: IX
- Deleted: should
- Deleted: X
- Deleted: s
- Deleted: , one of which shall contain a photo of the applicant.
- Deleted: 9.
- Deleted: Birth Certificate or Birth Registration, issued by a State, county, municipality or outlying possession of the U.S.
- Comment [dad3]: WG recom... [1]
- Formatted: Highlight
- Deleted: by a licensed doctor ... [2]
- Formatted: Highlight
- Formatted: Highlight
- Formatted: Highlight
- Comment [dad4]: Insert a new ... [3]
- Deleted: V
- Deleted: I
- Deleted: II
- Deleted: II
- Formatted: Font: Calibri, 10 pt

**KLG_315**

| Dept. of Homeland Security United States Coast Guard CG-719K (Draft E) | Coast Guard ...me Credential Medical Evaluation Report | ...  )0-0000 Page 2 |

Verification of medications in section II(a) of this form includes questioning the applicant about any medications or other substances reported, reviewing pertinent medical histories and records to determine if the applicant has omitted any medications or other substances, and affirmatively reporting any omitted medications or other substances where required.

*Deleted: V*

---

**General Instructions for Medical Practitioner Continued**

5. All examinations, tests and demonstrations must be performed, witnessed or reviewed by a physician (MD or DO) or nurse practitioner or a certified physician assistant, licensed by a State in the U.S., a U.S. possession, or a U.S. territory.

*Deleted: physician*
*Comment [dad5]: District of Colombia?*
*Deleted: licensed by a State in the U.S., a U.S. possession, or a U.S. territory*

6. The applicant should present acceptable proof of identity before the examination(s) begin per instructions for providing proof of identity above.

*Deleted: .*

7. All applicants who require a general medical examination must be physically examined by the verifying medical practitioner. Medical examinations based solely on patient history review, and/or documentary review, are unacceptable.

8. The verifying medical practitioner is not required to perform or witness every examination, test or demonstration. These may be referred to other qualified practitioners; however they must be reviewed to the satisfaction of the verifying medical practitioner. The last page of this form contains a certification that the general medical examination, vision and hearing tests, as well as the physical demonstration of competence...have been performed, witnessed or reviewed to the satisfaction of the verifying medical practitioner. Applicants who are required to complete a general medical examination are also required...on tests. An applicant may be required to complete hearing tests and/or demonstrations of physical competence as appropriate. The verifying medical practitioner must sign and date the certification where indicated...This signature attests, subject to criminal prosecution under 18 U.S.C. 1001 that all information reported by the verifying medical practitioner is true and correct to the best of her/his knowledge and that the verifying medical practitioner has not knowingly omitted or falsified any material information relevant to this form.

*Formatted Table*
*Formatted: Highlight*
*Formatted: Highlight*

9. If practitioners are unable to determine the applicant's physical ability, they should be referred to another healthcare provider who can properly evaluate one or more physical abilities.

*Deleted: ¶*

---

**Privacy Act Statement**

As required by Title 5 United States Code (U.S.C.) 552a(e)(3), the following information is provided when supplying personal information to the United States Coast Guard.

1. Authority for solicitation of the information: 46 U.S.C. 2104(a), 7101(c)-(e), 7306(a)(4), 7313(c)(3), 7317(a), 8703(b), 9102(a)(5).

2. Principal purposes for which information is used:
   a. To determine if an applicant is physically capable of performing shipboard duties.
   b. To ensure that a duly licensed Physician (MD or DO) / Physician Assistant / Nurse Practitioner conducts the applicant's physical examination/certification and to verify the information as needed.

3. The routine uses which may be made of this information:
   a. This form becomes a part of the applicant's file as documentary evidence that regulatory physical requirements have been satisfied and that the applicant is physically competent to hold a credential.
   b. The information becomes part of the total credential file and is subject to review by Federal agency casualty investigators.
   c. This information may be used by the United States Coast Guard and an Administrative Law Judge in

KLG_316

| Dept. of Homeland Security<br>United States Coast Guard<br>CG-719K (Draft E) | Coast Guard M...me Credential Medical Evaluation Report | OA  0-0000<br><br>Page 3 |
|---|---|---|

determining causation of marine casualties and appropriate suspension and revocation action.

.. Disclosure of this information is voluntary, but failure to provide this information will result in non-issuance of a credential.

