JOSEPH P. RUSSONIELLO
United States Attorney

BRIAN J. STRETCH (CASBN 163973)
Chief, Criminal Division

STACEY P. GEIS (CASBN 181444)
JONATHAN SCHMIDT (CABSN 230646)
Assistant United States Attorneys
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-6776 (tel)
(415) 436-7234 (fax)
Stacey.Geis@usdoj.gov
Jonathan.Schmidt@usdoj.gov

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

RICHARD A. UDELL
Senior Trial Attorney
Environmental Crimes Section
P.O. Box 23985
L'Enfant Plaza Station
Washington, DC 20004
(202) 305-0361 (tel)
(202) 514-8865 (fax)
Richard.Udell@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR 08-0160 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | GOVERNMENT'S OPPOSITION TO DEFENDANT COTA'S MOTION TO DISMISS THE CLEAN WATER ACT COUNT |
| ) | |
| JOHN JOSEPH COTA, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

# **TABLE OF CONTENTS**

I.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  Legal Framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.   Ninth Circuit Precedent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.    Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A.   Cota Had Notice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.   Misdemeanor Penalties Do Not Violate Due Process. . . . . . . . . . . . 16

      C.   Congress Clearly Intended to Criminalize Negligence. . . . . . . . . . . 19

           1.   Cota's Statutory Construction Argument is Erroneous. . . . . . . . 21

      D.   Cota is Liable Under the Criminal Provisions of the CWA. . . . . . . . 22

VI.   Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# FEDERAL CASES

*Brotherhood Shipping Co., Ltd. v. St. Paul Fire & Marine Ins. Co.,*
    985 F.2d 323 (7th Cir.1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Carpenters Health & Welfare Trust Funds v. Robertson,*
    53 F.3d 1064 (9th Cir.1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*City of Chicago v. M/V MORGAN,* 375 F.3d 563 (7th Cir. 2004).. . . . . . . . . . . . . . . . . 23

*Morissette v. United States,* 342 U.S. 246 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hanousek v. United States,* 528 U.S. 1102. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Holdridge v. United States,* 282 F.2d 302 (8th Cir. 1960).. . . . . . . . . . . . . . . . . . . . . . 16

*Lumber Jack Bldg. Centers v. Alexander,*
    536 F. Supp. 2d 804 (E.D. Mich. 2008) .. . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*The "Oregon Rule", The Oregon,*
    158 U.S. 186,
    15 S.Ct. 804
    39 L.Ed. 943 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Precious Metals Assoc., Inc. v. CFTC,* 620 F.2d 900 (1st Cir.1980). . . . . . . . . . . . . . . 15

*Ratzlaf v. United States,* 510 U.S. 135 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Russello v. United States,* 369 U.S. 1 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Russello v. United States,* 464 U.S. 16 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Safeco Ins. Co. of America v. Burr,* 127 S. Ct. 2201 (2007). . . . . . . . . . . . . . . . . . 21, 22

*Shevlin-Carpenter Co. v. Minnesota,* 218 U.S. 57 (1910).. . . . . . . . . . . . . . . . . . . . . . 16

*Staples v. United States,* 511 U.S. 600 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Tart v. Commonwealth of Massachusetts,* 949 F.2d 490 (1st Cir. 1991).. . . . . . . . . . . . . 12

*The "Pennsylvania Rule", The Pennsylvania,*
    86 U.S. (19 Wall.) 125 22 L.Ed. 148 (1873). . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Ahmad,* 101 F.3d 386 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Ayo-Gonzalez,*
    536 F.2d 652 (5th Cir. 1976),
    cert. denied, 429 U.S. 1072,
    97 S.Ct. 808, 50 L.Ed.2d 789 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Balint,* 258 U.S. 250 (1922).. . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*United States v. Corrow*, 119 F.3d 796 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. E.C. Inv., Inc.*, 77 F.3d 327 (9th Cir. 1996). . . . . . . . . . . . . . . . . . 15

*United States v. Engler*, 806 F.2d 425 (3d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Freed*, 401 U.S. 601 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Hanousek*, 176 F.3d 1116 (9th Cir. 1999). . . . . . . . . . . . . . . . 3, 9-11, 23

*United States v. Hopkins*, 53 F.3d 533 (2d Cir. 1995),
    cert. denied, 516 U.S. 1072 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. International Minerals & Chem. Corp.*, 402 U.S. 558 (1971). . . . . . . . 9

*United States v. Lewis*, 67 F.3d 225 (9th Cir.1995). . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Morgan*, 311 F.3d 611 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. National Dairy Prod. Corp.*, 372 U.S. 29 (1963). . . . . . . . . . . . . . . . 14

*United States v. Ortiz*, 427 F.3d 1278 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Reliable Transfer Co.*, 421 U.S. 397 (1973). . . . . . . . . . . . . . . . 22, 23

*United States v. Sinskey*, 119 F.3d 712 (8th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Smith*, 29 F.3d 270 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. United States Steel Corp.*,
    328 F. Supp. 354 (N.D. Ind. 1970),
    aff'd, 482 F.2d 439 (7th Cir.),
    cert. denied, 414 U.S. 909 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Unser*, 165 F.3d 755 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Weitzenhoff*, 1 F.3d 1523 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . 8, 9

*United States v. White Fuel Corp.*, 498 F.2d 619 (1st Cir. 1974). . . . . . . . . . . . . . . . 17

*United States v. Wilson*, 133 F.3d 251  (4th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Wulff*, 758 F.2d 1121 (6th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . 17

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## **FEDERAL STATUTES**

*Title 16, United States Code,*

    Section 707(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    Section 703. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Title 18, United States Code,*

    Section 492. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Section 793. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Section 1001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Title 33, United States Code,*

    Section 1319(c)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Section 1321(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Section 1321(b)(7)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Section 401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Section 1251(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Section 1319(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Section 1319(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Section 1319(c)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    Section 1321. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Section 1321(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Section 1321(B)(7)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Section 2701. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    Section 2702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    Section 2704. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    Section 1319(c)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    Section 1321(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Section 1319(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Section 1319(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Title 42, United States Code,*

    Section 1971. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Title 46, United States Code,*

    Section Subtitle II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    Section 2302(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Title 7, United States Code*,

Section 596(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Section 87b(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10


## <u>FEDERAL REGULATIONS</u>

40 C.F.R. § 110.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

40 C.F.R. §§ 10.717, 10.910. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

46 CFR 10.910. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14


## <u>MISCELLANEOUS</u>

Federal Water Pollution Control Act (33 U.S.C. 1319(c). . . . . . . . . . . . . . . . . . . . . . . 19

Pub. L. 101 - 380. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

118 Cong. Rec. 10644 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

136 Cong. Rec. S11544 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21


## <u>STATE CASES</u>

*People v. Chevron*, 143 Cal.App.3d 50 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*People v. Matthews*, 7 Cal.App.4th 1052 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State v. Hazelwood*, 946 P.2d 875 (Alaska 1997). . . . . . . . . . . . . . . . . . . . . . . 10, 12


## <u>STATE STATUTES</u>

Cal. Harb. & Nav. Code § 1101 (West 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Cal. Harb. & Nav. Code § 802 (West 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

California Fish & Game Code § 5650. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

California Fish & Game Code § 5650. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

California Government Code § 8670.64(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

California Health & Safety Code § 25189.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

California Health & Safety Code § 25190. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

The United States, by and through the undersigned attorneys, hereby files this opposition to defendant Cota's Motion to dismiss the Clean Water Act count of the Superseding Indictment. For the reasons set forth below, the government respectfully submits that the defendant's motion runs counter to binding Ninth Circuit precedent and is otherwise wholly without merit.

