1  Jeffrey L. Bornstein (State Bar No. 99358)
   Luke G. Anderson (State Bar No. 210699)
2  K&L Gates LLP
   55 Second Street, 17th Floor
3  San Francisco, CA 94105
   Telephone: (415) 882-8200
4  Facsimile: (415) 882-8220

5  Barry M. Hartman, *Admitted Pro Hac Vice* (DC Bar No. 291617)
   Christopher R. Tate, *Admitted Pro Hac Vice* (PA Bar No. 205510)
6  K&L Gates LLP
   1601 K Street, N.W.
7  Washington, D.C. 20006
   Telephone: (202) 778-9000
8  Facsimile: (202) 778-9100

9  Attorneys for Defendant
   JOHN J. COTA

10

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                        SAN FRANCISCO DIVISION

14 | UNITED STATES OF AMERICA, | Case No. CR 08-00160 SI |

15 |                    Plaintiff, | **DEFENDANT JOHN J. COTA'S** |

16 |    v.                          | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES** |

17 | JOHN J. COTA and               | |

18 | FLEET MANAGEMENT LIMITED,      | |

19 |                    Defendants. | Date:    September 22, 2008 |

20 |                                | Time:    11:00 am |
   |                                | Judge:   Honorable Susan Illston |

21 |                                | Speedy Trial Act; Excludable Time Through Disposition, 18 U.S.C. § 3161(h)(1)(F) |

22

23

24

25

26

27

28
                                 i

# TABLE OF CONTENTS

I.      INTRODUCTION.................................................................1

II.     PROCEDURAL HISTORY .................................................3

III.    ARGUMENT ........................................................................3

    A.    Transfer is Necessary Where Prejudice is Presumed from the Fact that the Community Where the Trial is to be Held is Saturated with Prejudicial and Inflammatory Media Publicity. ...............................................................3

    B.    Captain Cota Cannot Receive a Fair and Impartial Trial in the San Francisco Bay Area Due to Extensive Prejudicial and Inflammatory Media Coverage ............... 6

        1.    Expert Analysis Demonstrates that the Extensive Inflammatory Local Media Coverage of the COSCO BUSAN Incident and Captain Cota by the *San Francisco Chronicle* is Preemptively Prejudicial to Captain Cota. ..... 7

        2.    The Substance of the Massive Coverage Was Almost Uniformly Prejudicial to Captain Cota .................................................... 10

        3.    Even a Casual Review of the Inflammatory and Prejudicial Reporting of Captain Cota in Other Media Seen, Read and Heard in This Community Easily Demonstrates Presumptive Prejudice Requiring a Change of Venue ....................................................................................... 14

    C.    Alternatively, the Court Should Take Specific Measures to Protect Captain Cota's Right to a Fair and Impartial Jury Trial................................................17

IV.     CONCLUSION. .................................................................20

i

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

# TABLE OF AUTHORITIES

**Federal Cases**

*Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005) ................................................................. 4, 14

*Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ............................................................................ passim

*Marshall v. United States*, 360 U.S. 310 (1959) ............................................................................ 5

*Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991) ........................................................................... 18

*Patterson v. Colorado*, 205 U.S. 454, 462 (1907) ................................................................... 4, 14

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) ............................................................................. 5, 14

*Silverthorne v. United States*, 400 F.2d 627, 637-38 (9th Cir. 1968) ................................... 17, 18

*Swain v. Alabama*, 380 U.S. 202. 218-19 (1965) ....................................................................... 18

*United States v. Dischner*, 974 F.2d 1502, 1522 (9th Cir. 1992), overruled on other

   grounds in United States v. Morales, 108 F.3d 1031, 1035, fn. 1 (9th Cir. 1997) .................. 18

*United States v. Harris*, 542 F.2d 1283, 1295 (7th Cir. 1976) .................................................... 18

*United States v. Marcello*, 280 F. Supp. 510, 514 .......................................................................... 6

**Federal Statutes**

18 U.S.C. § 1001 ............................................................................................................................ 3

18 U.S.C. § 1519 ............................................................................................................................ 3

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

I.     **INTRODUCTION.**

By this Motion, Captain John J. Cota ("Captain Cota") requests that the Court transfer this case to the Eastern District of California in Fresno in order to protect Captain Cota's constitutional right to trial before a fair and impartial jury.  In the eight months since the container vessel M/V COSCO BUSAN ("COSCO BUSAN") accident, the San Francisco Bay Area has been subject to massive, continuous media coverage of this event in a manner that other communities simply have not, notwithstanding national coverage of the incident. There have been more than 800 articles about the spill and Captain Cota's connection to it between the date of the spill and July 2 – even before the government filed its second Superseding indictment on July 22.  In the *San Francisco Chronicle* alone, which no doubt is seen and read by virtually every potential juror, there were more than 200 articles. These articles were not buried on the back page.  In a sampling of just 63 *Chronicle* articles, there were 38 page-one articles with 39 negative references to Captain Cota in the first four weeks after the spill.    One could hardly walk by a newspaper machine without seeing one.  The passage of time has not ended this relentless onslaught.  Beginning in the fifth week after the spill and continuing through July of this year, the *Chronicle* ran 25 more page-one articles that had 265 negative references to Captain Cota.

The media blitz that has buried Captain Cota includes far more than the 200+ articles in the *Chronicle*.  Almost 600 additional articles appeared in other papers read by the potential jurors including the *San Francisco Examiner,* the *San Francisco Business Times,* the *San Jose Mercury News*, the *San Mateo County Times*, the *Oakland Tribune*, Associated Press (Regional and Local) and *Contra Costa Times*.  Nearly all of these articles directly reference Captain Cota by name, and the majority of them can fairly be described, even by the most casual layperson, as prejudicial to him.  What's worse, most contained inaccurate, incorrect and misleading information. This print media blitz is only the tip of the iceberg. The television, radio and internet coverage is immeasurable.