An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a valid OMB control number. The United States Coast Guard estimates that the average burden for completing this form is XX minutes. You may submit any comments concerning the accuracy of this burden estimate or any suggestions for reducing the burden to the Commandant (CG-CVC), United States Coast Guard, 100 2nd Street SW, Washington, DC 20593-0001.

| Section I - Application Information (to be completed by applicant) | | | |
|---|---|---|---|
| Last Name : | First Name: | Middl e Name : | Suffix: |
| Age: | Date of Birth (MM/DD/YYYY): | Social Security Number: | |

Deleted: ¶
Formatted Table
Formatted Table
Deleted: ¶

**Section II(a) - Medications (must be completed by the qualified medical practitioner as part of general medical examination)**

Applicants are required to report **all** current prescription and non-prescription (over-the-counter) medications, including dietary supplements and vitamins at the time of application include dosages of every substance reported, as well as the condition for which each substance is taken. The information reported by the applicant must be verified by the verifying medical practitioner, or by any other qualified medical practitioner to the satisfaction of the verifying medical practitioner. This includes assisting the applicant in reporting dosages and the condition(s) for which he/she takes each substance.

Additional sheets may be added by the applicant and/or qualified medical practitioner if needed to complete this section (include applicant name and DOB on each additional sheet).

List **all current medications (prescription and non-prescription) including dosage and the condition(s) for** ..ch **the medication(s) are taken. If none, check "NONE."**

☐ NONE

Deleted: V
Deleted: enter
Formatted Table

**Section II(b) - Certification of Medical History (must be reviewed by verifying medical practitioner as part of general medical examination)**

Applicants must report their complete medical history, and the qualified medical practitioner must verify the medical history, using the table below. Check "yes" if the applicant has had a previous diagnosis or treatment of the condition by a healthcare provider, even once in the applicant's life, or if the applicant is currently under treatment or observation for the condition, or if the condition is present regardless of treatment.

If the verifying medical practitioner, or any other verifying medical practitioner to the satisfaction of the verifying medical practitioner, discovers a condition not reported by the applicant, he/she must check "yes" in the appropriate block and explain in the remarks.

The verifying medical practitioner must address all reported conditions in detail in Section VII. This detailed explanation should include, at a minimum, identification of the condition, date of diagnosis, any

Deleted: ———Page Break———
Deleted: V
Deleted: b

KLG_317

| Dept. of Homeland Security United States Coast Guard CG-719K (Draft E) | Coast Guard Merchant Marine Credential Medical Evaluation Report | OMB 0-0000 Page 4 |
|---|---|---|

limitations, whether the condition is controlled, the prognosis and any additional information as appropriate.

Additional sheets may be added by the applicant and/or verifying medical practitioner if needed to complete this section of the form.

**Does the applicant have, or have ever suffered from, any of the following?  If YES:**

1.  **PROVIDE TEST RESULTS AND/OR RECORDS AS INDICATED (in accordance with NVIC-XX-XX).**
2.  **Identify the Condition**         4.  **Is Condition Controlled?**         6.  **Prognosis**
3.  **List Any Limitations**          5.  **Date of Diagnosis**                7.  **Additional Information**