## I.    Introduction

Defendant John Cota ("Cota") has been charged in a superseding indictment with the following:  Counts 1-2 – Knowing and willful material false statements made in 2006 and 2007 to the United States Coast Guard (on required medical forms in which he certified that all of the information provided was complete and true when  the information failed to accurately disclose his current medications, the dosage, side effects and medical conditions), in violation of 18 U.S.C. § 1001; Count 3 – Negligent discharge of a harmful quantity of oil in the navigable waters of the United States, in violation of the Clean Water Act, as amended by the Oil Pollution Act of 1990, 33 U.S.C. §§ 1319(c)(1), 1321(b)(3) (a misdemeanor offense); and Count 4 – Taking without a permit of protected migratory birds, in violation of the Migratory Bird Treaty Act, 16 U.S.C. §§ 703, 707(a) (a misdemeanor offense).

Defendant Cota, is a San Francisco Bar Pilot who also holds a U.S. Coast Guard's Master's (Captain's) license.  On November 7th, Captain Cota was piloting the M/V Cosco Busan, a giant container ship registered in Hong Kong.  The vessel is approximately three football fields long and one football field across and approximately 68,086 tons.  The ship was departing the Port of Oakland en route to China in dense fog when it allided[1] with a supporting tower of the San Francisco-Oakland Bay Bridge, resulting in the discharge of over 50,000 gallons of bunker fuel into the Bay and causing

---

[1] An *allision* is "[t]he sudden impact of a vessel with a stationary object such as an anchored vessel or a pier." *Black's Law Dictionary* 75 (7th ed. 1999).  A *collision,* on the other hand, is "[t]he crashing together of two vessels." *Id.* at 258.  Thomas J. Schoenbaum, *Admiralty & Maritime Law*, § 14-2 (4th ed. 2004).  The ship did not merely "scrape" the fendering of the bridge.  The crash and resulting discharge resulted in millions of dollars in damage to both the ship and bridge.

1   the death of approximately 2,000 migratory birds, among other things.  A last second

2   maneuver averted a head-on crash  that could have resulted in far greater damage to the

3   ship and bridge, perhaps causing an even larger discharge of oil, major loss of life among

4   those on the ship and possibly the bridge, and a long-term interruption of commerce

5   between the cities of San Francisco and Oakland.  As it actually happened, the "allision"

6   caused a gash measuring approximately 150 feet long by 12 feet high on the port side of

7   the ship, puncturing two fuel tanks.  Of the six pilots scheduled to navigate commercial

8   vessels out of the Bay on the morning of November 7, 2007, only Cota elected to sail in

9   the dense fog.

10          Count Three of the superseding indictment charges defendant Cota with a

11   negligent discharge of oil in such quantities as may be harmful, in violation of the Clean

12   Water Act, as amended by the Oil Pollution Act of 1990.  33 U.S.C. 1319(c)(1)(A). A

13   harmful quantity of oil is an amount that causes a film or sheen or discoloration of the

14   surface of the water or adjoining shorelines. 40 C.F.R. § 110.3. Violation of this statute,

15   enacted in the wake of the *Exxon Valdez* oil discharge in Alaska, requires only a showing

16   of simple negligence.  *United States v. Hanousek*, 176 F.3d 1116, 1121 (9th Cir. 1999).

17   **II.    Background**

18          The indictment alleges that defendant Cota negligently caused the discharge of oil

19   from the *M/V Cosco Busan*, by acting in a negligent manner, that included:  (a) failing to

20   pilot a collision free course; (b) failing to adequately review with the Captain and crew of

21   the *M/V Cosco Busan* prior to departure the official navigational charts of the proposed

22   course, the location of the San Francisco Bay aids to navigation, and the operation of the

23   vessel's navigational equipment; (c) departing port in heavy fog and then failing to

24   proceed at a safe speed during the voyage despite limited visibility; (d) failing to use the

25   vessel's radar while making the final approach to the Bay Bridge; (e) failing to use

26   positional fixes during the voyage; and (f) failing to verify the vessel's position vis-à-vis

27   other established and recognized aids to navigation throughout the voyage.

28          At trial, the government's evidence will include the audio voyage data recorder,

the testimony of the ship's crew, and the testimony of other ship pilots.  The government will also introduce additional statements of the defendant conceding that he was unfamiliar with the one piece of equipment that he chose to rely upon almost exclusively, the electronic chart system or voyage management system.  The defendant's statements after the incident also admit that he had forgotten that he was towing a tug boat, originally brought along as a possible safety measure.  The government's evidence will include experts who will testify that defendant Cota acted negligently, violating various procedures including the "rules of the road."  The government's evidence, including operation of the ship's radar and crew member testimony, also directly conflicts with Cota's claim to Coast Guard inspectors that he had found the radar unreliable.  Additionally, Cota's negligence includes piloting a vessel in light of his medical conditions and medical prescriptions.

A Bar Pilot is required to be aboard while a vessel is in transit in San Francisco Bay.  While aboard, the pilot is in charge of the vessel's navigation.  *See* Cal. Harb. & Nav. Code § 802 (West 2001).  Pilots are required to be intimately familiar with the navigational markers in San Francisco Bay and the other features of the Bay relevant to navigation (e.g., tides, bottom depth, etc.).  Due to their expertise, Pilots are especially well compensated.

During its transit, the *Cosco Busan* had to pass under the San Francisco-Oakland Bay Bridge ("Bay Bridge"), which spans San Francisco Bay and links the cities of San Francisco and Oakland.  The western span of the Bay Bridge connects San Francisco to Yerba Buena Island and is supported by five towers.  The two eastern most towers of the western span are known as the "Delta" tower and the "Echo" tower.  Delta and Echo are approximately 2,210 feet apart.

Located in front of and behind the Delta tower are two buoys, which serve as aids to navigation.  These buoys signal to mariners that a ship transiting out of Oakland should pass to the right of the buoys.  These buoys are clearly visible, well marked on official navigational charts and have been in place for many years.  In the center of the

1    Delta-Echo span of the Bay Bridge, and attached to the vehicle deck of the bridge, is a

2    RACON.  A RACON is a radar transponder that produces a response visible on a ship's

3    radar scope.  The RACON located between the Delta and Echo towers of the Bay Bridge

4    is coded as RACON "Y", and it marks the center of the Delta-Echo span.  San Francisco

5    Bar Pilots routinely rely on this aid to navigation for safe transit under the Bay Bridge.

6         At approximately 6:20 a.m. on the morning of November 7, 2007, Cota boarded

7    the *Cosco Busan* in the Port of Oakland.  His job was to navigate the *Cosco Busan* safely

8    from Berth 56 at the Port of Oakland, under the Bay Bridge, under the Golden Gate

9    Bridge, and out to sea.  As a highly trained Bar Pilot with 27 years of experience as a

10   Pilot in San Francisco Bay, Cota was expected to be intimately familiar with San

11   Francisco Bay, and particularly with the shipping channels, aids to navigation, and

12   navigational hazards.  As part of their training, licensing, and good seamanship, Bar

13   Pilots are required to (1) be aware of the position of all navigational buoys between the

14   Port of Oakland and the Bay Bridge; (2) be aware of the location of the two "preferred

15   channel to port" buoys on each side of the Delta tower of the Bay Bridge as well as the

16   RACON "Y"; and (3) follow all applicable rules of navigation.  *See* 40 C.F.R. §§ 10.717m

17   10.910.