1

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

The overwhelming quantity of media covering the spill and Captain Cota is only a part of the story.  The substance of those articles convicted Captain Cota in any reader's mind.  Articles have called him "the spill captain," the "bay spill pilot," and the "pilot who ran the ship into the bridge" causing the "worst spill in 20 years."  Dozens of articles accused him incorrectly of misusing medications based on the apparent publication of information apparently leaked by government officials that is supposed to be protected from disclosure under federal law, being in up to a dozen other incidents as a pilot (also untrue), possibly being impaired due to alcohol use (untrue).  Barely a mention was made that he passed all drug and alcohol tests, that he had a 26 year career that was essentially error free, and that he safely piloted thousands of ships before this incident.

In many instances the flames of prejudice against Captain Cota that were reported in the media were given the aura of accuracy and authority based on media reports that claimed to be characterizing statements by government officials and agencies, or quoting from official transcripts.  Articles quoted officials as saying the accident was 'a direct result of Captain Cota's piloting."  Moreover, much of the prejudicial content is incorrect, misleading and may not even be admissible in trial.

This media blitz actually increased against Captain Cota. With the one year anniversary of the spill just ten days before trial, it has and will continue, as the media repeats its tradition of celebrating the one year anniversary of newsworthy events.  This prejudicial pretrial publicity is virtually unavoidable within this community and thus necessitates a change of venue.

While the massive prejudicial pretrial publicity that has convicted Captain Cota in the press is clear from even a casual review of the 800 articles attached to this Motion, a more methodical and scientific analysis of these materials by an expert confirms this.  Dr. Craig New, an expert in evaluating the impact of media on parties to litigation, particularly in criminal cases, conducted a methodical analysis of these reports, based on a sampling of just one paper – the *San Francisco Chronicle*.  He has concluded that this medium has saturated the community and rendered it reasonably likely that Captain Cota cannot get a fair trial.

2

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

We are mindful that such motions are not often granted, but submit that the extraordinary nature of the pervasive media coverage directed against Captain Cota has been so prejudicial that no amount of *voir dire* will ensure an unbiased, fair and impartial jury.

## II.   PROCEDURAL HISTORY.

On the morning of November 7, 2007, the COSCO BUSAN scraped the San Francisco Bay Bridge fendering system, damaging the ship's hull and bunker fuel tank, thereby resulting in the fuel tank in the vessel to spill oil into the San Francisco Bay.  During the incident, Captain John Cota was onboard the COSCO BUSAN as an advisory pilot. On March 17, 2008, the United States Attorney's office formally charged Captain Cota with one count of negligence under the Clean Water Act ("CWA") and one count of violating the Migratory Bird Treaty Act ("MBTA").  On April 22, 2008, the Grand Jury returned a Superseding Indictment realleging the two misdemeanor counts and adding two felony counts for making false statements.  On July 21, 2008, this Court severed the misdemeanor and felony counts, based on the fact that the matters relating to the false statement charges had nothing to do with the CWA or MBTA.  On July 22, 2008, the United States Attorney obtained a Second Superseding indictment, this time realleging all the charges previously filed against Captain Cota, and charging Fleet Management Limited which managed and operated the COSCO BUSAN, with one count of negligence under the CWA, one count of violating the MBTA, three counts of false statements under 18 U.S.C. § 1001, and three counts of obstruction of justice under 18 U.S.C. § 1519.

## III.   ARGUMENT.

### A.   Transfer is Necessary Where Prejudice is Presumed from the Fact that the Community Where the Trial is to be Held is Saturated with Prejudicial and Inflammatory Media Publicity.

The Sixth Amendment of the U.S. Constitution "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). It is fundamental to our system of law "that the conclusion to be reached in a case will be induced only by the evidence and argument in open court, and not by any outside influence,

3

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

whether of private talk or public print." *Patterson v. Colorado*, 205 U.S. 454, 462 (1907). Accordingly, Rule 21(a) of the Fed. R. Crim. P. provides that "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

In the Ninth Circuit, change of venue is proper where there exists either actual or presumed prejudice. *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005). Actual prejudice exists where "the jurors demonstrated actual partiality or hostility that could not be laid aside." *Id*. at 1211. Presumed prejudice exists when "the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Id*. Factors to be considered in determining presumed prejudice include: "(1) whether there was a 'barrage of inflammatory publicity immediately prior to trial, amounting to a huge…wave of public passion;' (2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial." *Id*.

In *Daniels*, the Ninth Circuit Court of Appeals reversed defendant's conviction for first-degree murder of two police officers, finding presumed prejudice among the jurors. Applying the factors described above, the court noted that the killings generated extensive media coverage immediately after the shootings and again before trial, including press accounts that identified defendant as the killer. *Id*. at 1211. Local newspapers printed letters calling for defendant's execution. Some news articles also reflected the prosecution's theory of the case (i.e. defendant's motive to escape justice for a prior crime). The court found media "saturation" based on the fact that eighty-seven percent of the jury pool recognized the case from the media coverage, and two-thirds of those empaneled recalled some aspect of the case from the press it received. *Id*. at 1211-12. In reaching its decision, the Court explained that "[t]he nature and extent of the pretrial publicity, paired with the fact that the majority of actual and potential jurors remembered the pretrial publicity warranted a change of venue." *Id*. at 1212.

4

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

The U.S. Supreme Court has also required transfer of criminal cases due to prejudicial publicity.  In *Sheppard v. Maxwell*, 384 U.S. 333 (1966), for example, a defendant charged with murdering his wife was the subject of extensive newspaper, radio and television publicity, including matters which were unfavorable to defendant but not presented during the trial, which was held in a suburb of Cleveland, Ohio.  *Id*. at 338-42.  The trial judge denied various requests by the defense for both a change of venue and specific interrogation of the jurors regarding their exposure to the publicity.  After defendant*'*s conviction, the Supreme Court reversed and ordered a new trial.  *Id*. at 357, 363.