| # | YES | NO | Condition |
|---|---|---|---|
| 1. | ☐ | ☐ | Ear surgery |
| 2. | ☐ | ☐ | Hearing loss, hearing aid |
| 3. | ☐ | ☐ | Trouble smelling |
| 4. | ☐ | ☐ | Impaired speech or stuttering |
| 5. | ☐ | ☐ | Deformities of face |
| 6. | ☐ | ☐ | Open tracheostomy |
| 7. | ☐ | ☐ | Impaired balance or dizziness |
| 8. | ☐ | ☐ | Poor vision |
| 9. | ☐ | ☐ | History of eye disease or injury |
| 10. | ☐ | ☐ | History of eye surgery |
| 11. | ☐ | ☐ | Abnormal color vision |
| 12. | ☐ | ☐ | Glaucoma |
| 13. | ☐ | ☐ | Asthma |
| 14. | ☐ | ☐ | Emphysema or COPD |
| 15. | ☐ | ☐ | Collapsed lung/pneumothorax |
| 16. | ☐ | ☐ | Irregular heart beat |
| 17. | ☐ | ☐ | Heart murmur or valve replacement |
| 18. | ☐ | ☐ | Chest pain or angina |
| 19. | ☐ | ☐ | Heart attack/ myocardial infarction |
| 20. | ☐ | ☐ | Congestive heart failure |
| 21. | ☐ | ☐ | Heart surgery/stent/angioplasty |
| 22. | ☐ | ☐ | Pacemaker or defibrillator |
| 23. | ☐ | ☐ | Any other heart condition |
| 24. | ☐ | ☐ | High blood pressure/hypertension |
| 25. | ☐ | ☐ | Aneurysm or blockages |
| 26. | ☐ | ☐ | Pulmonary embolus or blood clots |
| | ☐ | ☐ | Gastrointestinal bleeding or ulcers |
| | ☐ | ☐ | Crohn's disease or ulcerative colitis |
| | ☐ | ☐ | Hepatitis or jaundice |
| 30. | ☐ | ☐ | Any spleen injuries or illnesses |
| 31. | ☐ | ☐ | Gallbladder problems or stones |
| 32. | ☐ | ☐ | Intestinal surgery |
| 33. | ☐ | ☐ | Any form of cancer |
| 34. | ☐ | ☐ | Anemia |
| 35. | ☐ | ☐ | Hemophilia or polycythemia |
| 36. | ☐ | ☐ | Any other blood disorders |
| 37. | ☐ | ☐ | Thyroid disease |
| 38. | ☐ | ☐ | Diabetes |
| 39. | ☐ | ☐ | HIV or AIDS |
| 40. | ☐ | ☐ | Lymphoma or leukemia |
| 41. | ☐ | ☐ | Tuberculosis |
| 42. | ☐ | ☐ | Neurofibromatosis |
| 43. | ☐ | ☐ | Skin tumors or cancer |
| 44. | ☐ | ☐ | Scleroderma |
| 45. | ☐ | ☐ | Lupus |
| 46. | ☐ | ☐ | Kidney transplant or dialysis |
| 47. | ☐ | ☐ | Kidney disease or cancer |
| 48. | ☐ | ☐ | Kidney stones |
| 49. | ☐ | ☐ | Bladder/prostate cancer |
| 50. | ☐ | ☐ | Protein/sugar/blood in urine |

| # | YES | NO | Condition |
|---|---|---|---|
| 51. | ☐ | ☐ | Back surgery or injury |
| 52. | ☐ | ☐ | Ruptured/herniated disc |
| 53. | ☐ | ☐ | Fractures requiring surgery |
| 54. | ☐ | ☐ | Limitation of any major joint |
| 55. | ☐ | ☐ | Bone or joint surgery |
| 56. | ☐ | ☐ | Dislocated joint |
| 57. | ☐ | ☐ | Recurrent neck or back pain |
| 58. | ☐ | ☐ | Swollen or painful joint |
| 59. | ☐ | ☐ | Arthritis or bursitis |
| 60. | ☐ | ☐ | Trick or locked knee |
| 61. | ☐ | ☐ | Amputation or prosthesis |
| 62. | ☐ | ☐ | Carpal tunnel |
| 63. | ☐ | ☐ | Difficulty walking or climbing |
| 64. | ☐ | ☐ | Sciatica or nerve pain |
| 65. | ☐ | ☐ | Other bone/joint disorder |
| 66. | ☐ | ☐ | Motion/sea sickness |
| 67. | ☐ | ☐ | Balance disorder or difficulty |
| 68. | ☐ | ☐ | Vertigo or dizziness |
| 69. | ☐ | ☐ | Numbness or paralysis |
| 70. | ☐ | ☐ | Head injury or skull fracture |
| 71. | ☐ | ☐ | Seizures or epilepsy |
| 72. | ☐ | ☐ | Recurrent headaches |
| 73. | ☐ | ☐ | Narcolepsy |
| 74. | ☐ | ☐ | Sleep apnea |
| 75. | ☐ | ☐ | Restless leg |
| 76. | ☐ | ☐ | Loss of consciousness |
| 77. | ☐ | ☐ | Fainting spells |
| 78. | ☐ | ☐ | Stroke or TIA |
| 79. | ☐ | ☐ | Brain tumor |
| 80. | ☐ | ☐ | Other brain or nerve disease |
| 81. | ☐ | ☐ | ADD, ADHD, or bipolar |
| 82. | ☐ | ☐ | Depression |
| 83. | ☐ | ☐ | History of suicide attempt |
| 84. | ☐ | ☐ | Schizophrenia |
| 85. | ☐ | ☐ | Anxiety |
| 86. | ☐ | ☐ | Substance abuse |
| 87. | ☐ | ☐ | Alcohol abuse |
| 88. | ☐ | ☐ | Loss of memory or amnesia |
| 89. | ☐ | ☐ | Other psychiatric disease |
| 90. | ☐ | ☐ | Sleepwalking |
| 91. | ☐ | ☐ | Bedwetting since age 12 |
| 92. | ☐ | ☐ | Any professional counseling |
| 93. | ☐ | ☐ | Sex change |
| 94. | ☐ | ☐ | Allergic reactions |
| 95. | ☐ | ☐ | Medical military discharge |
| 96. | ☐ | ☐ | Rejection from military |
| 97. | ☐ | ☐ | Medical disability |
| 98. | ☐ | ☐ | Any other illness/disease |
| 99. | ☐ | ☐ | Any other surgery |
| 100. | ☐ | ☐ | Any other hospitalization |
| | | | **FOR FEMALES ONLY** |
| 101. | ☐ | ☐ | Ovarian disease |