18        Prior to departure, Cota did not (1) discuss the preferred route through the

19   Delta-Echo span of the Bay Bridge with the Captain or crew of the *Cosco Busan*; (2)

20   review the official navigational charts or a passage plan of the proposed course with the

21   Captain or crew of the *Cosco Busan*; (3) discuss the location of the San Francisco Bay

22   aids to navigation with the Captain or crew of the *Cosco Busan*; or (4) discuss the

23   operation of or data from the vessel's navigational equipment, other than Cota's problems

24   with the radar, with the Captain or crew of the *Cosco Busan*.

25        The visibility on the morning of November 7, 2007, was extremely limited and

26   reported to be only in the "tens of meters" due to dense fog.  Crew members on the bridge

27   of the *Cosco Busan* were unable to see the bow of the ship located approximately 700 feet

28   away.  No other Bar Pilot assigned to navigate commercial vessels in San Francisco Bay

1  on the morning of November 7, 2007, elected to depart early that morning due to the poor

2  visibility.  Cota, however, decided to sail in the heavy fog.

3      The *Cosco Busan* departed its berth at approximately 7:48 a.m.  As the *Cosco*

4  *Busan* passed out of the Oakland estuary, Cota ordered a rapid increase in speed and a

5  broad port helm order, which had the effect of a sharp left turn for the vessel.  The

6  recording of the voyage shows that Cota issued commands that the crew followed.  The

7  *Cosco Busan* was traveling in excess of 10 knots during its transit.  As a result of the port

8  helm order, which remained in effect for approximately 75 seconds, the *Cosco Busan*

9  deviated far from the proper course.

10      Several minutes before striking the bridge, Cota claims he lost faith in the ship's

11  radar system and relied instead on the ship's electronic chart system to navigate the ship.

12  The ship's radar is a customary and primary tool of navigation, especially in fog.  When

13  Cota was examining the electronic chart viewer, located next to the radar, he asked the

14  Captain – a native of China who had never before sailed in San Francisco Bay – to

15  identify two red triangles.  The two red triangles represent the two buoys placed in front

16  of and behind the Bay Bridge's Delta Tower that Cota had seen thousands of times.  The

17  Captain responded affirmatively to Cota's assertion that they represented the center of the

18  bridge.  The electronic chart system had the capability to display this information and

19  show that they were buoys.  While relying on the electronic chart system, Cota never

20  requested the crew to take any fixed readings of the ship's actual location ("fixes") while

21  in transit in order to determine the ship's exact location.  Such fixes are required as part

22  of proper seamanship and by Coast Guard regulations known as the COLREGS.  During

23  this time, Cota never used parallel indexing, another customary navigational practice.

24  Cota also did not bring his own laptop, which would have provided an independent

25  method to ascertain the ship's location relative to charted hazards.  While not mandatory,

26  it is a common practice for some pilots to bring and use a laptop.

27      Despite the confusion in identifying certain navigational markings and the

28  continued poor visibility, Cota did not order a reduction in the vessel's speed or proceed

6

to an anchorage area to resolve any actual or perceived navigational problems.  At approximately 8:25 a.m., while relying upon the Captain's incorrect statement regarding the red marks on the chart viewer and without (1) using the vessel's radar; (2) obtaining positional fixes; (3) using parallel fixing; (4) consulting the official paper chart; (5) verifying the vessel's position vis-a-vis the aids to navigation; or (6) stopping or slowing the vessel, Cota remained off course, as opposed to steering for the middle of the navigational channel between the Delta and Echo Towers.[2]

Though the *Cosco Busan* avoided a head-on crash into the Delta tower, the port side of the vessel struck the bridge tower, causing a gash in the ship measuring approximately 150 feet long by 12 feet high.  The impact punctured two port side wing tanks, and caused approximately 58,000 gallons of bunker fuel to be discharged into San Francisco Bay.  The discharge of heavy fuel oil from the *Cosco Busan* on November 7, 2007, was especially harmful to the bird populations of San Francisco Bay.  More than 2,000 federally protected birds were recovered dead after coming into contact with the fuel oil discharged from the *Cosco Busan*.  The bird species included endangered Brown Pelican and threatened Marbled Murrelet.  The *Cosco Busan* oil spill also caused the immediate closure of approximately thirty miles of beaches along San Francisco Bay and resulted in the closure of offshore crab grounds.  The cost of clean up is currently estimated at sixty million dollars, and repairs to the ship and the bridge have each cost millions.

**III.    Legal Framework**

The Federal Water Protection Act ("FPCA"), commonly known as the Clean Water Act ("CWA") is a comprehensive statute designed "to restore and maintain the

---

[2] At approximately 8:27 a.m., and prior to the allision, Coast Guard Vessel Traffic Services questioned Cota about whether his intention was still to steer the ship between the Delta and Echo Towers of the Bay Bridge.  At that point, Cota abruptly changed course with a hard starboard turn. Around the same time, at approximately 8:30 a.m., the *Cosco Busan*'s boatswain, stationed as a lookout at the bow of the ship, observed a support tower of the Bay Bridge directly ahead of the ship and at a distance of approximately 100 yards.  The boatswain immediately informed the bridge crew via handheld radio that the bridge tower was directly ahead of the ship.  The crew informed Cota who then maintained the hard starboard rudder maneuver to avoid a head-on collision with the Delta tower.

1 chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

2 In the wake of the *Exxon Valdez* casualty, Congress passed the Oil Pollution Act of 1990

3 ("OPA"), an amendment to the CWA. In pertinent part, the CWA prohibits the

4 "discharge of oil or other hazardous substances (i) into or upon the navigable waters of

5 the United States, adjoining shoreline, or upon the waters of the contiguous zone . . . in

6 such quantities as may be harmful . . . ." 33 U.S.C. 1321(b)(3).

7    The CWA authorizes a wide array of mechanisms by which the government may

8 enforce the Act's prohibition on the unauthorized discharge of oil into waters of the

9 United States. The Act may be enforced administratively through issuance of

10 administrative compliance orders and imposition of civil administrative penalties. *See* 33

11 U.S.C. §§ 1319(g), 1321 (b)(6). The Act authorizes the United States to bring a civil

12 enforcement action seeking civil penalties in federal district court. 33 U.S.C. §

13 1321(B)(7)(E) . These civil penalty provisions do not require any *mens rea*. They may be

14 imposed against responsible parties on a strict liability basis. Where an oil spill is caused

15 by "*gross negligence*" a civil penalty of no less than $100,000 shall be imposed. 33

16 U.S.C. 1321(b)(7)(D).

17    The CWA criminal penalty provision makes it a felony to knowingly violate the

18 statute, while negligent violations are misdemeanors. *Compare* 33 U.S.C. § 1319(c)(2)

19 (Knowing violations are a felony punishable by a fine of not less than $5,000 nor more

20 than $50,000 per day of violation, or by imprisonment for not more than 3 years, or both)

21 *with* 33 U.S.C. § 1319(c)(1) (Negligent violations are a misdemeanor punishable by a fine

22 of not less than $2,500 nor more than $25,000 per day of violation, or by imprisonment

23 for not more than one year, or by both).