The Court found that defendant did not receive a fair trial consistent with the due process clause of the Fourteenth Amendment.  *Id*. at 335.  The Court explained that "due process requires that the accused receive a trial by an impartial jury free from outside influences" and that "courts must take such steps by a regulation that will protect their processes from prejudicial outside interferences."  Specifically, "where there is a <u>reasonable likelihood</u> that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity."  *Id*. at 362-63 (emphasis added).  Finding that the trial court failed to protect defendant from the "inherently prejudicial publicity which saturated the community," the Court reversed defendant*'*s conviction.  *Id*. at 363.

*Marshall v. United States*, 360 U.S. 310 (1959), is also instructive.  In *Marshall*, the Supreme Court reversed defendant*'*s conviction for illegally selling prescription drugs based on the fact that some jurors were exposed during the trial to *two* newspaper articles which stated that defendant had prior felony convictions – evidence the Court had previously ruled was inadmissible.  After the trial judge questioned each juror individually in chambers and was assured by each that he/she would not be influenced by the articles, the judge allowed the case to proceed.  In reversing defendant*'*s conviction, the Supreme Court explained that "prejudice to the defendant is almost certain to be as great when…evidence reaches the jury through news accounts as when it is part of the prosecution*'*s evidence" and "may indeed be greater for it is then not tempered by protective procedures."  *Id*. at 312-13.

5

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

Finally, it is important to note that while in many cases the change in venue is made either after voir dire or during/after trial, Rule 21 transfers are not "solely curative" and are, in fact, most valuably used pretrial. *United States v. Marcello*, 280 F. Supp. 510, 514 (U.S. Dist. Ct. E.D. La.) (stating that "the rule evokes foresight, always a more precious gift than hindsight" and that "it is the well-grounded fear that the defendant will not receive a fair and impartial trial which warrants the application of the rule"). In *Marcello*, the defendant had been subject to scant prejudicial publicity with respect to the indictment at issue, but substantial bad press previously as the alleged leader of a mafia crime ring. In affirming a venue transfer, the court explained that "when the pretrial publicity is great, the court may disregard prospective jurors' assurances of impartiality." *Id.* at 514, citing *Irvin v. Dowd*, 366 U.S. 717, 727-28 (1961). The court found that "[i]t is therefore quite proper, if not indeed required in some instances, to make the determination [to transfer], as we have done, solely on the basis of the pretrial publicity which has undoubtedly, as here, created a dominant sentiment of prejudice in the community." *Id.* at 515.

   **B.    Captain Cota Cannot Receive a Fair and  Impartial Trial in the San Francisco Bay Area Due to Extensive Prejudicial and Inflammatory Media Coverage.**

Applying these cases here, it is apparent that there is far more than merely a "reasonable likelihood" that prejudicial pretrial publicity will prevent Captain Cota from receiving a fair trial in this district. The San Francisco community where this trial is scheduled to be held has been saturated with prejudicial and inflammatory media publicity about the crime. This has continued through this summer and will continue as the one-year anniversary of the spill occurs just days before trial. This prejudice is demonstrated by the expert analysis of articles appearing in the *Chronicle*, and is further confirmed by even the most cursory review of many other media outlets servicing this community.

6

1. **Expert Analysis Demonstrates that the Extensive Inflammatory Local Media Coverage of the COSCO BUSAN Incident and Captain Cota by the *San Francisco Chronicle* is Preemptively Prejudicial to Captain Cota.**

Dr. Craig New, who is a qualified expert and has extensively analyzed, researched, and written on the impact of pretrial publicity on criminal defendants, has examined publicity in this case.[1]   As set forth in his declaration, the pretrial publicity surrounding this case has been both pervasive and extremely prejudicial to Captain Cota.  *Id.* at ¶ 13.  As is discussed further below, the spill generated between 207 and 228[2] articles in only eight months in the *San Francisco Chronicle* alone.  *Id.* These articles described the spill as the "biggest oil spill there in over 20 years and depicted Captain Cota as, among other things, the "spill pilot." *Id.*  The spill and the resulting damage have been described in the *Chronicle* in extensive and emotional detail.  *Id.* at ¶ 14.  The result of this level and type of negative publicity is highly likely to create a strong community desire to hold someone accountable for the damage.  *Id.*  Moreover, the appearance and concentration of prejudicial material with respect to Captain Cota has increased since the spill, particularly since March 2008, and has painted a picture of him as being responsible for the spill, as having a drinking problem and abusing medications, and having a history of poor performance as a pilot.  *Id.* at ¶ 15.  This information will only serve to reinvigorate the community desire for accountability and focus it on Captain Cota.  In the opinion of Dr. New, this has created a climate of prejudice within the venue in which it will be exceedingly difficult

---

[1] Dr. New is well qualified to apply content analysis in the context of a change of venue motion. His academic training is in the application of social psychological principles to legal issues. *Id.* at ¶ 2. It included formal training in content analysis. Declaration of Dr. Craig New, at ¶ 4 (hereafter "New Decl."). He has previously been involved in 31 cases relating to change of venue in a variety of states and has been retained as the primary venue expert in 19 cases. *Id.* at ¶ 7. He has been qualified in a number of courts as an expert in pretrial publicity and its effect on juror bias and juror judgment. *Id.* at ¶ 8

[2] As explained in his declaration, Dr. New examined the articles in the *Chronicle* using an on-line search methodology. The *San Francisco Chronicle* is published in print and on-line versions. Of the 228 on-line articles found, 207 were designated as having appeared in the print edition. It is possible that designation was omitted from the remainder.

7

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

1    to seat fair and impartial jurors or enter the trial with the presumption of innocence intact.[3]  *Id.* at

2    ¶¶ 15, 59-61.