Formatted Table

... [4]

KLG_318

| Dept. of Homeland Security United States Coast Guard CG-719K (Draft E) | Coast Guard M...me Credential Medical Evaluation Report | OM  0-0000 Page 5 |
|---|---|---|

| 102. | ☐ | ☐ | Abnormal pap smear |
| 103. | ☐ | ☐ | Currently pregnant |
| 104. | ☐ | ☐ | Other female disorders |

Please make numbered comments on positive answers above:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

| Section III(a) – Visual Acuity |
|---|
| This section to be completed by the verifying medical practitioner, or any other qualified medical practitioner to the satisfaction of the verifying medical practitioner.  Additional information must be reported in Section VII. |

| Distant Uncorrected | Distant Corrected To | Field of Vision | |
|---|---|---|---|
| ight:  20   / | Right:  20   / | Applicant must have a **100** degrees of horizontal field of vision. | ☐ Normal |
| Left:  20   / | Left:  20   / | | ☐ Abnormal |

| Section III(b) – Color Vision |
|---|

| The following color sense testing methodologies are acceptable: | ☐ Titmus Vision Tester / OPTEC 2000 – (No errors on six plates) |
|---|---|
| ☐ AOC (1965) – (6 or fewer errors on plates 1-15) | ☐ Farnsworth Lantern (colored lights) Test per instruction booklet. |
| ☐ AOC-HRR (2nd Edition) – (No errors in test plates 7-11) | |
| ☐ Richmond (1983) – (6 or fewer errors) | ☐ Optec 900 (colored lights) Test per instruction booklet. |
| ☐ Ishihara pseudoisochromatic plates test, 14 plate (5 or less errors), 24 plate (6 or less errors) 38 plate (8 or less errors) | ☐ an alternative test approved by the Coast Guard (indicate test) |

the physician should indicate test used and results (number correct).  Additional information must be reported in Section VI.  Color sensing lenses (e.g. X-Chrome) are prohibited.

| Color Vision (Circle Result) | Normal Color Vision / Abnormal Color Vision |
|---|---|

KLG_319

Formatted Table
Formatted Table
... [5]
Deleted: ———————Page Break———— Section II - Physical Informat ... [6]
Formatted Table
Formatted Table
Deleted: ¶
Formatted ... [7]
Formatted: Left
Deleted: This applicant must have ... [8]
Formatted Table
Comment [dad6]: WG recom ... [9]
Deleted: ¶ ... [10]
Comment [dad7]: WG reco ... [11]
Formatted: Left
Formatted Table
Deleted: 14 plate
Deleted: Ishihara ... [12]
Deleted: ,
Deleted: ¶
Deleted: 24 plate
Deleted: Ishihara
Deleted: or
Deleted: pseudoisochromatic ... [13]
Formatted: Superscript
Deleted: , or
Deleted: 38 plate
Formatted ... [14]
Deleted: Ishihara ... [15]
Deleted: Farnsworth Lantern ... [16]
Deleted: ¶ ... [17]
Deleted: . ¶ ... [18]
Formatted: Left
Deleted: ¶
Deleted: I
Formatted Table
Formatted: Left
Comment [dad8]: WG reco ... [19]
Deleted: Test Used:
Deleted: Verification by Qual ... [20]
Formatted Table
Deleted: ¶ ... [21]

| Dept. of Homeland Security United States Coast Guard<br>CG-719K (Draft E) | Coast Guard Marine Credential Medical Evaluation Report | ON 10-0000<br>Page 6 |