24 **IV.    Ninth Circuit Precedent**

25    Defendant Cota's motion to dismiss count 3 is contrary to the law of this Circuit

26 which has clearly held that neither the felony (knowing) nor the misdemeanor (negligent)

27 provisions of the CWA offend due process because the CWA is a public welfare statute.

28    In a felony CWA prosecution for a knowing discharge of sewage from a sewage

1    treatment plant, the Ninth Circuit held in *United States v. Weitzenhoff*, 1 F.3d 1523 (9th

2    Cir. 1993), *as amended on denial of rehearing and rehearing en banc*, 35 F.3d 1275 (9th

3    Cir. 1994), that knowing violations are general intent crimes (requiring knowledge of the

4    discharge and not specific knowledge that it was a violation of the CWA) because the

5    CWA is a public welfare statute. *Weitzenhoff*, 1 F.3d at 1530 ("The criminal provisions

6    of the CWA are clearly designed to protect the public at large from the potentially dire

7    consequences of water pollution, *see* S.Rep. No. 99-50, 99th Cong., 1st Sess. 29 (1985),

8    and as such fall within the category of public welfare legislation."). Shortly after the

9    initial *Weitzenhoff* decision, the Supreme Court decided two cases which Weitzenhoff

10   claimed called the Ninth Circuit's logic into question. The Ninth Circuit, however,

11   reaffirmed, denied rehearing and rehearing en banc, and distinguished the two new cases:

12   *Ratzlaf v. United States*, 510 U.S. 135 (1994), and *Staples v. United States*, 511 U.S. 600

13   (1994). *Weitzenhoff*, 35 F.3d at 1280-1281. The Ninth Circuit rested its amended

14   opinion on the Supreme Court's reasoning in *United States v. International Minerals &*

15   *Chem. Corp.*, 402 U.S. 558, 565 (1971). *Weitzenhoff*, 35 F.3d at 1284 ("[w]here

16   ...dangerous or deleterious devices or products or obnoxious waste materials are involved,

17   the probability of regulation is so great that anyone who is aware that he is in possession

18   of them or dealing with them must be presumed to be aware of the regulation.")

19       More recently, the Ninth Circuit has addressed the negligent CWA provision, the

20   exact same statute with which Cota is charged, in *United States v. Hanousek*, 176 F.3d

21   1116 (9th Cir. 1999), *cert. denied*, 528 U.S. 1102 (2000). Hanousek, a construction

22   project supervisor, was alleged to have negligently caused the discharge of a harmful

23   quantity of oil into navigable waters by failing to properly supervise a backhoe operation

24   digging next to a known oil pipeline. He appealed his conviction asserting that the

25   government should have been required to prove that he acted with criminal or gross

26   negligence, not ordinary negligence. The Ninth Circuit upheld the conviction and

27   squarely decided the issues now raised by Cota.

28       First, the Ninth Circuit held that CWA's plain language indicated that Congress

intended to criminalize ordinary negligence:

> If the language of the statute is clear, we need look no further than that language in determining the statute's meaning. *See United States v. Lewis*, 67 F.3d 225, 228 (9th Cir.1995). "Particular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme." Id. at 228-29. "When we look to the plain language of a statute in order to interpret its meaning, we do more than view words or sub-sections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole." *Carpenters Health & Welfare Trust Funds v. Robertson (In re Rufener Constr.)*, 53 F.3d 1064, 1067 (9th Cir.1995).

> Codified sections 1319(c)(1)(A) & 1321(b)(3) of the Clean Water Act work in tandem to criminalize the conduct of which Hanousek was convicted. Section 1319(c)(1)(A) provides that any person who negligently violates 33 U.S.C. § 1321(b)(3) shall be punished by fine or imprisonment, or both. Section 1321(b)(3) proscribes the actual discharge of oil in harmful quantities into navigable waters of the United States, adjoining shore lines or waters of a contiguous zone, as well as other specified activity.

*Hanousek*, 176 F.3d at 1120 (footnote omitted). This Circuit held that "negligently," as used in the CWA's criminal provisions, should be given its ordinary meaning of "a failure to use such care as a reasonably prudent and careful person would use under similar circumstances." 176 F.3d at 1120 (citations omitted). The Ninth Circuit's plain language approach to section 1319(c)(1)(A) has been embraced by the Tenth Circuit in *United States v. Ortiz*, 427 F.3d 1278, 1282-83 (10th Cir. 2005).

The Ninth Circuit further bolstered its plain language holding by observing that "[i]f Congress intended to prescribe a heightened negligence standard, it could have done so explicitly, as it did in 33 U.S.C. § 1321 (b)(7)(D)" which provides for increased civil penalties for cases involving "gross negligence or willful misconduct." 176 F.3d at 1221[3] (*citing Russello v. United States*, 369 U.S. 1, 23 (1962) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same

---

[3] In other statutes as well Congress has demonstrated that it knows how to prescribe a standard which would require proof of a greater deviation from ordinary, reasonable care than is conveyed by the unqualified term "negligently." See, e.g., 18 U.S.C. 793 (criminal violation to lose or disclose national security documents through "gross negligence"); 18 U.S.C. 492 (return of counterfeit items forfeited under a criminal statute is disallowed if the person acted in "willful negligence") 7 U.S.C. 87b(c) ("knowingly" defined as "gross negligence" in grain quality statute); 7 U.S.C. 1596(a) (gross negligence standard applies to violations of Department of Agriculture's seed regulations); 42 U.S.C. 1971 (Good Samaritan Food Donation Act defines "gross negligence" as voluntary and conscious conduct); 46 U.S.C. § 2302(b) ("gross negligence" in the operation of a ship).

1   Act, it is generally presumed that Congress acts intentionally and purposely in the

2   disparate inclusion or exclusion."). *Cf. State v. Hazelwood*, 946 P.2d 875, 881 (Alaska

3   1997) (holding the plain language of a state law patterned after the federal CWA

4   indicated that ordinary negligence was sufficient to convict the Master of the Exxon

5   Valdez; "The legislature made 'negligence' the standard of [criminal] liability.

6   Unadorned, this word is commonly understood to mean ordinary negligence, not criminal

7   or gross negligence."). Thus, where there is no limiting adjective on the term

8   "negligence" such as "gross" "criminal" or "culpable" negligence, the plain meaning of

9   neligence would not include any such adjective.