3         In reaching his opinion, Dr. New analyzed the effect of the *Chronicle's* pervasive and

4    prejudicial pretrial publicity on Captain Cota's ability to seat fair and impartial jurors using the

5    well-accepted content analysis methodology.  Content analysis is a systematic procedure for

6    summarizing the content of pictorial or verbal material.  *Id.* at ¶ 16.   It is one of the most

7    effective and commonly used tools for analyzing the content of pretrial publicity as it relates to

8    venue issues. *Id.*   Trial courts have long accepted it for this purpose. *Id.*

9         When using content analysis, a researcher first develops a set of themes to be coded and

10   then examines items, for example, newspaper articles, to determine which of the themes are

11   present. *Id.* at ¶ 17.  In this case, Dr. New performed a content analysis of a representative

12   sample of 63 of the 228 articles that appeared in the *Chronicle* from November 8, 2007 to July 2,

13   2008.[4]  The selected sample consisted of each case-relevant news article appearing on page 1 of

14   any section of the *Chronicle*.  *Id.* at ¶ 23.  Dr. New selected page-one articles because they are

15   the most prominently placed and most likely to be read and reflect the editor's assessment of

16   public interest.  *Id.*   This coded sample included only news articles and did not include letters to

17   the editor, columns or similar articles even though they are highly indicative of community

18   views, but did not appear on page one. *Id.*  The selected articles were then evaluated for the

19   extent of coverage (i.e., a quantitative analysis) and the nature of that coverage (i.e., a qualitative

20   analysis).

21        The results of the sample demonstrate that the volume of media articles prejudicial to

22   Captain Cota is significant and pervasive.  They further indicate that the pretrial publicity

23   regarding the spill and, in particular, Captain Cota, can be viewed as coming in two phases.

24

25   [3] Extensive research confirms that exposure to negative pretrial publicity is associated with juror
     bias in a criminal case. New Decl. ¶ 9.
26   [4] The *Chronicle* was selected as the appropriate media outlet for the content analysis based on
     the breadth of its circulation along the likely residence of the jury pool. *Id.* at ¶ 18,  fn. 2.
27   In addition, the media coverage of this incident was so pervasive that there was insufficient time
     to cover all media sources. *Id.*
28

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR
SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

Articles in the first phase, which includes weeks 1-4 after the spill (November 8 to December 7, 2007), discuss the spill itself, Captain Cota, the cleanup and community reaction, among other topics. During this phase, in 38 page-one articles, there were 39 instances of prejudicial content relating to Captain Cota. For example, Dr. New noted that one page-one article in the *Chronicle* on November 7, 2007, says

> Capt. John Cota, who was in charge of navigating the COSCO BUSAN when it hit the bridge, has been involved in a number of ship-handling incidents and was reprimanded last year for errors in judgment when he ran a ship aground near Antioch.

*See* New Decl. ¶ 26 and Attachment B. # 5.

In Phase 2, covering the period from mid-December 2007 through July 2, 2008, there was a remarkable increase in the focus on Captain Cota. During this phase, in just 25 page-one articles, there were **at least** 265 instances of prejudicial content relating to him.[5]

Again, Dr. New noted the following examples. In an article dated January 19, 2008, the *Chronicle* reported:

> Federal authorities are investigating reports that Capt. John Cota, pilot of the container ship Cosco Busan, was suffering from a sleep disorder and was taking medication that may have affected his judgment.

New Decl. ¶ 26, and Attachment B. # 191. In an article dated April 9, 2008:

> Immediately after he guided the container ship Cosco Busan into one of the support towers of the bay bridge, Capt. John Cota, the ship's pilot, apologized to the skipper of the big ship. 'Sorry, Captain,' Cota is quoted in the transcript of the doomed voyage last fall... 'I misunderstood the chart. I thought that was the center.

*Id.* Attachment B. # 217.

---

[5] Content related to the spill and subsequent litigation has been a consistent presence in the *Chronicle* since November of 2007. There were 71 media articles in the fist week alone and an average of 40 media articles per week during the initial phase of publicity. Clearly, even the most casual newspaper reader would have been exposed to multiple instances of prejudicial content during this time frame. Although the volume of articles decreased after mid-December, to 2.3 articles per week, the spill's effects and developments associated with Captain Cota continued to generate press. *Id.* at ¶ 28 and Figure 3.

9

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

1    Thus, while the initial burst of publicity was substantial and prejudicial in several ways,

2    the articles most prejudicial to Captain Cota have occurred since March 2008 and are likely to

3    continue as trial approaches.[6] *Id.* at ¶ 31.

4    The location of an article in the newspaper is another important aspect of the quantitative

5    analysis aspect of content analysis.  Location is an important structural feature because it relates

6    to the impact the article will have on readers and to the editor's judgment of the level of public

7    interest. *Id*. at ¶ 32.  Most of the coverage in this case has been prominently placed.  In the 228

8    *Chronicle* articles that discuss the spill there were 39 articles that appeared on page A1 and 34

9    that appeared on the page B1.  In all, 36% of the 228 articles appeared on page one of one of the

10   newspaper sections. *Id.*

11          **2.    The Substance of the Massive Coverage Was Almost Uniformly**
               **Prejudicial to Captain Cota.**
12

13   Not only is the volume of pervasive and prejudicial articles relating to Captain Cota

14   significant, the nature of that coverage has convicted Captain Cota, regardless of the facts.