## Section IV – Hearing

An applicant with normal hearing does not need to complete either the audiometer test or the functional speech discrimination test. The verifying medical practitioner, in consultation with any other qualified medical practitioners he/she deems appropriate, determines whether the audiometer and/or functional speech discrimination test are necessary.

This section must be completed by the verifying medical practitioner, or by any other qualified medical practitioner such as an audiologist or other hearing specialist, to the satisfaction of the verifying medical practitioner. If there are concerns that the applicant has abnormal hearing, the applicant must be complete an audiometer test or a functional speech discrimination test.

Both tests may be completed, but are not required. An applicant who is unable to meet the standards of the audiometer test must complete a functional speech discrimination test by an audiologist or other hearing specialist. An applicant who is unable to meet the standards of the audiometer test, but who can pass the functional speech discrimination test, may be eligible for a waiver.

The audiometer test should include testing at the following thresholds, 500Hz, 1,000Hz, 2,000Hz and 3,000 Hz. The frequency responses for each ear are averaged to determine the measure of an applicant's hearing ability. Applicant should demonstrate an unaided threshold of 30db or less in each ear.

In the functional speech discrimination test, the applicant should demonstrate functional speech discrimination of at least 90% (at 55 db) for issuance of an original credential, and 80% (at 55 db) for renewal or raise of grade.

When the applicant uses a hearing aid, the aided threshold should be at least 20 db in each ear, and the functional speech discrimination should be at least 90% (at 55 db) for all credentials. Use of a hearing aid must be noted (where indicated) on the form.

Additional information must be reported in Section VII.

| ☐ Normal Hearing | ☐ Abnormal Hearing | ☐ Hearing Aid Required | If abnormal, perform Audiogram, or Functional Speech Discrimination Test. |

| Audiometer Threshold Value | 500Hz | 1,000Hz | 2,000Hz | 3,000Hz | 4,000Hz | 6,000Hz | 8,000Hz |
|---|---|---|---|---|---|---|---|
| Right Ear (Unaided) | | | | | | | |
| Left Ear (Unaided) | | | | | | | |
| Right Ear (Aided) | | | | | | | |
| Left Ear (Aided) | | | | | | | |

| Functional Speech Discrimination Test @ 55dB | Right Ear (Unaided): ___% | Right Ear (Aided): ___% |
|---|---|---|
| | Left Ear (Unaided): ___% | Left Ear (Aided): ___% |

**Section V(a). - Physical Information (to be completed by qualified medical practitioner as part of general medical examination)**

This section to be completed by the verifying medical practitioner, or any other qualified medical practitioner to the satisfaction of the verifying medical practitioner. Additional information must be reported in Section VII.

| Height (inches only): | Weight (lbs): | BMI: Body Mass Index | Sex: Male Female (Circle) |
|---|---|---|---|
| Pulse Resting: _____ | Initial Blood Pressure: | | Repeat Blood Pressure (if needed): |