10          Second, following its decision in *Weitzenhoff*, the Ninth Circuit held that the CWA

11   is a public welfare statute. *Accord United States v. Hopkins*, 53 F.3d 533, 540 (2d Cir. 1995),

12   cert. denied, 516 U.S. 1072 (1996); *United States v. Wilson*, 133 F.3d 251, 264  (4th Cir. 1997);

13   *United States v. Sinskey, 119* F.3d 712, 716 (8th Cir. 1997), *but see United States v. Ahmad*, 101

14   F.3d 386, 391 (5th Cir. 1996) (felony CWA provisions not subject to a public welfare *mens rea*

15   exception). As such, the *Hanousek* court held that it was entirely proper and did not

16   violate due process to permit criminal penalties for simple negligence. *Hanousek*, 176

17   F.3d at 1122 ("In light of our holding in *Weitzenhoff* ... and the fact that a public welfare

18   statute may impose criminal penalties for ordinary neligent conduct without offending

19   due process, we conclude that section 1319(c)(1)(A) does not violate due process by

20   permitting criminal penalties for ordinary negligent conduct."). The Ninth Circuit

21   rejected Hanousek's argument that he was not in a position to know what the law required

22   and found that he was aware of the dangers in operating heavy machinery next to an oil

23   pipeline. *Id.*

24   **V.    Analysis**

25          Defendant Cota claims that count 3, charging a negligent discharge in violation of

26   the CWA/OPA, must be dismissed because it offends due process. In support of this

27   claim, he makes the following arguments. First, the defendant asserts that this Court

28   should distinguish *Hanousek* and *Weitzenhoff* and find instead that criminal negligent

1   violations, or at least those present in this case, are unconstitutional because the

2   defendant, a licensed Captain and specialist pilot, was not on notice that ship casualties

3   can cause major oil discharges and environmental damage.[4]  Second, the defendant urges

4   this Court to find that misdemeanor punishment is so "severe" that it renders the negligent

5   CWA offense unconstitutional.  Third, the defendant argues that this Court should ignore

6   the plain language of the CWA (and legislative history) and decide instead that Congress

7   did not really intend to make  negligent discharges of oil from ships, or at least non-tanker

8   ships, a crime under the CWA.  Finally, the defendant urges that if the Court follows

9   Ninth Circuit precedent upholding misdemeanor sanctions for ordinary negligence, then

10  he should be able to import civil defenses from Admiralty law.  Each of these assertions is

11  fatally flawed as demonstrated below.  Defendant Cota has failed to provide a legal or

12  reasoned basis for why this Court should depart from this Circuit's precedent.

13          A.    Cota Had Notice

14          Cota's claim that he lacked constructive notice of his potential liability for oil

15  spills is unsupported by the facts and the law.  It is worth reviewing his unique

16  employment that shows he had actual and constructive notice.  The position of Pilot in

17  San Francisco Bay is a life tenure appointment.  The only way to obtain the position is for

18  a current Pilot to die or retire.  The annual salary for a job that is typically less than forty

19  hours per week is approximately $500,000.  Compensation for a single voyage is as high

20  as $7,000 for a few hours work.  Why?  Because shepherding multi-million dollar vessels

21  with multi-million cargoes through environmentally sensitive waters is a highly

22  dangerous and specialized business requiring extensive training and experience.  Cota's

23

24          [4] Because negligent violation of the CWA has no common law crime antecedent, there is no
25  foundation for Cota's contention that common law principles must be imported into the CWA  *See
    Morissette v. United States*, 342 U.S. 246, 257-259 (1952) (rejecting the suggestion that standards
26  applicable to statutes that govern infamous crimes provide the appropriate test for determining the
    meaning of statutes making it a criminal offense to violate regulatory measures in the exercise of police
27  power for social betterment.); *Tart v. Commonwealth of Massachusetts*, 949 F.2d 490, 502 (1st Cir.
    1991) (since the "offense of landing raw fish without a permit is a regulatory offense not known at
28  common law, legislative silence should not be construed to import a common law mens rea
    requirement"); *State v. Hazelwood*, 946 P.2d at 882.

sole responsibility was to make sure that the Cosco Busan safely traversed San Francisco Bay. In the course of piloting some 180 ship transits in 2007, cota was entrusted with especially dangerous cargoes and extremely valuable ships and commodities. While the *M/V Cosco Busan* was a container ship, other vessels piloted by Cota could cause far greater damage to the environment, as well as major loss of life in such a populated area. In this case, at the last moment, after the bridge appeared out of the fog and while the ship was at full ahead, Cota made a last second attempt to avert a head on crash. It is not inconceivable that had it been a direct strike or had the cargo been explosive, that Cota's negligence could have resulted in substantial destruction of the San Francisco Bay Bridge and resulting loss of life and long term economic damage to the region and nation. This is part of the reason why pilots are compulsory. The environmental, safety and economic consequences are potentially staggering.

California developed the pilot program "to ensure the safety of persons, vessels, and property using Monterey Bay and the Bays of San Francisco, San Pablo, and Suisun, and the tributaries thereof, and to avoid damage to those waters and surrounding ecosystems as a result of vessel collision or damage." California wanted "to ensure safe and pollution-free waterborne commerce [. . .] in the confined, crowded, and environmentally sensitive waters of those bays." Cal. Harb. & Nav. Code § 1101 (West 2002). To secure his California pilot's license, Cota was required to demonstrate knowledge of state and federal environmental laws. Cal. Code Regs., tit. 7, § 214 (2008). According to state regulations, successful completion of the pilot training program is contingent upon the pilot's "familiarity with all relevant international, national, state and local laws and regulations applicable to navigational safety, rules of the road, pollution prevention, and contingency planning." *Id.* California law includes a strict liability misdemeanor for the discharge a pollutant that could be deleterious to fish or plant life into waters of the State. *See* California Fish & Game Code Section 5650; *see also People v. Chevron*, 143 Cal.App.3d 50 (1983) (holding that Section 5650 is indeed a strict liability statute that did not require proof of scienter or criminal negligence).

Since 1994, Cota held a Master's license for certain vessels from the U.S. Coast Guard. As a prerequisite, he was required to demonstrate knowledge of United States maritime and environmental laws including the CWA/OPA and MARPOL. *See* 46 CFR 10.910.[5] Cota also held an STCW[6] endorsement and certificate that attests to his knowledge of environmental requirements including MARPOL Annex I, which governs oil discharges from ships. Cota's licensing also required training in to ensure safe navigation and protection of the environment. *See* STCW A-II/I, 2, available at www.uscg.mil/stcw/stcw-code-into.htm.

Cota, a Coast Guard licensed Master, Coast Guard licensed Pilot, and State of California licensed Pilot, cannot seriously assert that he was not on notice that his job involved environmental dangers. This is an absurd claim. Cota had far more notice than the backhoe operator in *Hanousek*. The defendant suggests that he was no more on notice than a person driving a car with a gas tank. While the average automobile gas tank holds approximately 15 gallons, the Cosco Busan held approximately 2,142,000 gallons of petroleum as fuel in tanks on the side and bottom of the vessel where it is anticipated that they may potentially be breached.

The Supreme Court has held, that "criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed."

---

[5] Before such a license is issued issued, a mariner must pass a license exam covering a broad range of subjects, including knowledge of domestic and international pollution laws. Prior to taking the exam, the mariner must undergo extensive training, either in the classroom or while serving in a lesser capacity aboard ships. The assertion that a mariner, particularly a pilot of a large vessel, is unaware of the environmental hazards associated with piloting such a vessel in a restricted waterway is inconceivable.