15   In the 63 article sample the allision itself was described or referenced in some way 133 times,

16   using language such as "crashing," "smashing," "slamming," or "ramming" into the  bridge or

17   the bridge tower.  *Id.* at ¶ 34 and Attachment B.  Captain Cota was said to have "hit the bridge,"

18   "run into the bridge," "scraped the bridge," "sideswiped the bridge," or "clipped the bridge." *Id.*

19   The resulting spill was also frequently mentioned - 220 instances - and was described as a

20   "major oil spill," and the "worst oil spill…since 1996." *Id*., Attachment B, # 4, 5.  The oil itself

21   was depicted as foul and dangerous, for example: "deadly black goo," "tarry, gooey black mess,"

22   or "toxic bunker fuel oil."  *Id.* Attachment B. # 73, 5.  Such prominent, frequent, and dramatic

23   depictions of the accident and the spill along with the firsthand observations of many area

24   citizens have saturated the venue, making it highly probable that potential jurors were exposed to

25   prejudicial information about this case.  *Id.* at ¶ 36.

26

27   [6] Moreover, as is discussed below, most of the recent articles have been filled with details
     concerning Captain Cota's actions, his alleged responsibility for the accident and spill and the
28   legal claims filed against him.  *Id.* at ¶ 31.

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR
SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

1    Following the initial coverage that depicted the scope and nature of the spill, the

2    subsequent articles have focused more on the cause of the spill and who was or should be

3    responsible for it.  *Id.* at ¶ 37.  Captain Cota has been the unrelenting focus of these reports. He is

4    mentioned by name in connection with the spill 227 times and 131 of these mentions have

5    occurred since March 18.  No other single individual was mentioned so prominently and

6    repeatedly.  This consistent and repeated association is prejudicial because it blames him for the

7    accident by using words that imply responsibility such as "bay spill pilot," "oil spill pilot," or the

8    "pilot who ran into the bridge." *Id*. at ¶ 38.  In the 63 articles examined for the content analysis

9    there were 97 instances in which responsibility for the accident and the spill was specifically

10   placed on Captain Cota.  *Id.* at ¶ 39.  The first attribution of blame occurred on December 7,

11   2007 in page A1, and was filled with prejudicial material.  *Id.* at ¶ 39.  It reported that a

12   "thorough investigation" by the state Board of Pilot Commissions had "minced no words" and

13   said that the "accident was 'a direct result of Captain's Cota's piloting'."  *Id.,* Attachment C, #

14   159.  The article goes on to discuss the charges against Captain Cota and to detail his alleged

15   mistakes that led to the accident.

16   The focus on Captain Cota intensified beginning on March 18, 2008, *id.* at ¶ 41, with an

17   article that describes him as the pilot who was navigating the ship when it "crashed into the Bay

18   Bridge in November, spilling more than 50,000 gallons of fuel into the bay and killing thousands

19   of birds…" *Id*.  The articles continues with a description of the federal charges brought against

20   Captain Cota and a list of a series of actions that allegedly indicate his negligence, for example,

21   sailing in the fog, failing to proceed at a safe speed and not reviewing the proposed course with

22   the ship's Captain and officers. *Id*.

23   In fact, the March 18 article was the first of 19 articles related to the accident from that

24   point to July 2.  Ten of these articles dealt squarely with the issue of Captain Cota's

25   responsibility for the accident, his history of ship handling incidents, and/or the litigation against

26   him.  *Id*. at ¶ 42.  These ten articles were prominently placed with four running on page A1 and

27   five on page B1. The content of these articles was shockingly inflammatory.  In one (Attachment

28

11

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

B to the New Decl., #210, the headline is, "**Cosco Busan Pilot Charged with Pair of Crimes.**" In that article it says,

> The state pilot commission investigation last year concluded Cota made a number of errors and that 'pilot error was the cause of the crash.'

In another the headline reads, "**Cosco Busan Pilot Convicted of DUI in 1999.**" In that article it says,

> The pilot of the container ship that sideswiped the Bay Bridge and spilled 53,000 gallons of fuel oil into the bay, was convicted of drunken driving in 1999 and was taking medications for depression, anxiety, and sleep apnea, that could have impaired his ability to steer the ship federal officials said Wednesday.

New Decl, Attachment B, Article # 218.

Dr. New observed that one of the most prejudicial articles appeared on April 12, 2008. It reported on the voice recording device on the ship which the article claimed proved several of the charges against Captain Cota. It also incorrectly cast doubt on Captain Cota's contention that the crew's English language skills were insufficient. Finally, it misleadingly attributed certain statements to Captain Cota which were tantamount to reporting a confession in the press [7] and would make it "exceedingly difficult for a juror with this information to begin the trial free from bias or without preformed opinions." *Id*.

The articles included in Dr. New's analysis included other types of prejudicial content in addition to that attributing responsibility to Captain Cota. Twenty-six instances in six articles discussed Captain Cota's alleged piloting problems in the past. *Id*. at ¶ 45. Massive and unfounded speculation regarding the role of drug and/or alcohol use by Captain Cota appeared almost immediately after the incident. *Id.* at ¶ 46. While there were a handful of reports acknowledging that Captain Cota had tested negative for drugs and alcohol, the vast majority still focused on alleged prescription medications and how they might affect his ability to pilot a ship. *Id*. at ¶ 47. They incorrectly reported medications and medical conditions, and were in part

---

[7] The quoted statements were allegedly said by Captain Cota just after contacting the Bridge tower and include the statement: "Yeah, that's the bridge pier (expletive). I thought it was the center. Oh (expletive.)" *Id*. at ¶ 43

12

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

1   based on information that, if accurate is supposed to be protected by federal law, but was

2   improperly leaked.

3        Finally, there has been a parade of articles regarding the legal actions against and

4   possible consequence for Captain Cota.  *Id*. at ¶¶ 48-49. Mentions of legal actions, potential or

5   actual, occurred at least 84 times in 20.6% of the coded articles.  Consequences faced by him

6   appeared 29 times in 14.3 % of the articles.  In addition, Captain Cota's decisions to invoke his

7   Fifth Amendment rights and to refuse to testify before the Pilot's Commission have appeared

8   four times in three recent articles.  *Id.* at ¶ 51.  According to Dr. New, these factors are likely to

9   contribute to the development of a juror's belief that Captain Cota has done something wrong

10  and to reinforce a juror's opinion regarding Captain Cota's guilt. *Id.* at ¶¶ 50-52.