**Section V(b) – Physical Exam (must be completed by verifying medical practitioner as part of general medical**

Right margin comments/edits:
- Formatted Table
- Deleted: An applicant with normal hearing does not need to complete either the audiometer test or the functional speech discrimination test. The verifying medical practitioner, in consultation with any other qualified medical practitioners he/she deems appropriate, determines whether the audiometer and/or functional speech discrimination test are necessary.
- Deleted: ometer
- Deleted: Audiometer Threshold Value ... [22]
- Comment [dad10]: WG recommends adding the additional frequencies from the typical test, 4K, 6K, & 8K. Reason for this is due to new higher pitch alarms. Standardization of alarm frequencies being addressed at IMO.
- Comment [dad11]: WG recommends adding the additional frequencies from the typical test, 4K, 6K, & 8K. Reason for this is due to new higher pitch alarms. Standardization of alarm frequencies being addressed at IMO.
- Comment [dad12]: WG recommends adding the additional frequencies from the typical test, 4K, 6K, & 8K. Reason for this is due to new higher pitch alarms. Standardization of alarm frequencies being addressed at IMO.
- Comment [dad13]: WG recommends adding the additional frequencies ... [23]
- Formatted: Centered
- Formatted Table
- Formatted: Right
- Formatted: Centered
- Formatted: Right
- Deleted: ¶ ¶
- Deleted: II
- Formatted Table
- Deleted: ¶
- Deleted: Section V(a) - Medications (must be completed ... [24]
- Formatted: Font: Bold
- Formatted Table
- Deleted: ¶
- Formatted Table
- Deleted: c

KLG_320

| Dept. of Homeland Security United States Coast Guard CG-719K (Draft E) | Coast Guard /. .me Credential Medical Evaluation Report | OM 00-0000 Page 7 |

…mination)

| # | Normal | Abnormal | System / Organ | # | Normal | Abnormal | System / Organ |
|----|--------|----------|----------------|----|--------|----------|----------------|
| 1. | | | Head, Face, Neck, Scalp | 10. | | | Skin |
| 2. | | | Eyes / Pupils / EOM | 11. | | | Lymphatics |
| 3. | | | Mouth And Throat | 12. | | | Neurologic |
| 4. | | | Ears / Drums | 13. | | | Vascular System |
| 5. | | | Lungs And Chest | 14. | | | Genital-Urinary System |
| 6. | | | Heart | 15. | | | Hernia |
| 7. | | | Abdomen | 16. | | | Missing extremities / Digits |
| 8. | | | Upper / Lower Extremities | 17. | | | General / Systemic |
| 9. | | | Spine / Musculoskeletal | | | | |

Please make numbered comments on positive answers above:

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Section VI(a) - Demonstration of Physical Ability (to be completed by the verifying medical practitioner)**

- If the applicant has a Body Mass Index (BMI) of 40.0 or higher, or if the verifying medical practitioner doubts the applicant's ability to successfully perform any of the following functions, a suitable practical demonstration is required. The verifying medical practitioner, in consultation with any other qualified practitioners he/she deems appropriate, determines whether a practical demonstration is necessary, and whether the applicant is physically competent or not physically competent.

- All practical demonstrations, if required, should be performed by the applicant without outside assistance. Any prosthesis normally worn by the applicant, and other aid devices, may be used by the applicant in all practical demonstrations except when the use of such items would prevent the proper wearing of mandated personal protection equipment (PPE).

- If the verifying medical practitioner is unable to conduct the practical demonstration, the applicant should be referred to a competent evaluator of physical ability, such as a licensed physical therapist, or licensed occupational therapist.

- If the applicant is unable to perform any of the following functions, the examining practitioner should provide information on the degree or the severity of the applicant's inability to meet the standards. The results of any practical demonstration or attendant physical evaluation should be recorded in the Section VII.

List of tasks considered necessary for performing ordinary and emergency response shipboard functions:

1. Is able to maintain a sense of balance without disturbance while walking and standing

*Formatted: Font: Not Bold*
*Formatted: Not All caps*
*Deleted: #*
*Deleted: ¶ ¶ Verification by Qualified Medical Practitioner Completing Sections V(a), V(b) & V(c)*
*Deleted: Name:*
*Deleted: ¶*
*Formatted Table*
*Formatted: Left, Position: Horizontal: -0.06", Relative to: Column*

KLG_321

| Dept. of Homeland Security United States Coast Guard CG-719K (Draft E) | Coast Guard / .me Credential Medical Evaluation Report | OM 10-0000 Page 8 |
|---|---|---|