[6] Standards of Training, Certification and Watchkeeping ("STCW") is an international convention created to standardize shipboard training and Watchkeeping, to which the United States is a party. *See* International Convention on Standards of Training, Certification and Watchkeeping for Seafarers (STCW Convention), July 7, 1978, Int'l Maritime Org., Doc. Sales No. IMO-945E (1996) (entered into force Apr. 28, 1984), as amended by the Seafarers' Training, Certification and Watchkeeping (STCW) Code, July 7, 1995, Int'l Maritime Org., Doc. Sales No. IMO-945E (1996), implemented pursuant to 46 U.S.C. Subtitle II, Part E and 46 C.F.R. Parts 10-13. Issuance of an STCW endorsement means that the mariner has demonstrated knowledge, understanding, and proficiency in pollution prevention requirements, among other areas.

1    *United States v. National Dairy Prod. Corp.*, 372 U.S. 29, 32-33 (1963).  The Ninth

2    Circuit has already found that the terms of the CWA as amended by OPA are clear.

3    *Hanousek*.  However, as demonstrated above, defendant did not only have constructive

4    notice, he had actual notice.  It was defendant's job to be familiar with these provisions

5    and they are widely known within the industry and the subject of training for a Coast

6    Guard license.

7         A criminal prohibition provides sufficient notice unless the law is "so vague that it

8    fails to give a person of ordinary intelligence fair notice that his contemplated conduct is

9    forbidden."  *United States v. E.C. Inv., Inc.*, 77 F.3d 327, 331 (9th Cir. 1996).  While fair

10   notice should be determined from the point of view of a reasonable person in the position

11   of the defendant, when a criminal prohibition involves conduct of a select group of

12   persons having specialized knowledge, a court may presume that defendants in the

13   relevant group have a more specialized understanding than would an average person.  *See*

14   *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 501 (1982)

15   (examining vagueness of ordinance from the perspective of a "business person of

16   ordinary intelligence");  *Weitzenhoff*, 35 F.3d at 1289 (holding that in evaluating the

17   vagueness of a statute involving conduct of a select group of people, the statute may be

18   upheld if the meaning of the statute is "well enough known to enable those within its

19   reach to correctly apply [the law]");  *Precious Metals Assoc., Inc. v. CFTC,* 620 F.2d

20   900, 907-08 (1st Cir.1980) (holding that provisions of the Commodity Futures Trading

21   Act prohibiting trading of commodity options were not unconstitutionally vague where

22   members of regulated group were highly specialized and had thorough knowledge of

23   what was prohibited).   The test is whether the "language sufficiently conveys a definite

24   warning as to the proscribed conduct, when measured by common understanding and

25   commercial practice."  *Precious Metals*, 620 F.2d at 907.

26        Defendant asserts that imposing liability in this case would expose countless

27   individuals to criminal liability and therefore offend due process.  However, this is not a

28   case where a defendant is being prosecuted for "normal industrial operations."  *Hanousek*

15

1    *v. United States*, 528 U.S. 1102, 1103 (Thomas, J. *dissenting from denial of cert.*).

2    As demonstrated above, Cota's job is highly specialized and his training and certifications

3    required him to be acutely aware of the environmental risks inherent in his employment.

4    The class of individuals with similar training and responsibility is limited.  There are only

5    60 licensed San Francisco Bay bar pilots. (San Francisco Bar Pilots Association,

6    http://www.sfbarpilots.com, last visited June 23, 2008).

7        Defendant's motion also intimates that Cota should not be held accountable

8    because the oil discharged was from a fuel tank or because the ship was not a tanker.

9    There is no legal basis for such exceptions to the Clean Water Act.  Indeed, the OPA

10    amendment was enacted specifically to address vessel pollution and Congress chose to

11    apply it to all vessels, not just tankers,[7] and even to land based facilities.[8]

12        B.    Misdemeanor Penalties Do Not Violate Due Process

13        The misdemeanor penalties imposed for negligent discharges under the CWA do

14    not violate defendant's due process rights.  Cota suggests that in the absence of any intent

15    or any evil intent, it is inappropriate to exact even misdemeanor penalties in this case.[9]

16    In support, he cites *Holdridge v. United States*, 282 F.2d 302, 310 (8th Cir. 1960), which

17    is inapposite because it addresses the due process requirements for strict liability offenses,

18    rather than negligence offenses.  Even if *Holdridge* were applicable, a simple negligence

19    standard is supported by congressional purpose of the CWA.  *Holdridge*, 282 F.2d at 310.

20        The Supreme Court has long stated that even certain strict liability public welfare

21    offenses withstand due process scrutiny.  *Shevlin-Carpenter Co. v. Minnesota*, 218 U.S.

22

23        [7] 33 U.S.C. § 2701 (27) ("'vessel' means every description of watercraft or other artificial
24    contrivance used, or capable of being used, as a means of transportation on water, other than a public
    vessel").

25        [8] *See e.g.* 33 U.S.C. § 2702 (a) (extending liability to facilities as well as vessels); 33 U.S.C. §
26    2704 (establishing limits of liability for onshore facilities).

27        [9] As a general proposition, this conflicts with public welfare doctrine cases upholding
28    misdemeanor sanctions for strict liability crimes.  *See, e.g., Weitzenhoff*, 35 F.3d at 1286 n.7; *United
    States v. Freed*, 401 U.S. 601, 609-10 (1971) (five years imprisonment based on strict liability standard
    upheld).

16

57, 65 (1910) (misdemeanor removal of timber from state lands without a permit); *United States v. Balint*, 258 U.S. 250, 251 (1922) (illegal drug sale); *United States v. Freed*, 401 U.S. 601, 609, (1971) (possession of unregistered hand grenades).

Strict liability environmental crimes have existed since the Rivers and Harbors Act of 1899 made it a strict liability crime to discharge refuse, including oil, into navigable waters. Rivers and Harbors Act of 1899, 33 U.S.C. 401 et seq. *See, e.g., United States v. White Fuel Corp.*, 498 F.2d 619, 622 (1st Cir. 1974); *United States v. United States Steel Corp.*, 328 F. Supp. 354, 356 (N.D. Ind. 1970), *aff'd*, 482 F.2d 439 (7th Cir.), *cert. denied*, 414 U.S. 909 (1973). As mentioned above, strict liability environmental crimes also exist at the State level. *See e.g.,* California Fish & Game Code Sec. 5650; *see also* California Health & Safety Code Section 25190 ("any person who violates any provision of this chapter [concerning the handling, storage, and disposal of hazardous waste], or any permit, rule, regulation, standard or requirement....is...guilty of a misdemeanor."); *see also People v. Matthews*, 7 Cal.App.4th 1052 (1992)(finding Section 25190 violations constitute strict liability offenses or "so-called 'public welfare' or 'malum prohibitum' crimes" which are punishable despite the absence of any criminal intent or criminal negligence).[10]

Due process challenges to strict liability environmental crimes with penalties similar to those at issue here have been unsuccessful. *United States v. Unser*, 165 F.3d 755, 762 (10th Cir. 1999) (operation of a motor vehicle in state forest lands; fine up to $5,000, and/or imprisonment up to six months); *United States v. Ayo-Gonzalez*, 536 F.2d 652 (5th Cir. 1976) (fishing in United States contiguous fishing zone; fine up to $100,000 and/or imprisonment up to one year), *cert. denied*, 429 U.S. 1072, 97 S.Ct. 808, 50 L.Ed.2d 789 (1977).