11       According to Dr. New three other areas of prejudicial content are likely to impact

12  significantly the attitudes of those in the likely jury pool when combined with the foregoing

13  prejudicial and negative reporting.  First, the environmental impact of the spill, the cleanup

14  efforts and the future environmental damage have been significant themes in the media coverage,

15  appearing in 54 of the 63 articles in the sample (82.5%).  *Id.* at ¶¶ 52-55.  This extensive damage

16  from the spill and the various aspects of life affected by it creates a situation in which the jurors

17  will have a larger stake in the outcome of the trial because the event is seen as a crime against the

18  community.[8]  *Id.* at ¶ 56.  They are likely to want to hold someone responsible.  Second, the

19  press had reported extensively on the community volunteer response to the spill.  Reports of this

20  appeared in 28.6 % of page-one articles.  A negative attitude developed through personal

21  experience is, typically, stronger and more difficult to overcome.  *Id.* at ¶ 57.  Finally, the

22  governmental response to the spill, including the number of hearings and investigations held,

23  and the stated desire to place blame for the spill  emphasize the importance of the issue to the

24  area and is likely to create a desire to hold Captain Cota responsible. *Id.* at ¶ 58. The imprimatur

25

26

27  _____
    [8]  Such a situation is therefore different from the typical criminal case which involves a crime
28  against a single victim and less personal juror identification. *Id*. at ¶ 56.

13

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR
SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

of government officials' comments regarding Captain Cota only serves to reinforce and legitimize the media's negative portrayal of Captain Cota.

Dr. New's content analysis establishes that, in this venue, Captain Cota cannot receive the "fair trial by a panel of impartial," "indifferent jurors" required by the Sixth Amendment. *Irvin*, *supra* at 722. The results of the analysis compel the conclusion that prejudice from pretrial publicity must be presumed. The evidence clearly demonstrates that the venue has been saturated with news articles that are prejudicial and inflammatory regarding Captain's Cota's responsibility for the accident. *Daniel*, *supra* at 1181.

Moreover, much of the prejudicial content is incorrect, misleading and may not even be admissible in trial. There is no truth to the stories that Captain Cota was on the medications reported. There is no truth to the stories that he was investigated 12 times. There is no truth to the stories that he navigated the vessel through the Bay. He did not. He neither had the authority nor the permission of the Master to do so. There is no truth that other vessels did not get underway because of the weather conditions. The navigation information upon which the many stories prejudicing Captain Cota are based is incorrect, faulty, and according to the government was falsified by members of the crew. Dozens of passenger laden ferries operated at speeds far faster than the COSCO BUSAN.

Based on the foregoing, there is a very reasonable likelihood that the prejudicial news regarding Captain Cota which has appeared and will continue to appear will prevent a fair trial and a change of venue is warranted. *Sheppard*, *supra* at 362-63. Otherwise Captain Cota will not be guaranteed that the verdict in his case was induced only by the evidence in court and was not the result of the outside influence of "public print." *Patterson*, *supra* at 462.

**3**.    **Even a Casual Review of the  Inflammatory and Prejudicial Reporting of Captain Cota in Other Media Seen, Read and Heard in This Community Easily Demonstrates Presumptive Prejudice Requiring a Change of Venue**.

The scientific analysis of the *San Francisco Chronicle* demonstrates, standing alone, the presumptive prejudice sufficient to compel changing venue. But even a cursory review of the

14

almost 600 other articles appearing in print media between November 7, 2007 to July 2, 2008 demonstrates substantial prejudice and negative reporting regarding Captain Cota. These articles appeared in, among other outlets, the *San Francisco Examiner,* the *San Francisco Business Times,* the *San Jose Mercury News*, the *San Mateo County Times*, the *Oakland Tribune*, Associated Press (Regional and Local) and *Contra Costa Times*. *See* New Decl. and Appendix D. And even this cursory review does not include television, radio and internet reports that have saturated the community.

Nearly all of these articles directly reference Captain Cota by name, and the majority of them can fairly be described, even by the most casual layperson, as negative. They suggest the same negative themes that Dr. New identified on the dozens of page-one articles from the *Chronicle.* Just like the *Chronicle*, the onslaught against Captain Cota started as soon as the spill occurred, and became even more focused and pronounced beginning in late March and continuing until July, when this canvassing of articles ended. The following is a brief description of a small sampling of the articles:

(1) Articles focused on and contained massive and incorrect statements about Captain Cota's use of medications, medical conditions, alleged alcoholism and repeatedly incorrectly implicitly or explicitly connecting them to the cause of the spill while almost uniformly failing to note the one uncontested fact that Captain Cota passed every drug and alcohol test he was given including false, incorrect and misleading reports that in one sentence talked about the spill and in the next said things like (i) Captain Cota "was taking a combination of medications that should have barred him from having his license renewed," (ii) he was "treated for alcoholism and depression in 1999 and had a DUI conviction," (iii) "Cota had a drunken driving conviction and a history of alcohol abuse and took numerous prescription drugs that could have impaired his judgment," (iv) "Cota suffers from sleep apnea, a breathing condition that can disrupt sleep all night long and leave sufferers severely fatigued during the day" (v) Cota was taking Provigil "to ward off drowsiness," (vi) investigators have been probing whether Cota's sleep disorder or medication he took for it contributed to the accident (despite the fact that such connection is not

15

alleged in the indictment); and (vii) reports Cota was taking prescriptions for glaucoma.