2. Is able to climb up and down a 16-foot vertical ladder (90 degree vertical)
3. Is able to climb up and down three sets of 8 feet high inclined stairs
4. Is able to step over a door sill or coaming up to 24 inches in height
5. Is able to move through a restricted opening of 24 inches by 24 inches
6. Is able to open and close watertight doors that weigh up to 55 pounds. Must be able to move hands/arms in vertical and horizontal directions, rotate wrists and reach above shoulder height to turn handles
7. Is able to lift at least a 40 pound load off the ground, and to carry, push, or pull the same load a distance of 200 feet
8. Is able to grasp and manipulate common tools such as wrenches, hammers, screwdrivers and pliers
9. Is able to crawl a distance of at least 16 feet
10. Is able to distinguish differences in texture and temperature by feel
11. Is able to stand on feet for up to 4 hours, and to walk a distance of at least 400 feet as a pace of not less than 5 feet per second
12. Is able to react to visual alarms and instructions
13. Is able to react to audible alarms and instructions
14. Is capable of normal conversation
15. Is able to pull an uncharged 2.5-inch diameter fire hose with nozzle at least 400 feet, and to lift a charged 2.5-inch diameter fire hose to firefighting position
16. Is physically able to put on a Personal Flotation Device (PFD) or exposure suit without assistance from another individual
17. Has no physical limitations that would hinder or prevent the performance of duties

| Examiner Recommendation: | ☐ Physically Competent ☐ Not Physically Competent | Deleted: In my opinion the applicant is |
|---|---|---|
| | Further evaluation is required regarding the following Medical / Physical Conditions: ☐ _____ _____ _____ _____ | Deleted: : |

| Section VII- Certification (to be signed by verifying medical practitioner) | Deleted: ¶ ——Page Break—— |
|---|---|

I hereby certify that the general medical history, physical examination and vision test, as well as the hearing and physical demonstration of competence as appropriate, have been performed, witnessed or reviewed to my satisfaction.

To the extent that there are any physical or medical conditions that may preclude the applicant from performing his/her duties, all relevant information has been reported on this form (and any attached sheets) to the best of my knowledge and belief.

My signature below attests, subject to criminal prosecution under 18 USC 1001, that all information reported by me is true and correct to the best of my knowledge and belief, and that I have not knowingly omitted to report any material information relevant to the form.

*Deleted: Section VII – Remarks (to be completed by verifying medical practitioner) ... [30]*
*Formatted Table*
*Formatted Table*
*Deleted: I*

| Signature: | Date: | National Provider Identifier: _ _ _ _ _ _ _ _ _ _ |
|---|---|---|

| Name: | Phone: | Fax: |
|---|---|---|
| Street: | City: | State: |
| Zip: | Email: | |

KLG_322

| Dept. of Homeland Security United States Coast Guard CG-719K (Draft E) | Coast Guard / ime Credential Medical Evaluation Report | O ͂    ͂0-0000 Page 9 |
|---|---|---|

| **Section VIII - Applicant Certification (to be signed by applicant)** | | | Deleted: IX / Formatted Table |
|---|---|---|---|
| My signature below attests, subject to prosecution under 18 USC 1001, that all information that I have reported is true and correct to the best of my knowledge and belief, and that I have not knowingly omitted to report any material information relevant to this form. | | | |
| Name (Printed ): | Signatur e: | Date: | |

| **Section IX - Release (to be signed by applicant and verifying medical practitioner)** | | | Deleted:  Page Break |
|---|---|---|---|

I hereby authorize the verifying medical practitioner provider, who has signed the certification on page X of this form, to release to, or discuss with authorized Coast Guard personnel, any pertinent information in his/her possession regarding any physical or medical condition that may require review by the Coast Guard prior to determining whether the Coast Guard should issue a credential(s) for maritime service.

Deleted: 8

I understand that this authorization is voluntary. I also understand that failure to provide authorization could affect the Coast Guard determination as to whether the Coast Guard should issue me a credential(s) for maritime service. This authorization will remain in effect until the Coast Guard determines whether to issue me the requested credential(s) for maritime service, but no longer than 180 days.

I have read and understand the following statement about my rights:

- I may revoke this authorization at any time prior to its expiration date by notifying the providing organization in writing, but the revocation will not have any effect on any actions taken before they received the notification.
- I may see or copy the information described in this form if I ask for it.
- I am not required to sign this form to receive my medical evaluation.

| **Applicant:** | | | |
|---|---|---|---|
| Name (Printed): | Signature: | Date: | Formatted Table |
| **Verifying Medical Practitioner:** | | | |
| Name (Printed): | Signature: | Date: | Formatted Table |

Deleted: 9
Privacy Act Statement    [... 31]

**KLG_323**