Defendant Cota has not challenged Count 4 alleging a misdemeanor strict liability

---

[10] Indeed, under California law, there are *felony* provisions for the negligent discharge of oil into waters of the State, *see* California Government Code Section 8670.64(a)(3), as well as for the negligent handling, storage, treatment, or disposal of hazardous waste. *See* California Health & Safety Code Section 25189.5.

1  offense under the Migratory Bird Treaty Act (MBTA).  Defendant cites *United States v.*

2  *Wulff*, 758 F.2d 1121, 1122 (6th Cir. 1985) (holding that the felony MBTA provision was

3  unconstitutional because it had no *scienter* requirement and "because the felony penalty

4  provision is severe and would result in irreparable damage to one's reputation"), without

5  citing *United States v. Engler,* 806 F.2d 425, 435-36 (3d Cir. 1986) (explicitly declining

6  to follow *Wulff* and finding MBTA penalty was not so severe that a scienter requirement

7  was necessary).  Regardless, in 1986, Congress responded to *Wulff*, adding the word

8  "knowingly" to the felony provision 16 U.S.C. §707(b), which had been a strict liability

9  provision until that time.  S.Rep. No. 99-445 (1986).  Accordingly, more recent and post-

10 *Staples* cases not cited by the defendant hold misdemeanor violations of MBTA do not

11 violate due process despite the lack of a *mens rea* element.  *United States v. Morgan*, 311

12 F.3d 611, 615 (5th Cir. 2002) (exceeding bag limit, mentioning other circuits have found

13 no due process problems);  *United States v. Corrow,* 119 F.3d 796, 805 (10th Cir. 1997)

14 (possession of eagle feathers, holding due process did not require a *scienter* element

15 because MBTA is a regulatory act with small penalties and there is no grave harm to an

16 offender's reputation);  *United States v. Smith,* 29 F.3d 270, 273 (7th Cir. 1994)

17 (possession of eagle feathers, following *Engler*).

18        The defendant misapprehends negligence to be the absence of intent.  However,

19 Cota is alleged to have acted negligently because he failed to take reasonable measures

20 and violated other rules of the road that would have prevented the casualty.  At trial, the

21 government will show that his negligence was the result of volitional, conscious decisions

22 not to follow safe navigational procedures and take safety precautions such as those

23 alleged with specificity in Count 3.

24        Congress' decision to punish negligent conduct is reasonable because negligent

25 conduct is avoidable.  *Cf. United States v. Balint,* 258 U.S. at 252-253 ("where one deals

26 with others and his mere negligence may be dangerous to them . . . the policy of the law

27 may, in order to stimulate proper care, require the punishment of the negligent person").

28 Furthermore, it is reasonable to expect persons to act in a non-negligent way, particularly

where, as here, the defendant was responsible for operating inherently dangerous vessels carrying hazardous materials.

Misdemeanor penalties, while not insignificant, are also not as severe as suggested by Cota. The five dissenters in *Weitzenhoff* noted that misdemeanors are significantly less severe than felonies, suggesting that although they objected to a felony prosecution they may not have dissented to a misdemeanor prosecution. *Weitzenhoff*, 35 F.3d at 1297 (Kleinfeld, J. *dissenting from denial of rehearing en banc*) ("Making these acts a misdemeanor is one thing, but a felony is quite another . . . ."). *See also Engler* and MBTA cases cited *supra*.

C.    Congress Clearly Intended to Criminalize Negligence

As set forth *supra*, this Circuit has held that the plain language of the CWA indicates that Congress intended to criminalize ordinary negligence. This holding is supported by the *Hanousek* court's statutory construction as well as by the legislative history.

Punishing marine operators with jail time for negligently causing large oil spills was precisely what Congress had in mind when it enacted the Oil Pollution of Act of 1990 ("OPA"). OPA was a direct response to the 1989 Exxon Valdez oil spill – the worst maritime environmental disaster in U.S. history. The public outrage that accompanied that spill spurred Congress to resolve fifteen years of political and policy differences and pass a statute designed to prevent future oil spill catastrophes. Among the main elements of the Oil Pollution Act were criminal penalties. In particular, Section 4301 of the Act amended the Clean Water Act to authorize prison terms and criminal fines for both knowing <u>and</u> negligent oil spills.[11] Pub. L. 101 - 380, tit. IV, § 4301, 104 Stat. 484

---

[11] In pertinent part, Section 4301 reads as follows:

(c) CRIMINAL PENALTIES.--Section 309(c) of the Federal Water Pollution Control Act (33 U.S.C. 1319(c)) is amended by inserting after "308," each place it appears the following: "311(b)(3),".

Section 311(b)(3) governs the discharge of oil or hazardous substances. 33 U.S.C. §1321(b)(3).

19

(1990). Had Congress wanted to impose jail time only for knowing violations, it would have amended only the felony provisions found in Section 309(c)(2)(A) of the Clean Water Act, 33 U.S.C. § 1319(c)(2)(A). Instead, Congress amended both Section 309(c)(1)(A) and 309(c)(2)(A), 33 U.S.C. §1319(c)(1)(A) and §1319(c)(2)(A), thereby making negligent spills punishable with prison sentences of up to 1 year. *See* H.R. Rep. No. 101-653, at 154 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 834.[12]

The legislative history of OPA demonstrates that Congress viewed the discharge of oil from ships to pose a danger to public health and welfare:

> Section 311(c)(2) of the [CWA], as amended by the Conference substitute, replaces section 311(d) of that Act to require the President to direct all Federal, State, and private actions to remove a discharge or to mitigate or prevent a substantial threat of a discharge if the discharge is of such a size or character as to be a substantial threat to the public health or welfare of the United States. The public health or welfare of the United States includes, but is not limited to fish, shellfish, wildlife, other natural resources, or public or private shorelines and beaches. Examples of spills that have posed such a substantial threat to the public health or welfare include the spills from the Exxon Valdez in Alaska's Prince William Sound and from the American Trader in California's coastal waters, and the spill and substantial threat of a larger spill from the Mega Borg in the waters of the Gulf of Mexico.

H. R. Rep. No. 101-653, at 145 (1990) *reprinted in* 1990 U.S.C.C.A.N. 779, 824-825. Congress' unambiguous desire that criminal penalties, including imprisonment, be imposed for oil spills was underscored by Senator Lieberman during the senate adoption of the Conference Report. Senator Lieberman stated:

> I am particularly pleased that the legislation assures that those who are responsible for damaging our fragile environment will be subject to substantial civil and criminal penalties in addition to responsibility for cleanup costs. . . .
>
> It was my intent in writing the penalty provisions of my legislation, which have been substantially adopted in this bill that, in the event of a spill, the Government apply the penalty provisions in a manner which will punish the

---

[12] The Joint Explanatory Statement reads:

Section 4301(c) of the Conference substitute provides that violations of the prohibition on discharges of oil or hazardous substances are subject to criminal penalties established under section 309(c) of the Federal Water Pollution Control Act. These penalties are $2,500-$25,000/one year in prison for negligent violations, $5,000-$50,000/three years for knowing violations, and up to $250,000 and 15 years for knowing endangerment.

violator and deter and prevent future violations. . . .  In enforcing these provisions, the Government should also bear in mind that law enforcement officials, including the Attorney General of the United States, have recently emphasized that criminal enforcement is a particularly effective tool in securing compliance with our environmental laws; this special deterrent effect should be strongly considered in those cases where the Government may have discretion to apply civil or criminal penalties.