Attachment D # 403, 701, 703, 704, 721, 722, 723, 725, 741, 768, 769, 772, 774, 775, 776, 777,

778, 780, 781, 782, 785, 788, 789, 790, 791, 792, 793, 794, 795, 797, 800, 801, 803, 804, 807,

808, 811, 816, 817, 818, 819, 820, 821, 824, 825, 828, 833, 849, 869, 870, 872. [9]

(2)   Articles incorrectly saying that Captain Cota was responsible for steering the vessel

through the Bay, and was somehow exclusively responsible for the vessel's movements, which

he indisputably was not, and suggestions that he should be responsible because of how much he

earns.  Examples include headlines and articles saying: (i) "With Ship Pilot's Clout, Pay Comes

Great Responsibility"; (ii) crews of large vessels depend on one person – Bar pilots;  (iii)  Bar

pilots take daily responsibility for huge cargoes costing billions of dollars; (iv)  thousands of

passengers and the welfare of the people, structures and ecosystem along the way; (v)  the that

average Bar Pilot's income was $491,892; (vi) Cota stands to make a "substantial pension" upon

his retirement;  (vii) "much of [investigators's] attention will undoubtedly be focused on [the]

pilot, 59-year-old John J. Cota of Petaluma"; and  (viii)  the NTSB's investigation is focusing on

"the *key role* of Cota" (emphasis added).  Attachment D # 359, 575, 617, 618, 629, 633, 800,

803, 804, 844, 845.

(3)  Incorrect and false reports that Captain Cota acknowledged that the spill was his

fault. … "Cota apologized to the captain for misreading electronic instruments…underplayed

damage…a *distraught* harbor pilot told the captain 'Sorry, I misunderstood the chart.  I thought

that was the center,' and at the same time faced 'felony counts for making false statements'."

Attachment D # 436, 475, 800, 803, 852.

(4) False, incorrect and misleading reports that Captain Cota had "struggled to navigate

the vessel," (he did not), "had a history of poor performance,…"(he did not), "had been the

subject of 12 probes…" (he was not), "had reportable incidents on his record….", "had  a pattern

---

[9] As the Status Report submitted on August 14, 2008, by Fleet Management, Ltd. indicates, there will be an unrelenting effort by it to make this the center of its defense.  If Captain Cota is exposed to this, the need for a jury uninfected by these massive press reports is all the more important.

1   of performance degradation" as a Bar pilot (he did not), was "enraged and irrational," that

2   Captain Cota was "struggling" (he was not) and later that "Cota and the Chinese captain

3   squabbled" Attachment D # 303, 318, 554, 555, 561, 562, 774, 776, 780, 787, 790, 791, 792,

4   793, 794, 795, 797, 803, 813, 814, 815, 816, 819, 828, 850.  Not a single report mentioned his

5   99.9% perfect record.  In every case the aura of accuracy of these statements was enhanced

6   because the reports tied these statements to those of officials.

7        In sum, there can be no doubt that the pretrial prejudicial publicity in this case constitutes

8   presumptive prejudice against Captain Cota.  Accordingly, Captain Cota's trial should be

9   transferred from this venue.

10      **C.    Alternatively, the Court Should Take Specific Measures to Protect
        Captain Cota's Right to a Fair and Impartial Jury Trial.**

11

12       We respectfully submit that no amount *voir dire* or other mitigation measures can

13  assure Captain Cota of a fair trial due to the massive pretrial prejudicial publicity.  Should the

14  Court decline to transfer this case to a different venue, Captain Cota requests that the Court take

15  specific measures in an effort to protect his right to a fair and impartial jury trial.  As explained

16  by the Ninth Circuit Court of Appeals, "when pretrial publicity is great, the trial judge must

17  exercise correspondingly great care in all aspects of the case relating to publicity which might

18  tend to defeat or impair the rights of an accused."  *Silverthorne v. United States*, 400 F.2d 627,

19  637-38 (9th Cir. 1968).

20       As a threshold matter, this case should not be scheduled for trial just a week after

21  the one-year anniversary of the COSCO BUSAN incident.  It has become commonplace for the

22  news media to "celebrate" high profile and negative incidents on the first anniversary of their

23  occurrence.  Hurricane Katrina spawned one-year retrospectives.  *See, e.g.,* Editorial, *Katrina,*

24  *One Year Later: There's Still No Substitute for Competence*, Wash. Post., Tuesday, August 29,

25  2006, at A14.  Particularly where environmental damage occurs, attention is paid to whether the

26  alleged damage has been cured and the victims of it made whole.  *See, e.g.,* Ralph Blumenthal,

27  *Many From Love Canal Remain Unsettled*, N.Y. Times, February 14, 1981, at B26 (chronicling

28

17

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR
SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

1    difficulties facing victims of toxic waste site in upstate New York State).  Captain Cota therefore

2    requests that the trial date be continued for at least a month from its currently scheduled date of

3    November 17, 2008.

4                    In addition, the Court should implement jury selection procedures which address

5    the extensive, prejudicial media coverage of this matter.  It is critical in high-profile cases that

6    "the judge must insure that the *voir dire* examination of the jurors affords a fair determination

7    that no prejudice has been fostered" and determine whether "the nature and strength of the

8    opinion formed [if any] are such as in law necessarily…raise the presumption of partiality."

9    *Silverthorne*, 400 F.2d at 638.

10                    At a minimum, the *voir dire* process must be reasonably sufficient to test for bias

11    or partiality.  *United States v. Dischner*, 974 F.2d 1502, 1522 (9th Cir. 1992), overruled on other

12    grounds in *United States v. Morales*, 108 F.3d 1031, 1035, fn. 1 (9th Cir. 1997).  Indeed, *voir*

13    *dire* "serves the dual purpose of enabling the court to select an impartial jury and assisting

14    counsel in exercising peremptory challenges" (which the Supreme Court has recognized as "one

15    of the most important rights secured to the accused").  See *Mu'Min v. Virginia*, 500 U.S. 415,

16    431 (1991); *Swain v. Alabama*, 380 U.S. 202. 218-19 (1965).