136 Cong. Rec. S11544–46 (1990) (statement of Sen. Lieberman).[13]

Defendant Cota's conduct is exactly what Congress had in mind when it passed the OPA amendment to the CWA.  In so doing, Congress rejected the notion, implied by Cota, that his conduct was merely accidental or that negligence cannot be deterred. Congress was well aware that large oil spills, like the one in this case and like the Exxon-Valdez case, are acts of negligence that should have been avoided.

### 1.    Cota's Statutory Construction Argument is Erroneous

Cota erroneously asserts that "the *Hanousek* court's ruling is based entirely on a construction that is premised on comparing the use of particular words in a criminal statue with those used in a civil statute under the construction principle calling for reading similar statues in pari material." (Def.'s Mot. to Dismiss CWA Count 16.)  As discussed above, the Ninth Circuit's holding in *Hanousek* is first and foremost a plain language holding.  Statutory construction merely bolsters the holding in *Hanousek* as does the legislative history set froth above.  Cota then compounds his error by claiming that the doctrine of *in pari materia* has been expressly declared erroneous in *Safeco Ins. Co. of America v. Burr*, 127 S. Ct. 2201 (2007), thus overruling *sub silentio* the holding of *Hanousek*, as well as, by implication, *Russello v. United States*, 464 U.S. 16 (1962) and numerous other cases of statutory construction.

This vastly overstates the reasoning and holding of *Safeco* which sought to determine the meaning of "willfully" under the Fair Credit Reporting Act.  The *Safeco*

---

[13] During congressional debates considering a proposal to expand the scope of penalty provisions, Representative Harsha stated: "I would like to call to the attention of my colleagues the fact that in this legislation we already can charge a man for *simple negligence*, we can charge him with a criminal violation under this bill for *simple negligence*."  118 Cong. Rec. 10644 (1972) (emphasis added). This undisputed statement corroborates the plain language of the statute.

court merely noted that the term "willfully" has historically meant different things in civil and criminal law and thus it would be inappropriate in that context to use the criminal definition to construe the civil definition. *Safeco*, 127 S. Ct. at 2210. The *Safeco* court did not address or interpret the meaning of the term "negligently." At least one district court has declined the invitation to extend *Safeco* to even other statutes where the term "willfully" is at issue. *See Lumber Jack Bldg. Centers v. Alexander*, 536 F. Supp. 2d 804, 808 (E.D. Mich. 2008). In short, even if *Hanousek's* rationale were not primarily a plain language interpretation, *Safeco* would not alter the Ninth Circuit's clear holding regarding the meaning of negligent CWA violations.

D.     Cota is Liable Under the Criminal Provisions of the CWA

Cota has been properly charged with a violation of the CWA and has available to him defenses to the elements of the offense charged. Without support, and without authority for the proposition that vessel pollution cases should be treated differently when Congress explicitly chose not to do so in the CWA, Cota asserts that civil defenses available in admiralty jurisprudence should be available to him in this criminal prosecution. This would also lead to absurd and potentially adverse results for this defendant.[14]

---

[14] Under admiralty law and the "Oregon Rule", *The Oregon,* 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895), cited by Cota, there is a rebuttable presumption of fault against a moving vessel and those responsible for it when a moving vessel allides with a stationary object. Defendant might want to reconsider before urging this rule apply since in criminal cases, the defendant is presumed not guilty.

The "Pennsylvania Rule", *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873), also referenced by the defendant, states that when "a ship at the time of a collision or an allision is in violation of a statutory rule intended to prevent the collision or allision, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster." Again, in admiralty law, in such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, *but that it could not have been*. The rule can also apply to regulatory violations and to violations of the Inland Rules or internationally mandated navigation rules.

Cota's brief refers to *Reliable Transfer*, which adopted comparative fault principles in admiralty collision cases, *i.e.*, each defendant is liable for its percentage of comparative fault. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 411 (1973). The Seventh Circuit discussed the Oregon Rule, the Pennsylvania Rule, and *Reliable Transfer* in a 2004 allision case:

1    If defendant's point is that others are also negligent, that may be true, but is not a

2    valid defense as to *his* negligence.  The instructions approved by the Ninth Circuit in

3    *Hanousek* amply account for any such concern.  In *Hanousek*, the Circuit approved of an

4    instruction advising the jury that the defendant could only be convicted on the basis of his

5    own negligence and that his conduct was a proximate cause of the discharge.  *Hanousek*,

6    176 F.3d at 1123-24.

7    **VI.    Conclusion**

8    For the reasons set forth above, including the plain language of the CWA, as

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   _____

18   Rebutting the presumption [of the Oregon Rule] does not necessarily exonerate
     the vessel from all liability. Under the principles of pure comparative fault, both parties
19   may be found to have contributed to the accident. 'When two or more parties have
     contributed by their fault to cause property damage in a maritime collision or stranding,
20   liability for such damage is to be allocated among the parties proportionately to the
     comparative degree of their fault, and that liability for such damages is to be allocated
21   equally only when the parties are equally at fault or when it is not possible fairly to
     measure the comparative degree of their fault.'  *United States v. ReliableTransfer Co.,*
22   421 U.S. 397, 411, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); *Brotherhood Shipping Co.,*
     *Ltd. v. St. Paul Fire & Marine Ins. Co.,* 985 F.2d 323, 325 (7th Cir.1993). Therefore,
23   under the comparative fault analysis between a vessel and a stationary object, a vessel
24   may minimize its liability by providing evidence that the stationary object contributed to
     the injury it incurred, however, it will be absolved of liability only if the stationary object
25   is deemed the *sole* proximate cause of the injury. *Bunge Corp.,* 558 F.2d at 802
26   (emphasis added).

27   *City of Chicago v. M/V MORGAN*, 375 F.3d 563, 573 (7th Cir. 2004).  These are not elements or defenses
28   to a criminal prosecution (and it would appear unlikely that Cota could demonstrate that the San
     Francisco Bay Bridge was at fault, let alone the sole proximate cause).

amended by OPA, and Ninth Circuit law embodied in *Hanousek*, the United States respectfully submits that defendant Cota's motion should be denied.

JOSEPH P. RUSSONIELLO
United States Attorney

BRIAN J. STRETCH
Chief, Criminal Division

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources
Division
United States Department of Justice

DATED: July __, 2008____          By:_____/s/_____
                                         STACEY GEIS
                                         JONATHAN SCHMIDT
                                         Assistant United States Attorneys


                                   By:_____/s/_____
                                         RICHARD A. UDELL
                                         Senior Trial Attorney
                                         Environmental Crimes Section