17                    Furthermore, in cases, as here, involving the risk of prejudice from pretrial

18    publicity, it is proper to conduct individualized *voir dire* of potential jurors outside the presence

19    of other potential jurors.  *Silverthorne v. United States*, 400 F.2d at 640; *United States v. Harris*,

20    542 F.2d 1283, 1295 (7th Cir. 1976).  Also, in such cases, the *voir dire* must include inquiry into

21    the specific information each juror had obtained relative to the case and their source of

22    knowledge. *Silverthorne v. United States*, 400 F.2d at 640.

23                    In accordance with these requirements, Captain Cota requests that the following

24    jury selection procedures be followed in this case:

25                    (1)    Juror Questionnaire:  A juror questionnaire will streamline the selection

26    process and allow for jurors to candidly address the inquiries of the Court and counsel in advance

27    of *voir dire*, without the risk of prejudicing the other venire members.  While it is not a substitute

28                                                            18

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR**
**SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

for *voir dire*, a juror questionnaire is an effective and efficient mechanism for preliminary screening of jurors.

(2)    <u>Individualized, Sequestered *Voir Dire*</u>:  As set forth above, sequestered *voir dire* of individual venire members is appropriate in this case.  It will enable jurors to privately discuss their exposure to prejudicial pretrial publicity without defeating the very purpose of jury selection by infecting other potential jurors with prejudicial information to which they have been exposed.  In a case involving issues as volatile as those presented here, sequestered *voir dire* must be utilized.

(3)    <u>Counsel *Voir Dire*</u>:  Due to the complexity of the issues in this case as well as the massive amount of pretrial publicity, a reasonable period of counsel *voir dire* is appropriate.  Counsel *voir dire* will allow for exploration of subtle areas of bias which may be rooted in factual intricacies or the individualized circumstances of the parties.  Further, given the importance of peremptory challenges in a case of this nature, the parties should be allowed to inform the use of such challenges through counsel *voir dire*, in a manner specific to that party's cause.

(4)    <u>Additional Peremptory Challenges</u>:  The Court has authority to provide defendants with additional peremptory challenges.  Fed. R. Crim. P. 24(b).  The Court should do so here given the overwhelming pretrial publicity in this case and the importance and difficulty of ascertaining which jurors harbor prejudice as a result of such publicity.

//

//

//

//

//

//

//

//

19

IV.    **CONCLUSION**.

For the foregoing reasons, Captain Cota respectfully requests that this Court grant his motion to transfer venue. Should this Court decline to do so, Captain Cota reserves the right to seek a continuance and to seek additional jury selection procedures to give Captain Cota a chance to receive a fair trial.

Respectfully submitted,

K&L GATES LLP

Dated:  August 18, 2008            By:  /s/ Jeffrey L. Bornstein
                                        Jeffrey L. Bornstein, Esq.
                                        Luke G. Anderson, Esq.
                                        Barry M. Hartman, Esq., *Admitted Pro Hac Vice*
                                        Christopher R. Tate, Esq., *Admitted Pro Hac Vice*

                                        Attorneys for Defendant
                                        JOHN J. COTA

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

**PROOF OF SERVICE**

I am employed in the County of San Francisco, State of California by a member of the Bar of this Court, at whose direction this service was made. I am over the age of 18 and not a party to the within action. My business address is 55 Second Street, Suite 1700, San Francisco, CA 94105. On August 18, 2008, I served the document(s) described as:

**Defendant John Cota's Memorandum of Points and Authorities in Support of Motion to Change Venue or, Alternatively, for Special Jury Selection Procedures**

on the parties to this action named on the attached service list by the method described below.

(BY PERSONAL SERVICE) I caused a true and correct copy of said document(s) to be served by hand to the addressee(s) listed below, with the name and address of the person served shown on the envelope.

(BY OVERNIGHT DELIVERY) I enclosed a true and correct copy of said document(s) in an envelope/package provided by an overnight delivery carrier addressed to the addressee(s) listed below, sealed it, and placed it for collection and overnight delivery following the ordinary business practices of K&L Gates LLP. I am readily familiar with the firm's practice of collecting and processing correspondence for overnight delivery. On the same day that correspondence is placed for collection and overnight delivery, it is collected by an overnight delivery carrier. Delivery fees are pre-paid or provided for in accordance with the ordinary business practices of K&L Gates LLP.

**X** (BY ELECTRONIC TRANSMISSION) I transmitted a true and correct copy of said document(s) by electronic mail to the offices of the addressee(s). I did not receive, within a reasonable time after the transmission, any message or other indication that the transmission was unsuccessful.

(BY FACSIMILE) I transmitted a true and correct copy of said document(s) by facsimile to the offices of the addressee(s). Upon completion of the facsimile transmission, a transmission report was issued showing the transmission was complete and without error.

(BY U.S. MAIL) I enclosed a true and correct copy of said document(s) in an envelope addressed to the addressee(s) listed below and placed it for collection and mailing following the ordinary business practices of K&L Gates LLP. I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the U.S. Postal Service with postage fully prepaid at San Francisco, California.

Executed on August 18, 2008 at San Francisco, California.

I declare under penalty of perjury that the foregoing is true and correct.

_____/s/ Mae A. Chu_____
Mae A. Chu

21

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**

**SERVICE LIST**

| | |
|---|---|
| **Stacey Geis, Esq.**<br>**Jonathan Schmidt, Esq.**<br>Assistant United States Attorneys<br>U.S. Attorney's Office<br>450 Golden Gate, 11th Floor<br>San Francisco, CA 94102<br><br>Fax: (415) 436-7234 | **Richard Udell**<br>US Department of Justice, Environment<br>Crimes Section<br>PO Box 23985<br>Washington, DC 20026<br><br>Fax: (202) 305-0396 |

22

**DEFENDANT JOHN J. COTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE OR, ALTERNATIVELY, FOR SPECIAL JURY SELECTION PROCEDURES—CR 08-0160 SI**